KENNETH M. SORENSON
Acting United States Attorney
District of Hawaii

MARGARET C. NAMMAR #9045
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  Margaret.Nammar@usdoj.gov

Attorneys for Plaintiff-Respondent
UNITED STATES OF AMERICA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| COURTNEY GENE JETER,<br><br>  Defendant-Petitioner,<br><br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>  Respondent. | ) Case No. CR21-00126-JMS-01<br>) Case No. CV25-00208-JMS-RT<br>)<br>) UNITED STATES OF AMERICA'S<br>) ANSWER TO MOTION UNDER 28<br>) U.S.C. § 2255 (ECF NOS. 166 & 166-1);<br>) DECLARATION OF MYLES S.<br>) BREINER; DECLARATION OF GARY<br>) G. SINGH; EXHIBITS "1-8";<br>) CERTIFICATE OF SERVICE<br>)<br>)<br>)<br>)<br>) |

UNITED STATES OF AMERICA'S
ANSWER TO MOTION UNDER 28 U.S.C. § 2255

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...................................................................................i

I.      RELEVANT BACKGROUND .....................................................................1

II.     PETITIONER'S ARGUMENTS...................................................................17

III.    LEGAL ARGUMENT ..................................................................................20

        A.      Counsel's Performance Did Not Prejudice Petitioner........................21

        B.      Counsel's Performance Was Not Deficient. ......................................35

IV.     CONCLUSION.............................................................................................37

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                 <u>Page(s)</u>

*Baumann v. United States*, 692 F.2d 565 (9th Cir. 1982) ...................................... 21

*Blackledge v. Allison*, 431 U.S. 63 (1977) ............................................................. 21

*Delgado v. Lewis*, 223 F.3d 976 (9th Cir. 2000) .................................................... 35

*Griffith v. Kentucky*, 479 U.S. 314 (1987) ............................................................. 16

*Hill v. Lockhart*, 474 U.S. 52 (1985) ..................................................................... 35

*Shah v. United States*, 878 F.2d 1156 (9th Cir. 1989) ........................................... 21

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................... 20, 21, 36

*Turk v. White*, 116 F.3d 1264 (9th Cir. 1997) ........................................................ 21

*United States v. Day*, 285 F.3d 1167 (9th Cir. 2002) ............................................ 20

*United States v. Jacobo Castillo*, 496 F.3d 947(9th Cir. 2007) (en banc).............. 34

*United States v. Schaflander*, 743 F.2d 714 (9th Cir. 1984) ........................... 21, 35

*United States v. Schwartz*, 274 F.3d 1220 (9th Cir. 2001) .................................... 16

*United States v. Torres*, 828 F.3d 1113 (9th Cir. 2016) ........................................ 34

<u>Statutes</u>

21 U.S.C. §§ 841, 846 .............................................................................................. 1

28 U.S.C. § 2255 ..........................................................................................*passim*

UNITED STATES OF AMERICA'S
<u>ANSWER TO MOTION UNDER 28 U.S.C. § 2255</u>

The United States of America hereby responds to the allegations in the

petition of Courtney Gene Jeter (hereinafter "Jeter" or "Petitioner") in support of

his motion to vacate, set aside, or correct his sentence pursuant to Title 28, United

States Code, Section 2255 (ECF Nos. 166 and 166-1).[1]  For the reasons set forth

below, Petitioner's § 2255 motion should be denied without a hearing because his

allegations are without merit and he is not entitled to relief.

## I.    <u>RELEVANT BACKGROUND</u>

On September 29, 2021, a Criminal Complaint was issued charging Jeter

with one count of distribution of methamphetamine, in violation of Title 21, United

States Code, Sections 841(a)(1) and 841(b)(1)(A).  ECF No. 1.  Jeter was arrested

on September 30, 2021.  *Id.*  On October 7, 2021, a federal grand jury returned a

10-count indictment charging Jeter and two others for their participation in a drug

trafficking conspiracy involving the distribution and possession with intent to

distribute methamphetamine, fentanyl, heroin, and cocaine, in violation of Title 21,

United States Code, Sections 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), and 846.  ECF

No. 10.  Jeter was also charged with substantive drug trafficking and firearm

offenses and money laundering.  *Id.*  Specifically, Jeter was charged in Counts 1-5

---

[1] All ECF references are to filings in Case No. CR21-00126-JMS-01.

and 8-10 of the Indictment.  *Id.*

Jeter retained private counsel William A. Harrison to represent him.  Mr. Harrison represented Jeter at his arraignment and plea to the Indictment on October 12, 2021, up until approximately February 14, 2022, following the court's finding that "a serious potential for conflict" existed and consequent disqualification of Mr. Harrison from representing Jeter in the case.  *See* ECF Nos. 25, 52, 53, 55.  Thereafter, Jeter retained Myles S. Breiner as counsel.  *See* ECF No. 57.  Mr. Breiner represented Jeter up until approximately January 20, 2023, when Mr. Breiner's motion to withdraw based on a conflict of interest was granted.  *See* ECF Nos. 79, 80.  Thereafter, Jeter retained Gary G. Singh as counsel.  *See id.*  Mr. Singh represented Jeter from approximately January 23, 2023, through his change of plea and sentencing.  *See* ECF No. 80.

### *Investigation and Factual Background*

The charges in this case were the result of over a year-long investigation conducted by the Federal Bureau of Investigation ("FBI") and others.  The investigation was initiated by the FBI in March 2019.  ECF No. 136, PSR(2) ¶ 18.  In approximately December 2020, it became a joint investigation with the Drug Enforcement Administration ("DEA") when a DEA confidential source ("CS") provided information to law enforcement relating to Jeter and his drug distribution activities.  *Id.*  The investigation, which included court authorized interceptions of

2

wire and electronic communications over Jeter's cellular phone, ultimately
revealed that Jeter was the organizer/leader of a Hawaii based drug trafficking
organization ("DTO") and was obtaining large quantities of methamphetamine,
cocaine, heroin, and counterfeit M-30 pills laced with fentanyl directly from
Mexico.  PSR(2) ¶ 35.  Jeter was storing the controlled substances at a stash house
on Oahu where he then distributed the controlled substances to sub-distributors,
including Janet Pauline Nelson ("Nelson"), David Abraham Monalim
("Monalim"), and other known and unknown individuals.  PSR(2) ¶ 30, 35.
Nelson, Monalim, and others were in turn distributing the narcotics throughout
Hawaii and providing Jeter with the proceeds from the sale of the narcotics.  Jeter
was also laundering the drug proceeds through sham business transactions with a
local jeweler and through his pawn shops.  PSR(2) ¶ 36.  At the time of the
investigation, Jeter owned and operated a pawn shop in Hawaii, namely, Gold
Hawaii Pawn.  *Id.*

Jeter was using his stepdaughter and son-in-law's residence as a "stash
house" or storage location for narcotics.  PSR(2) ¶ 30.  Stationary surveillance,
physical surveillance, and GPS location data on Jeter's cellular phone showed that
Jeter had a pattern of going to the stash house after receiving calls that
investigators suspected were about drug transactions.  Jeter would then
immediately meet up with the individuals to conduct drug transactions.  Jeter

3

followed this same pattern when arranging drug transactions with the CS and ultimately meeting up with the CS to provide narcotics. A search warrant was executed on the stash house on or about September 30, 2021, and revealed that Jeter had a built-in safe in a closet in the garage of the residence. PSR(2) ¶ 30. Jeter voluntarily provided law enforcement with the code to the safe. *Id.* The search of the safe resulted in the seizure of approximately 15.52 kilograms of 97% pure methamphetamine hydrochloride; 1,203 grams of cocaine; 2,922.8 grams of fentanyl; 959 grams of heroin; and 255 gross grams of marijuana; a scale and other drug paraphernalia; and a loaded Taurus .38 caliber revolver, a loaded Ruger 9MM caliber pistol, and 424 rounds of assorted ammunition. PSR(2) ¶ 31-32.

The search of Jeter's personal residence resulted in the seizure of approximately $50,000 in cash from a safe. PSR(2) ¶ 33. Jeter also consented to the search of four safe deposit boxes located at a storage facility on Young Street and estimated that they contained approximately $350,000 in cash. PSR(2) ¶ 34. In total, law enforcement seized approximately $408,919 in U.S. currency from Jeter's residence and safe deposit boxes. *Id.* The court further authorized several seizure warrants on bank accounts belonging to Jeter, which resulted in the seizure of an additional $261,292.38 in U.S. currency. PSR(2) ¶ 37.

*Post-Miranda Statement*

Following his arrest, Jeter was advised of his rights, waived his rights and made incriminating admissions to law enforcement.  PSR(2) ¶ 35; *see also* Exhibit 1, attached hereto (DEA-6 Report of Investigation – Interview of Courtney Jeter on 09-30-2021).  Jeter provided law enforcement the code to his safe at both his residence and at his stash house where he said he had approximately 35 pounds of methamphetamine, heroin, knock-off oxys with fentanyl, cocaine, and two pistols that he bought twenty years ago.  *Id.*  Jeter told agents that the Pachecos (his family members who lived at the stash house) were not involved in the drug business and had no knowledge of him secreting drugs at their residence.  *Id.*  Jeter stated that he got back into drug dealing approximately four years prior when he visited his daughter and son-in-law, Lamont Tellis, in Mazatlan, Mexico.  *Id.*  Jeter stated while in Mexico, Tellis introduced him to Jeff Lynch and that Lynch then introduced him to others who began supplying him with controlled substances.  *Id.*  Jeter admitted that he had been shipping in approximately 50 pounds of narcotics at a time via FedEx.  *Id.*  Jeter estimated that over the last four years he had received at least eight 50-pound shipments of narcotics.  *Id.*  Jeter mentioned that for a couple of his transactions he was put in touch with a Canadian broker that provided the cash for Jeter up front to be paid back with interest.  *Id.*  He stated he was put in touch with a courier who would show up in Hawaii and identify himself

5

with serial numbers on a $1 bill.  *Id.*  He further admitted to negotiating drug

shipments from Mexico to Hawaii; the prices he paid for the various controlled

substances; how he provided his source of supply with the proceeds; and that he

distributed controlled substances to Nelson, Monalim, Phillip Dunn, Jonnaven

Monalim, and others.  *Id.*  Jeter explained how he fronted the controlled substances

to these individuals and how they would meet up to receive product and provide

him with payment.  *Id.*  Jeter admitted that he would go to the Pacheco's where he

stored the drugs, retrieve the drugs, and then meet up with his sub-distributors.  *Id.*

He further admitted to laundering the proceeds through a jewelry/gold business.

*Id.*  He admitted that his wife knew he was dealing drugs and had warned him to

quit several times.  *Id.*

### *Proffers With Counsel and the Government and Plea Negotiations*

At Jeter's request, through counsel, he met with the government on at least

two occasions pursuant to a proffer agreement.  First, on November 30, 2021, Jeter

and Mr. Harrison met with counsel for the government and entered into a proffer

agreement.  At this meeting, Jeter affirmed the admissions he made at the time of

his arrest regarding his involvement in the charged drug trafficking conspiracy,

including that he resumed drug dealing in approximately 2017; his statements

about Lamont Tellis and Jeff Lynch introducing him to others including a male

named "Oscar"; that he negotiated amounts and prices of controlled substances;

that he had the controlled substances delivered to his son's residence in California and that his son then shipped the drugs to Jeter in Hawaii; and that Lamont Tellis eventually took over shipping the drugs to Hawaii in 2020.  *See* Exhibit 2, attached hereto (DEA-6 Report of Investigation – Proffer Interview of Courtney Jeter on 11-30-2021).

On April 20, 2022, Jeter and his new counsel Mr. Breiner again met with counsel for the government pursuant to a proffer agreement.  Thereafter, Mr. Breiner engaged in on going plea discussions with counsel for the government through both email and telephone calls.  *See* Declaration of Myles S. Breiner; *see also* Exhibits 3 – 7, attached hereto (Emails between Breiner and AUSAs re plea negotiations).  In a letter to counsel for the government dated October 27, 2022, Mr. Breiner advocated against the 924(c) firearm charge and the organizer/leader and stash house enhancements.  *See* 10.27.2022 letter attached to Breiner Decl. Jeter and Mr. Breiner signed at least two Memorandum of Plea Agreements, the final one of which was provided to the government on January 11, 2023, and a change of plea was scheduled with the Court for January 20, 2023 (ECF No. 76). *See* Ex. 7.  Sometime thereafter, Mr. Breiner became aware of a conflict of interest and moved to withdraw as counsel for Mr. Jeter.  *See* ECF No. 77.  The change of plea hearing was converted to a hearing on the motion to withdraw as counsel.  Mr. Breiner was ultimately permitted to withdraw and was replaced by privately

retained counsel Gary G. Singh.

***Change of Plea***

On March 30, 2023, Jeter appeared with Mr. Singh before United States

Magistrate Judge Wes Reber Porter, consented to the Rule 11 plea before the a

magistrate judge and entered a plea of guilty to Counts 1, 8, and 10 of the

Indictment, pursuant to a Memorandum of Plea Agreement ("MOPA").  *See* ECF

Nos. 87, 89.  In exchange for his guilty plea, the government agreed to dismiss

Counts 2 through 5, and 9 of the Indictment, after sentencing.  *Id.*

In his MOPA, Jeter admitted and stipulated to the following facts:

> a.   By at least January 2018, and continuing to on or about
> September 30, 2021, within the District of Hawaii and elsewhere,
> there was an agreement between the defendant, Courtney Gene Jeter
> (hereinafter "Jeter" or "the defendant"), and others known and
> unknown, including but not limited to Janet Pauline Nelson and David
> Abraham Monalim, to possess and distribute controlled substances.

> b.   Jeter was the organizer/leader of the Hawaii based drug
> trafficking organization.  Jeter had an agreement with individuals
> known and unknown located in Mexico to supply him with large
> quantities of controlled substances, including methamphetamine,
> cocaine, heroin, and knockoff Oxycodone M-30 pills for further
> distribution in Hawaii.  During the period of the conspiracy, Jeter was
> supplied with approximately 50 pounds of ICE every six months and
> he paid $4,000 per pound.  He was also supplied with cocaine, heroin,
> and knockoff Oxycodone M-30 pills on an as needed basis.  In
> approximately May 2021, Jeter received a shipment containing 30,000
> knockoff Oxycodone pills laced with fentanyl.  After the controlled
> substances were transported from Mexico into California, Jeter
> arranged for them to be shipped from California to Hawaii via FedEx
> or other mail carriers.  Once the controlled substances arrived in
> Hawaii, Jeter stored them at a residence located on Uahanai Place in

Kapolei, Hawaii, hereinafter referred to as the "stash house." Jeter would then distribute the controlled substances to his sub-distributors, including but not limited to Nelson and Monalim. After distributing the controlled substances, Nelson, Monalim, and others then provided Jeter with proceeds from the sale of the controlled substances.

c.  Specifically, Jeter had agreements with Nelson, Monalim, and others that he would "front" (provide on consignment) them controlled substances, including methamphetamine, cocaine, and knockoff Oxycodone M-30 pills for them to further distribute to others in Hawaii. In furtherance of those agreements, Nelson, Monalim, and others distributed the controlled substances and provided Jeter with cash they received from the sale of the controlled substances, keeping any profit for themselves.

d.  Beginning in at least January 2021, and continuing until about September 2021, Jeter fronted Nelson approximately two to three pounds of methamphetamine every two weeks. Nelson in turn distributed the methamphetamine to others in Hawaii and then paid Jeter the proceeds from the sale of the methamphetamine. During this time period and in furtherance of the conspiracy, Jeter distributed at least 27 pounds of methamphetamine to Nelson for further distribution in Hawaii. Jeter also fronted Nelson other controlled substances for distribution, including cocaine.

e.  When Nelson needed more controlled substances or to provide Jeter with proceeds, Nelson and Jeter would text message or call each other and arrange to "meet up for drinks." "Drinks" was code for drugs or drug proceeds. For example, on September 14, 2021, Jeter sent Nelson a text message and asked if she wanted to have "drinks" this Friday. Nelson responded in a text message and asked if they were meeting at Hibiscus again. On September 17, 2021, Nelson met with Jeter and his wife at the Hibiscus Club located on Ward Avenue in Honolulu, Hawaii and Nelson provided Jeter with proceeds from the sale of controlled substances.

f.  Beginning by at least January 2021, and continuing until about September 2021, at least two to three times a month, Jeter and Monalim met in person at which time Jeter fronted Monalim controlled substances, including methamphetamine, knockoff

9

Oxycodone M-30 pills containing fentanyl, and cocaine. Monalim in turn distributed the controlled substances to others in Hawaii and then paid Jeter cash proceeds from the sale of the controlled substances. During this time period and in furtherance of the conspiracy, Jeter distributed at least 45 pounds of methamphetamine to Monalim for further distribution in Hawaii.

g.  When Monalim needed more controlled substances or to provide Jeter with proceeds, Monalim and Jeter would text message or call each other and arrange to meet up.  Jeter and Monalim used coded language in these conversations. They often discussed meeting up for "drinks." "Drinks" was code for drugs or drug proceeds.  For example, on July 20, 2021, Monalim called Jeter on his cellular phone.  During the conversation, Jeter asked Monalim if he wanted to "turn up a few and pelt some brews."  Monalim agreed to meet up with Jeter the next day.  On July 21, 2021, law enforcement electronic surveillance showed Jeter entering the stash house and then leaving the stash house carrying a bag with a Nike logo.  Jeter was then seen by law enforcement driving to the Kapolei shopping center where he met with Monalim and gave Monalim the same bag with the Nike logo.  This bag contained controlled substances, which Jeter provided to Monalim for further distribution to others in Hawaii.

h.  During the period of the conspiracy and in furtherance of his drug trafficking, Jeter knowingly and intentionally possessed a Taurus, .38 caliber revolver bearing serial number QF84836, a Ruger, 9MM caliber pistol bearing serial number 313-71342, and 424 rounds of assorted ammunition to include: 403 rounds of 9mm ammunition, 17 rounds of .38 caliber ammunition, 2 rounds of .25 caliber ammunition, and 2 rounds of .22 caliber ammunition.  The firearms and ammunition were owned by Jeter and stored by Jeter at the stash house in a safe along with controlled substances.  Jeter possessed these firearms and ammunition in furtherance of the charged drug trafficking conspiracy, including for protection against assault, and protection against robbery and theft of his controlled substances and proceeds.

i.  On or about September 29, 2021, a federal search warrant was executed at the stash house.  The search resulted in the seizure of the above listed firearms and ammunition, as well as the following: 15.52

kilograms (net weight) of pure Methamphetamine Hydrochloride; 1,203 grams (net weight) of Cocaine; 2,922.8 grams (net weight) of Fentanyl (approximately 26,561 pills); 959 grams (net weight) of Heroin; and a scale and other drug paraphernalia.  All of the above belonged to Jeter and he knew that the knockoff Oxycodone pills contained Fentanyl.  The controlled substances were sent to the Drug Enforcement Administration laboratory for testing and analysis.  Lab results confirmed the above net weights and substances.

    j.  During the period of the conspiracy, Jeter owned and operated a pawn shop in Hawaii, namely, Gold Hawaii Pawn.  Jeter laundered his drug proceeds through his business, including but not limited to a $50,000 sham business transaction in or about August 2021, in which he exchanged $50,000 in United States currency for business checks from a precious metals and jewelry store in Honolulu, Hawaii, and then deposited the checks into his various bank accounts.  Jeter conducted these financial transactions to conceal and disguise the nature, source, ownership, and control of the proceeds, which he knew were from his illegal drug trafficking.

    k.  Jeter admits that the approximately $408,919.00 in United States currency seized by the government from his residence and safe deposit boxes and the approximately $261,292.38 seized from his personal and business bank accounts are proceeds of the charged drug trafficking conspiracy.

    l.  In furtherance of the charged drug trafficking conspiracy, Jeter distributed to a confidential informant working for the Drug Enforcement Administration (DEA) 50 grams or more of methamphetamine on each of December 17, 2020, January 28, 2021, March 5, 2021, and August 12, 2021.  In exchange for the methamphetamine received during these four controlled purchases of methamphetamine from Jeter, the DEA paid Jeter via the confidential informant $39,000.00 in United States currency, which Jeter admits are proceeds of the charged drug trafficking conspiracy.

ECF No. 89 at 7-13, ¶ 8.

11

At the hearing, Jeter specifically admitted the following under oath:  "I acquired the drugs from Mexico, got them to Hawaii, put them away in a stash house, and distributed them to David Monalim and Janet Pauline Nelson."  ECF No. 170, Exhibit 8 at 27, lines 13-15, attached hereto (March 30, 2023 *partial* Transcript of Change of Plea Hearing).  He admitted to fronting Nelson and Monalim pound quantities of cocaine and meth and receiving the proceeds from the sale of the controlled substances.  *Id.* at 28, lines 11-20.  He further admitted that he possessed the firearms at issue in the case and that he did so in furtherance of the drug trafficking conspiracy, to protect himself and his dope.  *Id.* at 30, lines 7-25; 31, lines 1-11.

Jeter also waived his right to appeal his conviction and the sentence imposed as follows:

> 13.  The defendant is aware that he has the right to appeal his conviction and the sentence imposed.  The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his conviction and any sentence within the Guidelines range as determined by the Court at the time of sentencing, and any lawful restitution order imposed, or the manner in which the sentence or restitution order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement.  The defendant understands that this waiver includes the right to assert any and all legally waivable claims.
>
> a.  The defendant also waives the right to challenge his conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may

make such a challenge (1) as indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

b.  If the Court imposes a sentence greater than specified in the guideline range determined by the Court to be applicable to the defendant, the defendant retains the right to appeal the portion of his sentence greater than specified in that guideline range and the manner in which that portion was determined and to challenge that portion of his sentence in a collateral attack.

ECF No. 89 at 16-17, ¶ 13.  Jeter orally acknowledged his understanding of this appellate waiver at his change of plea.  *See* Ex. 8 at 20, lines 5-22.

### *Presentence Investigation Reports, Sentencing Memorandum, and 5K Motion*

On June 14, 2023, the draft Presentence Investigation Report ("draft PSR") was issued and concluded that Jeter was responsible for a total of 679,708.6 kg of converted drug weight resulting in a base offense level of 38.  ECF No. 107 at 17, ¶¶ 53-54.  A 4-level increase to Jeter's offense level computation for his aggravating role in the offense was also applied in the draft PSR.  *Id.* at 18, ¶ 58.  Pursuant to USSG §3B1.1(a), a 4-level increase is applied if the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.  The participants in the case were identified as the two charged codefendants Nelson and Monalim, Jeter's other unnamed sub-distributors, his sources of supply in Mexico, and Jeter.  *Id.*  Jeter further stipulated in the MOPA that he was an organizer/leader.  ECF No. 89 at 8, ¶ 8.  The investigation established that Jeter exercised control and decision-making authority

13

over other participants, that he arranged with suppliers in Mexico to ship parcels containing controlled substances to California and Jeter further arranged for them to be shipped to Hawaii.  *Id.*  He also admittedly distributed pound quantities of controlled substances on a consignment basis, set the price, then collected the drug proceeds and kept the profit.  *Id.*  The draft PSR further concluded that Jeter's adjusted offense level was 44 and he received minus 3 levels for acceptance and his timely plea, which resulted in a total offense level of 41.  ECF No. 107 at 18.  Jeter's criminal history score was 0, which put him in criminal history category I.  *Id.* at 21, ¶ 72.  A total offense level of 41 and a criminal history category of I resulted in a guideline imprisonment range of 324 to 405 months.  *Id.* at 28, ¶ 114.

On August 31, 2023, Mr. Singh filed 50 character letters in support of Jeter, which included Jeter's own letter to the Court.  ECF No. 121.  Mr. Singh also filed Exhibits "A – W" in support of Jeter's sentencing.  ECF No. 122.  Mr. Singh filed a Sentencing Statement and Memorandum in Support of Downward Departure and Variance, along with Exhibit A—a psychiatric evaluation of Jeter conducted by Martin Blinder, M.D.  ECF No. 123.  He also filed Exhibit "AA"—a book coauthored by Jeter.  ECF No. 124.  The Sentencing Statement indicated that Jeter had no objections to the draft PSR.  ECF No. 123.  In his Sentencing Memorandum, Mr. Singh argued for a downward variance of a sentence between 120-180 months.  *Id.*  Mr. Singh set forth facts that he believed were mitigating

and warranted the requested variance, including Jeter's efforts toward rehabilitation while in custody, his family support, his difficult childhood, his cooperation efforts, and other section 3553(a) factors. *Id.* On April 30, 2024, Mr. Singh filed "Jeter's Statement for Sentencing," which was in addition to a letter previously submitted to the Court by Jeter. *See* ECF No. 147.

On September 19, 2023, PSR(1) was issued. ECF No. 125. On December 28, 2023, PSR(2)—the final PSR—was issued and merely updated the sentencing date, which had been continued, and paragraph 48 to reflect the use of the 11/01/2023 Guidelines Manual. ECF No. 136. Probation recommended a sentence of 324 months as to Count 1 and 240 months as to Count 10, to run concurrently with each other; and 60 months as to Count 8, to run consecutively to Counts 1 and 10, for a total of 384 months. *Id.* at 37.

On May 10, 2024, the government filed a Motion for Downward Departure and Sentencing Recommendation Pursuant to USSG §5K1.1 and 18 U.S.C. § 3553(e) and recommended a downward departure of three offense levels to a total offense level of 38. ECF No. 155. This resulted in a new advisory guideline range of 235-293 months. *Id.*

### *Sentencing*

On May 13, 2024, Jeter, along with his counsel Mr. Singh, appeared before the Court for sentencing. Mr. Singh expanded on the mitigating facts set forth in

15

his sentencing memorandum, argued that Jeter is "not a gun person," and concluded asking for a sentence of between 10 to 15 years. *See* ECF No. 161 at 4-6.  Jeter also made a statement at his sentencing. *See id.* at 6-21.  Among other things, Jeter stated the following about Mr. Breiner and Mr. Singh:

> To the attorneys, I know I owe a price for breaking the law, but Gary, Myles, I appreciate you guys putting up with me, keeping me calm, and going beyond your professional capacity to keep me focused and informed on this ordeal.  I really appreciate it.  And I thank you for coming.

*Id.* at 7-8.  The Court sentenced Jeter to a total of 240 months' imprisonment—180 months as to each Counts 1 and 10 to run concurrently with each other and 60 months as to Count 8 to run consecutively to Counts 1 and 10—to be followed by five years of supervised release.  *See* ECF Nos. 157, 158.  The government dismissed Counts 2-5, and 9 of the Indictment, pursuant to the plea agreement.  *See* ECF No. 157.  Judgment was entered on May 14, 2024.  ECF No. 158.

On May 21, 2025, Jeter, through retained *pro hac vice* counsel D. Craig Hughes, submitted the current motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  *See* ECF No. 166, 166-1.  The motion is timely submitted.[2]

---

[2] A prisoner in custody has one year within which to file a request for relief under 28 U.S.C. § 2255.  28 U.S.C. § 2255(f).  The one-year period runs from the latest of four specified events.  Relevant here, the limitation period runs from the date on which the judgment of conviction became final.  *Id.*  When a prisoner does not take a direct appeal from his conviction, the conviction becomes final when the time for

## II.    **PETITIONER'S ARGUMENTS**

Petitioner alleges that his privately hired attorneys rendered ineffective assistance of counsel to him throughout his case—from pretrial investigation and initial plea negotiations through sentencing and thereafter, by failing to file a notice of appeal.  ECF Nos. 166, 166-1.

Under the heading GROUND ONE, Petitioner states, "Pretrial Counsel's Failure to Investigate if the Government Committed Prosecutorial Misconduct." ECF No. 166 at 5.  In his Memorandum of Law in Support, he claims that "[t]he record in this case indicates deliberate prosecutorial misconduct, worthy of investigation."  ECF No. 166-1 at 13.  Specifically, he alleges entrapment, government overreach, and the knowing use of false or misleading testimony.  *Id.* at 11-13.  He asserts that "he constantly and specifically requested" that his pretrial counsel investigate these allegations, that counsel failed to do so, and thus were ineffective in their representation such that it violated his constitutional rights.  *Id.*

Under the heading GROUND TWO, he alleges "Ineffective Assistance of Pretrial Counsel."  ECF No. 166 at 6.  As supporting facts, Petitioner states:

Pretrial counsel's failure to:

---

filing a notice of appeal expires.  *See Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987); *United States v. Schwartz*, 274 F.3d 1220, 1223 (9th Cir. 2001).  Petitioner did not take a direct appeal, so his conviction became final 14 days after judgment was entered against him.  Fed. R. App. P. 4(b)(1)(A).  Judgment was entered on May 14, 2024.  ECF No. 158.  Thus, Petitioner had until May 28, 2025, to file a petition pursuant to Section 2255.

(1) Communicate with Jeter and inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial;

(2) Conduct an adequate and independent pretrial investigation.

    a. Failure to examine Jeter's role in the offense-- failed to challenge his leader/organizer enhancement pursuant to USSG § 2D1.1(b)(12); and

    b. Failure to challenge the premises claim-- failed to challenge the stash house enhancement pursuant to USSG § 2D1.1(b)(12); and

    c. Failure to challenge the 924(c) charge-- failed to challenge the firearm pursuant to USSG § 2D1.1(b)(18).

(3) Attempt to negotiate a favorable Plea Agreement deprived Jeter of effective assistance of pretrial counsel under the Sixth Amendment of the Constitution of the United States.

*Id.* at 6.

In his Memorandum of Law in Support, he further states that he "expressed his willingness to plead guilty to the drug distribution charge from the beginning" but "specifically sought to challenge several enhancements and additional charges, including a leadership role enhancement, a stash-house enhancement, and a firearms charge, which he believed were inappropriately applied."  ECF No. 166-1 at 14-15.  He claims that "[n]either Breiner nor Singh meaningfully consulted with [him] about possible defenses, trial strategies, or the consequences of accepting or rejecting the government's plea offer."  *Id.* at 15.  Consequently, he alleges he did not make an informed choice to knowingly waive his trial rights.  *Id.*

He also claims that "Singh failed to review critical records, including the PSR and the underlying investigate materials, and did not pursue discovery or interview key witnesses.  He did not investigate the roles of Lynch, the alleged

informant, or Tellis . . ." *Id.* at 16.  He claims that Breiner and Singh "did not

thoroughly research relevant case law, investigate key facts, or explore potential

defenses." *Id.* at 17.  He specifically alleges that counsel failed to (1) investigate

his "actual role in the alleged drug conspiracy," (2) challenge the enhancement for

maintaining a stash-house, (3) contest the 924(c) charge, and (4) hire a private

investigator.  *Id.* at 18-20.

Under the heading GROUND THREE, Petitioner alleges "Ineffective

Assistance of Sentencing Counsel."  ECF No. 166 at 7.  As supporting facts,

Petitioner states:

> Sentencing counsel's failure to:
> (1) Correctly discuss and explain the PSR to Jeter prior to the
> sentencing hearing;
> (2) File substantive objections to the PSR;
> (3) Argue for mitigation of punishment and object to his sentence
> being substantively unreasonable; and
> (4) File a Notice of Appeal deprived Jeter of effective assistance of
> sentencing counsel.

*Id.*

In his Memorandum of Law in Support, he further claims that Singh did not

review the PSR with him or how the sentencing enhancements were calculated.

ECF No. 166-1 at 22.  He asserts "there was no evidence that [he] directed others

or occupied a leadership role; rather, the record shows he operated as a

middleman." *Id.*  And he asserts that there was no evidence supporting the stash

house or firearm enhancements.  *Id.* at 23.  He argues that Singh should have

19

objected to all of these enhancements and sought a mitigating role adjustment. *Id.*

Petitioner further claims that Singh did not present any mitigating evidence in support at sentencing. *Id.* at 23. He asserts that he failed to mention his upbringing, losing his mother to sexual violence and murder, and the deaths of several of his siblings as well as being the caretaker for others. *Id.* He states that "Singh did not advocate for a downward variance or object to the sentence as excessive." *Id.*

Finally, Petitioner claims that he instructed Singh to file a notice of appeal on his behalf and that he failed to do so. *Id.*

## III.    **LEGAL ARGUMENT**

Ineffective assistance of counsel claims are reviewed under the framework of *Strickland v. Washington*, 466 U.S. 668 (1984); *see also, United States v. Day*, 285 F.3d 1167, 1169 (9th Cir. 2002). "A convicted defendant seeking to overturn his conviction or sentence on the basis that he was denied effective assistance of counsel must establish (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed." *Id.* at 697.

Under § 2255, the Court is required to hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner

is entitled to no relief." 28 U.S.C. § 2255(b). In lieu of an evidentiary hearing, however, the Court may rely on the record, which may be supplemented by documentary evidence, the Court's notes and recollection of the plea hearing and sentencing process, and common sense. *Shah v. United States*, 878 F.2d 1156, 1159 (9th Cir.), *cert. denied*, 493 U.S. 869 (1989). A summary dismissal of the motion is appropriate if Petitioner's allegations, when viewed against the record, either do not state a claim for relief, or are "palpably incredible" or "patently frivolous." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984), *cert. denied*, 470 U.S. 1058 (1985) (citing *Blackledge v. Allison*, 431 U.S. 63, 76 (1977) and *Baumann v. United States*, 692 F.2d 565, 571, 581 (9th Cir. 1982)). Conclusory allegations unsupported by a factual or legal explanation fall short of stating a cognizable claim of ineffective assistance of counsel. *See Blackledge*, 431 U.S. at 74.

As to both *Strickland* prongs, the burden falls on the defendant to show that the standard is met. *Turk v. White*, 116 F.3d 1264, 1265-66 (9th Cir. 1997). In this case, Petitioner cannot meet his burden as to either prong.

### A.    Counsel's Performance Did Not Prejudice Petitioner.

In order to show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner

cannot make that showing here.  Significantly, Jeter provides no evidence, not even sworn statements, to support any of his claims.

### 1. *Petitioner's allegations of prosecutorial misconduct are unsupported and contradicted by his own admissions.*

Petitioner asserts that "he constantly and specifically requested" that his counsel investigate "if the government committed prosecutorial misconduct," counsel failed to do so and thus, his rights were violated.  ECF No. 166 at 5.  Petitioner claims that "[t]he record in this case indicates deliberate prosecutorial misconduct, worthy of investigation."  ECF No. 166-1 at 13.  Specifically, he alleges entrapment, government overreach, and the knowing use of false or misleading testimony.  *Id.* at 11-13.  Yet he fails to cite to any evidence in support.

In his post-arrest statement to law enforcement Jeter admitted that he got *back into* drug dealing approximately four years prior when he visited his daughter and son-in-law, Lamont Tellis, in Mazatlan, Mexico.  Ex. 1.  While in Mexico, Tellis introduced him to Jeff Lynch and Lynch introduced him to others who began supplying him with controlled substances.  *Id.*  Jeter admitted that he had been shipping approximately 50 pounds of narcotics at a time into Hawaii from Mexico.  *Id.*  He estimated that over the last four years he had received at least eight 50-pound shipments of narcotics.  *Id.*  He admitted that he personally negotiated the drug shipments and prices, and that he "fronted" and distributed the controlled substances to various other individuals in Hawaii.  *Id.*  Jeter admitted that he stored

his drugs in a safe in his daughter/stepdaughter's garage and that he would go there to retrieve the drugs prior to meeting up with his sub-distributors. *Id.*

Jeter's own admissions from day one of his arrest contradict the allegations he now makes. His post-arrest statement alone does not support a claim of entrapment or government overreach, nor does the evidence. Rather, it shows that Jeter was deeply involved in the drug trafficking business with his own family members who introduced him to the individuals in Mexico who he began doing business with, prior to any government contact. Neither Tellis nor Lynch were government cooperators as alleged in his memorandum. *See* ECF No. 166-1 at 12. There were simply no drug transactions that the government was aware of between Jeter, Tellis, or Lynch that were "filmed, controlled, and confirmed by federal law enforcement" as Jeter now alleges. *Id.* Jeter asserts that the record suggests that Lynch was operating under FBI authority but cites to no evidence of this in the record because there is none. *Id.* It was Jeter who alerted the government to the drug trafficking activities of Tellis and Lynch on the day of his arrest. Jeter also now suggests that redactions in the DEA-6 report documenting his post-arrest confession were an effort to mislead the court and jury. *See* ECF No. 166-1 at 12. This report, however, was not previously provided to the court, or admitted as evidence at any hearing or trial. This case did not proceed to trial. Such redactions are often made for investigative reasons and/or privacy concerns.

23

Moreover, the confidential source ("CS") in this case was an individual residing in Hawaii who was friends with Jeter and had previously purchased controlled substances from him prior to becoming a cooperator.[3]  Later in his memorandum in support of his motion, Jeter alleges it was this CS that entrapped him not Tellis or Lynch.  *See* ECF No. 166-1 at 18.  Jeter's September 2021 confession in which he admitted that he got back into the drug business approximately four years prior clearly contradicts any entrapment claim involving the CS.  *See* Ex. 1 at 2.  The controlled purchases between Jeter and the CS occurred in 2020 and 2021.  *See* PSR at ¶¶ 18-22.

Mr. Breiner states that from his discussions with Jeter and his review of the evidence with him, he did not believe there were any grounds to successfully move to suppress Jeter's post-*Miranda* statements, or any other evidence.  *See* Breiner Decl. at ¶ 4.  He states that Jeter never raised concerns that Tellis or Lynch were government agents who had entrapped him.  *Id.* at ¶ 7.  He further states that from the beginning of his representation of Jeter, Jeter had decided to take full responsibility for his conduct and focus his efforts on his cooperation in hopes of receiving a 5K motion for a sentence reduction.  *Id.* at ¶ 4.  Mr. Singh confirms the

---

[3] The CS's background was clearly set forth in the wiretap affidavits, which were disclosed to Jeter in discovery.  The identity of the government's CS was no secret to Jeter as the audio and video recordings from the controlled purchases between Jeter and the CS were also disclosed in discovery.

same.  *See* Singh Declaration at ¶¶ 4, 5, 7.  Jeter has simply failed to show that counsels' performance was deficient or that the outcome would have been any different.

### 2. *The record is clear that Petitioner's claims of ineffective assistance of pretrial counsel for failing to communicate, investigate, negotiate a plea, and challenge certain sentencing enhancements are all meritless.*

Petitioner argues that his counsel, both Mr. Breiner and Mr. Singh (1) failed to communicate with him and inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial; (2) failed to conduct an adequate and independent pretrial investigation, specifically, that they should have challenged the sentencing enhancements for leader/organizer and maintaining a stash house, as well as the 924(c) firearm charge; and (3) did not attempt to negotiate a favorable plea.  ECF Nos. 166 at 6, 166-1 at 14-21.  He again fails to provide any evidence in support of his allegations.

Contrary to Jeter's allegations, Mr. Breiner states that over the course of his representation he had in depth discussions with Jeter regarding his post-*Miranda* statement, his statements made during the proffer session with Mr. Harrison, the government's evidence, and his knowledge of other criminal activity.  Breiner Decl. at ¶¶ 4, 5.  Mr. Breiner states that he "communicated with and advised Jeter extensively about the strength of the government's evidence, his right to proceed to trial, and the risks and benefits associated with proceeding to trial versus pleading

guilty." *Id.* at ¶ 9. "This discussion included reviewing the discovery/evidence and advising Jeter of the drug, firearm, and money laundering charges and the penalties he faced for each charge." *Id.* Mr. Breiner provided Jeter a copy of the government's plea offer and went over it with Jeter in detail. *Id.* at ¶ 10. This included a discussion about the charges, which included the 924(c) firearm charge, the sentencing guidelines, the relevant drug weight, the enhancements for leader/organizer and stash house. *Id.* Mr. Breiner also discussed possible defenses with Jeter. *Id.* Mr. Breiner then engaged in extensive discussions both in writing and over the telephone with counsel for the government. *See* letters attached to Breiner Decl.; *see also* Exs. 3 – 7.

As reflected in the attached emails between counsel, based on the strength of the evidence the government was not willing to dismiss the 924(c) charge or change its position regarding the sentencing enhancements. *See* Exs. 3 – 7. Moreover, despite the overwhelming evidence of his leadership role and the stash house, Jeter's post-*Miranda* admission alone is sufficient to prove these sentencing enhancements. *See* Ex. 1.

Also contrary to Jeter's allegations, Mr. Singh states that when he began his representation of Jeter, Jeter had already signed a plea agreement with the government. Declaration of Gary G. Singh at ¶ 4. Based on his discussions with Mr. Breiner, he was aware of the plea negotiations between Mr. Breiner and the

government.  *Id.* at ¶¶ 5, 6.  He was further aware that the government was not willing to dismiss the 924(c) charge or back away from the sentencing enhancements for leader/organizer and maintaining a stash house.  *Id.*  Mr. Singh further states that he had in depth discussions with Jeter about his prior statements, the government's evidence, the sentencing enhancements, and the charges, including the firearm charge.  *Id.* at ¶ 9.  Mr. Singh states that he discussed with Jeter his right to proceed to trial and the risks and benefits associated with proceeding to trial versus pleading guilty.  *Id.*  Jeter conveyed to him that he understood and did not wish to contest the case.  *Id.*  Mr. Singh provided Jeter with a copy of the government's plea offer and reviewed it in detail with Jeter.  *Id.* at ¶ 11.  Mr. Singh advised Jeter of the penalties he faced for each charge and the elements the government must prove.  *Id.*  This included a discussion of the relevant sentencing enhancements and the sentencing guidelines.  *Id.*

At the hearing on the change of plea, under oath Jeter stated the following of relevance here:  (1) aside from the agreements in the MOPA no one had made any other or different promises or threats to get him to plead guilty (Ex. 8 at 18, lines 13-18); (2) he had an opportunity to discuss his case sufficiently with his counsel Mr. Singh (*Id.* at 6, lines 22-24); (3) he was satisfied with his counsel Mr. Singh and the advice he had given him in his case (*Id.* at 6, line 25; 7, lines 1-2); (4) he reviewed the Indictment and had a chance to sufficiently discuss the allegations

and charges with his counsel (*Id.* at 7, lines 3-10); (5) he understood the essential elements of the charges to which he was pleading guilty, Counts 1, 8, and 10 (*Id.* at 7-9); (6) he understood the maximum and mandatory minimum penalties (*Id.* at 9-10); (7) he understood the rights he was giving up by pleading guilty versus proceeding to trial (*Id.* at 10-12); and (8) he had read the MOPA and discussed it with Mr. Singh prior to signing it (*Id.* at 13).  In addition to stipulating to the facts set forth in the plea agreement, at the hearing Jeter stated, "I acquired the drugs from Mexico, got them to Hawaii, put them away in a stash house, and distributed them to David Monalim and Janet Pauline Nelson."  *Id.* at 27, lines 13-15.  He admitted to fronting Nelson and Monalim pound quantities of cocaine and meth and receiving the proceeds from the sale of the controlled substances.  *Id.* at 28, lines 11-20.  He further admitted that he possessed the firearms at issue in the case and that he did so in furtherance of the drug trafficking conspiracy, to protect himself and his dope.  *Id.* at 30, lines 7-25; 31, lines 1-11.  The record demonstrates that Jeter entered into the plea knowingly and voluntarily.  *See* Ex. 8. Furthermore, at sentencing Jeter acknowledged both Mr. Breiner and Mr. Singh and thanked them for "going beyond [their] professional capacity to keep [him] focused and informed on this ordeal."  ECF No. 161 at 7-8.

The record, declarations of counsel, and attached communications clearly contradict Jeter's allegations that his counsel failed to communicate with him

regarding his guilty plea, trial, the sentencing enhancements, and charges.  It further supports counsels' efforts to negotiate a favorable plea.

Jeter has not and cannot show that counsel was deficient or that the result would have been different.

### 3. The record is clear that Petitioner's claims of ineffective assistance of sentencing counsel are all meritless.

#### a. Petitioner's claims that counsel failed to discuss and explain the PSR or file substantive objections lack merit.

Jeter argues that Mr. Singh failed to explain the PSR to him prior to sentencing or file objections to the enhancements for aggravating role, maintaining a stash house, and possession of firearms.  ECF No. 166-1 at 22-23.

As set forth above, the evidence, which includes Petitioner's post-*Miranda* admission, proffer statements, and his admissions on the record at his change of plea, strongly supported the sentencing enhancements for his leadership role and maintaining a stash house.  Jeter did not receive a sentencing enhancement for the firearms, rather, he pleaded guilty to the 924(c) charge, pursuant to the plea agreement.  There was no basis for counsel to object to the charges or the agreed upon enhancements that Jeter had stipulated to in his plea agreement.

Relating to the PSR, Mr. Singh states that Jeter did not raise any questions regarding the evidence during the interview with U.S. Probation and that when the draft PSR was issued he provided a copy to Jeter.  Singh Decl. at ¶ 16.  He further

29

states that he met with Jeter and explained the draft PSR to him and that they

discussed the information therein. *Id.* Jeter had no substantive objections. *Id.* Mr.

Singh reviewed and discussed the final PSR with Jeter prior to his sentencing. *Id.*

at ¶ 19. He advised Jeter about what he could expect to happen procedurally at

sentencing. *Id.* He provided Jeter a copy of the government's 5K motion and

discussed it with him. *Id.* ¶ 20. Indeed, consistent with Mr. Singh's declaration, at

the sentencing hearing Jeter stated that he had a "full and fair opportunity to read,

review, and discuss the presentence report and to file any objections." ECF No.

161 at 2, lines 17-24. Nor did Jeter raise any objections at the hearing.

Based on this record, counsel's performance cannot possibly be found to

have been ineffective. Regardless, Petitioner suffered no prejudice. He cannot

show the result would have been any different.

### b. Counsel raised and argued factors in mitigation at sentencing and the sentence was not substantively unreasonable.

Petitioner asserts that counsel was ineffective for failing to advocate for

mitigation and object to the sentence as being substantively unreasonable. But the

record is clear that Mr. Singh presented evidence in mitigation and argued for a

significant downward departure at sentencing. Moreover, there was nothing

substantively unreasonable about the 240-month sentence received by Jeter. It was

significantly below Jeter's original guideline range of 324 to 405 months, and at

the low end of the guideline range suggested by the government based on the government's 5K motion.

The record reveals that in support of Jeter for sentencing, Mr. Singh filed (1) 50 character letters, which included Jeter's own letter to the Court (ECF No. 121); (2) Exhibits "A – W", which included a letter and an email regarding Jeter's attempts at cooperating, articles relating to Jeter's mother's murder and unsolved case, various articles about Jeter and his family members' accomplishments in sports growing up, photos of his family, etc. (ECF No. 122); (3) a Sentencing Statement and Memorandum in Support of Downward Departure and Variance with Exhibit A—psychiatric report from Martin Blinder, M.D. (ECF No. 123); (4) Exhibit "AA"—a copy of a book coauthored by Jeter (ECF No. 124); and (5) "Jeter's Statement for Sentencing" (ECF No. 147), which was in addition to the letter previously submitted to the Court by Jeter.

In the sentencing memorandum, Mr. Singh argued for a downward variance of a sentence between 120-180 months.  ECF No. 123.  Mr. Singh set forth facts that he believed were mitigating and warranted the requested variance, including Jeter's efforts toward rehabilitation while in custody, his family support, his age, his difficult childhood that included the murder of his mother, his cooperation efforts, and other section 3553(a) factors.  *Id.*  Additionally, he argued that Jeter was not a violent person and attempted to provide an explanation for the firearms

31

he possessed.  *Id.* at 5, n.1.  At the sentencing hearing, Mr. Singh reiterated and expanded on the arguments he made in his filed memorandum and concluded asking for a sentence of between 120-180 months.  ECF No. 161 at 4-6.  The Court stated it considered the many letters and various exhibits submitted in support as well as the mitigating facts argued by counsel, in determining its ultimate sentence. *See id.* at 3, 31-35.

Counsel presented and argued evidence in mitigation and asked for a significant downward variance—exactly what Petitioner is alleging he should have done.  There were no grounds on which to object that the sentence was substantively unreasonable.  Counsel's performance in these regards cannot possibly be found to have been ineffective.  Regardless, Petitioner suffered no prejudice from the performance.  Given that Petitioner cannot establish any prejudice, his ineffective assistance of counsel claims relating to sentencing mitigation and failing to object to the sentence as being substantively unreasonable must be rejected.

### c.  *Mr. Singh declares under penalty of perjury that Jeter never requested that he file a notice of appeal.  Regardless, Petitioner cannot show that the result would have been different.*

Jeter claims that he asked Mr. Singh to file a notice of appeal, that Mr. Singh assured him he would but failed to file a notice of appeal.  ECF No. 166-1 at 24-25.  Jeter offers nothing in support of this allegation.  To the contrary, Mr. Singh

states, under penalty of perjury, that he met with Jeter at the Federal Detention center the day after sentencing following the entry of the final judgment and discussed the 14 day period to file an appeal with Jeter.  Sing Decl. at ¶ 22.  Mr. Singh further states that Jeter never expressed a desire to appeal his sentence or ask him to file a notice of appeal at that time.  *Id.*  Rather, Jeter expressly stated that he was going to accept the Court's decision.  *Id.*  Mr. Singh continued to meet with Jeter and advise him on personal matters over the next month following his sentencing and not once during that time did Jeter indicate that he wanted to appeal or ask Mr. Singh to file an appeal.  *Id.* at ¶ 24.  Mr. Singh further states that had Jeter asked him to file a notice of appeal on his behalf he absolutely would have.  *Id.* at ¶ 24.  Indeed, he filed apology letters from Jeter to the Court and the AUSA at Jeter's request following his sentencing.  *See id.* at ¶ 24; ECF No. 160.

Moreover, as set forth above, Jeter's plea agreement contains a written waiver of his appellate rights.  During the plea colloquy, this appeal waiver provision was reviewed in open court with Jeter, who confirmed his understanding of the provision.  *See* Ex. 8 at 7, line 7.  The appellate waiver is also mentioned in his PSR.  ECF No. 136 at 10.  At his sentencing hearing, the Court asked Jeter if he had "a full and fair opportunity to read, review, and discuss the presentence report and to file any objections" and Jeter stated, "I have, Your Honor."  ECF No. 161 at 2, lines 17-24.  After imposing his sentence, the Court specifically advised Jeter

33

that he entered into a plea agreement in which he waived most of his rights to appeal the sentence just imposed but that if he believed that waiver was not enforceable or that the sentence falls outside of the plea agreement "then you must file a notice of appeal within 14 days of entry of judgment." *Id.* at 47-48.  When asked if he understood, Jeter asked the Court to repeat what it had just said. *Id.* at 48.  The Court did and Jeter then stated "okay." *Id.*

The record clearly shows that Jeter was advised of his very limited appellate rights and understood that he had waived his right to appeal.  The fact that Jeter did not bring this alleged failure of his counsel to file a notice of appeal to the Court's attention until over one year after his sentencing hearing is further support that Jeter never asked Mr. Singh to file a notice of appeal because he knew it would be futile.  The record supports that Jeter knowingly waived his appellate rights and knew his only option was to file a § 2255 motion, which he has now done.

Even assuming counsel failed to file a notice of appeal, Petitioner cannot show that the result would have been different as he waived his right to appeal on all of the grounds he now raises.  Had Petitioner sought to appeal his below guideline sentence and conviction, his appeal would likely have been dismissed pursuant to the appellate waiver in his plea agreement. *See United States v. Torres*, 828 F.3d 1113, 1124 (9th Cir. 2016) (citing *United States v. Jacobo Castillo*, 496 F.3d 947, 957 (9th Cir. 2007) (en banc)) (Court will ordinarily not review the

34

merits of appeal if valid appellate waiver).  He has suffered no prejudice.  His ineffective assistance of counsel claim must be dismissed.

In sum, all of Petitioners claims either do not state a claim for relief or are "palpably incredible" or "patently frivolous."  *Schaflander*, 743 F.2d at 717.  Petitioner cannot establish any prejudice, and all of his ineffective assistance of counsel claims must be rejected.

### B.    Counsel's Performance Was Not Deficient.

Petitioner's ineffective assistance of counsel claims are meritless for the additional reason that counsels' performance was not constitutionally ineffective.  To demonstrate constitutionally ineffective performance, Petitioner must show that his counsels' performance was not "within the range of competence demanded of attorneys in criminal cases," *Hill v. Lockhart*, 474 U.S. 52, 56 57 (1985), and that "his attorney's performance was deficient in a way that fell below an objective standard of reasonableness."  *Delgado v. Lewis*, 223 F.3d 976, 980 (9th Cir. 2000); *see Lockhart*, 474 U.S. at 58.  He cannot make that showing.

Here, the record clearly demonstrates that most of Petitioner's allegations are inaccurate and/or the things he complains about are supported by overwhelming evidence, including his own admissions.  Defense counsels' plea negotiations and pre-plea appeals to the government are clearly supported in the attached emails, letters, and declarations of counsel.  Moreover, the overwhelming

35

evidence in this case, including Jeter's own statements, show that had Jeter not stipulated to the sentencing enhancements and counsel raised objections, they would have been overruled by the Court given the significant amount of evidence against Petitioner.

Both the Ninth Circuit and the Supreme Court have recognized the importance of allowing counsel leeway to make judgments about how best to represent a criminal defendant.  As the Supreme Court explained in *Strickland*, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  466 U.S. at 688-89.

In light of the evidence here, including Petitioner's uncontroverted admissions, it cannot be said that counsel provided constitutionally ineffective assistance.  In the particular circumstances of this case, counsels' performance was not constitutionally deficient.

//

//

//

36

IV.    **CONCLUSION**

For all the reasons stated herein, this Court should deny Petitioner's § 2255 motion without a hearing.  Furthermore, because Petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability should be issued.

DATED:  July 1, 2025, at Honolulu, Hawaii.

Respectfully submitted,

KENNETH M. SORENSON
Acting United States Attorney
District of Hawaii

By:  */s/ Margaret C. Nammar*
MARGARET C. NAMMAR
Assistant U.S. Attorney

37