IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 21-00126JMS |
| | ) | |
| Plaintiff, | ) | Honolulu, Hawaii |
| | ) | December 3, 2025 |
| vs. | ) | |
| | ) | |
| (01) COURTNEY GENE JETER, | ) | DEFENDANT/MOVANT'S REMAINING |
| | ) | CLAIM OF INEFFECTIVE |
| Defendant. | ) | ASSISTANCE OF COUNSEL FOR |
| | ) | FAILURE TO FILE AN APPEAL |
| | ) | UNDER 28 U.S.C. 2255 |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: MARGARET C. NAMMAR, ESQ.
Office of the United States Attorney
PJKK Federal Building
300 Ala Moana Blvd., Room 6100
Honolulu, Hawaii 96850

For the Defendant: D. CRAIG HUGHES, ESQ.
Law Offices of D. Craig Hughes
7324 Southwest Freeway
Suite 1466
Houston, Texas 77074-2174

Also Present, for Andrea Jeter: Robert Christensen, Esq.

Official Court Reporter: Cynthia Fazio, RMR, CRR, CRC
United States District Court
300 Ala Moana Blvd., C-270
Honolulu, Hawaii 96850

Proceedings recorded by machine shorthand, transcript produced with computer-aided transcription (CAT).

# I N D E X


| EXAMINATIONS | PAGE |
|---|---|
| ANDREA JETER | |
| DIRECT EXAMINATION BY MR. HUGHES | 14 |
| CROSS-EXAMINATION BY MS. NAMMAR | 31 |
| REDIRECT EXAMINATION BY MR. HUGHES | 54 |
| COURTNEY JETER | |
| DIRECT EXAMINATION BY MR. HUGHES | 57 |
| CROSS-EXAMINATION BY MS. NAMMAR | 83 |
| GARY SINGH | |
| DIRECT EXAMINATION BY MS. NAMMAR | 110 |
| CROSS-EXAMINATION BY MR. HUGHES | 138 |
| REDIRECT EXAMINATION BY MS. NAMMAR | 159 |
| COURTNEY GENE JETER | |
| RESUMED CROSS-EXAMINATION BY MS. NAMMAR | 163 |
| REDIRECT EXAMINATION BY MR. HUGHES | 166 |
| RECROSS-EXAMINATION BY MS. NAMMAR | 172 |


## E X H I B I T S


| | PAGE |
|---|---|
| Government's Exhibits 21 through 25 were received in evidence | 9 |
| Defendant's Exhibits 1 through 3 were received in evidence | 9 |
| Defendant's Exhibit 4 was received in evidence | 140 |

WEDNESDAY, DECEMBER 3, 2025 9:05 A.M.

THE COURTROOM MANAGER: Criminal Number 21-00126JMS, United States of America versus Courtney Gene Jeter.

This case has been called for an evidentiary hearing on Defendant's Remaining Claim of Ineffective Assistance of Counsel for Failure to File an Appeal Under 28, United States Code, Section 2255.

Counsel, your appearances please for the record.

MS. NAMMAR: Good morning, Your Honor. Margaret Nammar for the United States. Also present at counsel table is Kari Sherman, our paralegal specialist.

THE COURT: All right. Thank you.

MR. HUGHES: Good morning, Your Honor. Craig Hughes for the petitioner, Courtney Gene Jeter.

THE COURT: All right. Thank you and welcome to Honolulu, Mr. Hughes.

MR. HUGHES: Thank you, Your Honor. Thank you.

THE COURT: Okay. So, you can be seated. Any preliminary matters we need to take up before we get started with the evidence phase here?

MR. HUGHES: Yes, Your Honor.

MS. NAMMAR: Yes, Your Honor. I notified Mr. Hughes that he had put on his witness list Andrea Jeter and Shawntel Pacheco. Both of those individuals, Andrea Jeter is Mr. Jeter's wife, Shawntel Pacheco is his, I believe,

stepdaughter. They were both implicated in the drug conspiracy. And so there was concern that they could -- you know, by testifying today could be implicating themselves further.

My understanding, I met Mr. Robert Christensen, I believe is his name, attorney for Andrea Jeter. She's retained an attorney now.

THE COURT: Okay.

MS. NAMMAR: He has indicated that she still intends to take the stand, but she will be asserting the Fifth with regards to anything relating to the drug trafficking conspiracy, if we were to get into any questions about that. I do think that some of that could be relevant and go towards her bias. So I can make arguments on that later but.

And then as for Shawntel Pacheco, I'm not aware that she has counsel and my understanding is that she's not made a decision whether she intends to testify or not. So, we do kind of have those preliminary.

THE COURT: Okay. Well, those are pretty significant preliminary matters we need to discuss. Make sure you use the microphone, Mr. Hughes.

MR. HUGHES: Yes, Your Honor. May I respond?

THE COURT: Yeah, of course.

MR. HUGHES: Judge, our position is that this hearing, there are only two questions to be explored, two issues to be

explored, and those are, did Mr. Jeter request and Mr. Singh file a Notice of Appeal on his behalf. And if the answer to that is yes, question number two, did Mr. Singh do so. We would take the position --

THE COURT: We know he didn't do so, right?

MR. HUGHES: That's correct.

THE COURT: So it's really just one question. Yeah.

MR. HUGHES: Absolutely. Really just one question.

I can't think of a single relevant question related to that issue that would implicate either Andrea Jeter or Ms. Pacheco in any type of a drug trafficking conspiracy. I would certainly object as being irrelevant any questions that do not relate to the specific issue of did Mr. Jeter request Mr. Singh file a Notice of Appeal.

THE COURT: Ms. Nammar?

MS. NAMMAR: Yes, Your Honor. I think, you know, one of the reasons that --

THE COURT: I mean the bias, it seems to me, you can argue is family member and so forth, right, but I'm not sure how --

MS. NAMMAR: I think bias and her credibility. I think Mr. Singh will testify that one of the reasons Mr. Jeter did not want to -- didn't express any desire to file an appeal, didn't ask him to file an appeal, didn't want to file an appeal is because he was trying to protect his wife who was involved

in the drug conspiracy and had not been charged by the U.S. Attorney's Office; his son, who he admitted at the proffer was involved in the drug trafficking conspiracy; his daughter Shawntel Pacheco, who was involved in the drug trafficking conspiracy, was trying to protect them from being charged by the government. So he was taking responsibility and not --

THE COURT: Okay. But that can come in, it seems to me. And you don't -- Mr. Singh, if there's a foundation for it, could testify to that. You agree with that, Mr. Hughes?

MR. HUGHES: I would, Your Honor.

THE COURT: Right. I mean it's relevant as to motive to file an appeal or not file an appeal.

But I guess what I'm struggling with is, if one of the family members, let's just take Mrs. Jeter for example, is on the stand, I'm not sure what additional relevance there is to you asking her essentially if she was in fact involved in the drug conspiracy. Because what matters is what was in Mr. Jeter's mind, not whether in fact that was true or not. Right?

MS. NAMMAR: And technically what Ms. Jeter says is irrelevant because it's only between what Mr. Singh and Mr. Jeter discussed, right?

THE COURT: Right.

MS. NAMMAR: Except that Ms. Jeter's testimony could possibly corroborate Mr. Jeter's testimony.

THE COURT: Let me ask you this: First of all, I'd want to talk to Ms. Jeter's counsel and her, and make sure we're all on the same page.

MR. HUGHES: Correct.

THE COURT: As to where she stands as opposed to just a proffer that I'd receive right now. And I'd want to talk to -- I'm sorry, the name that --

MR. HUGHES: Shawntel Pacheco.

THE COURT: Pacheco.

MR. HUGHES: And she would like to hear from you as well, Judge.

THE COURT: Yes. So, you know, I'll have a discussion with her as well.

But it sounds like there would be a valid Fifth Amendment privilege as to questions regarding drug dealing.

My preliminary view is they're probably not relevant. And so I think we probably can conduct this hearing, as Mr. Hughes suggests, without getting into that. So my suggestion is we get started. Let me hear the context of everything and then if you do think it's relevant to get into, we can have that discussion, perhaps have them leave the stand, have that discussion at that point in time.

MS. NAMMAR: Okay.

THE COURT: Does that work?

MS. NAMMAR: That works for me. Yes, Your Honor.

MR. HUGHES: That's fine, Your Honor.
THE COURT: Okay. Okay. So, anything else as far as preliminary matters to take up?
MR. HUGHES: Yes, Your Honor. I have a copy, we have three exhibits, I've got copies for you, I apologize.
THE COURT: Well, I think I have those. Let me just double-check.
MR. HUGHES: We filed them, but I don't think copies were sent directly to you.
THE COURT: Okay. So, first of all, Ms. Nammar, your Exhibits 1, 2 and 3 are now superseded --
MS. NAMMAR: Correct.
THE COURT: -- by the 200 series, correct?
MS. NAMMAR: 21 through 25.
THE COURT: Get rid of that. All right.
I see. Okay. You're 21 through 25, are the new exhibits.
MS. NAMMAR: Yes, Your Honor. So that we didn't duplicate the numbers.
THE COURT: Okay. So, Mr. Hughes, I then do have your Exhibits 1 through 4?
MR. HUGHES: Right, and I think we're not going to use 4, Your Honor. We probably are not going to introduce 4. It all depends on Mr. Singh's testimony.
THE COURT: All right. But I do have those, so I

don't think I need anything more.

MR. HUGHES: I have two more sets also as well with me, so.

THE COURT: Okay. Okay. If we need to go there. Okay.

All right. Anything else then?

MS. NAMMAR: Oh, Your Honor, we have agreed that the -- to stipulate to all the exhibits coming in. And so --

THE COURT: Okay. So, if I understand then, I can preadmit Exhibits 1 through 4, and 21 through -- 1 through 3 for now I suppose, Mr. Hughes.

MR. HUGHES: That's correct.

THE COURT: And 21 through 25?

MS. NAMMAR: Correct.

MR. HUGHES: Yes, Your Honor.

THE COURT: Okay. So those exhibits are admitted.

(Government's Exhibits 21 through 25
were received in evidence.)

(Defendant's Exhibits 1 through 3 were received in evidence.)

THE COURT: So why don't we start with Ms. Jeter and her attorney, if someone could bring them in?

I'm sorry, Ms. Nammar, who is her attorney?

MS. NAMMAR: Robert Christensen.

THE COURT: Christensen.

Mr. Christensen, if you don't mind coming up to the

microphone up here, I can have a discussion with you first.

You can come up here, ma'am, and we'll do it like that.

MR. CHRISTENSEN: Good morning, Your Honor.

THE COURT: Good morning.

All right. So for the record, Andrea Jeter; is that right?

THE WITNESS: Yes.

THE COURT: Yes. Okay. Is in the courtroom on the stand.

And, Mr. Christensen, you represent her; is that correct?

MR. CHRISTENSEN: Yes, Your Honor.

THE COURT: Okay. So I've been told there's a potential issue about Fifth Amendment privilege. So I want to hear from you as to your client's position on this, make sure she's had sufficient time to consult with you and so forth.

MR. CHRISTENSEN: Yes, Your Honor. So, my understanding is the 2255 hearing is around the appeal issue. Anything outside of that my client will assert her Fifth Amendment right.

THE COURT: Okay. So, we've had some discussions among ourselves and the thought was to proceed because clearly we're not -- we're going to start with anything else. I've given a sort of pre-indication I don't necessarily see the

relevance of getting into the underlying drug conspiracy and who was involved in it. But if Ms. Nammar believes it's relevant, she can make those arguments to me and I would rule at that point in time and then your client could invoke the Fifth. But are you going to stay in the courtroom?

MR. CHRISTENSEN: Yes, Your Honor.

THE COURT: Okay. So, put your hand up in the air if you want to speak at any point in time.

MR. CHRISTENSEN: I will, Your Honor. And thank you, Your Honor.

THE COURT: Okay?

All right. So, ma'am, you understand you do have a Fifth Amendment privilege not to say anything that may incriminate you as to any criminal conduct; do you understand that?

THE WITNESS: Yes.

THE COURT: Okay. You have to speak into the microphone so I can hear you.

THE WITNESS: Yes.

THE COURT: Okay. And Mr. Christensen is your counsel, correct?

THE WITNESS: Yes.

THE COURT: Okay. And you've had sufficient time to talk with him?

THE WITNESS: Yes.

THE COURT: Okay. You understand during the course of your testimony, if you want to talk to him at any point in time just let me know and I'll let you talk to him in private.

THE WITNESS: Okay.

THE COURT: Okay? And you -- as I understand it, the broad outlines, you're fine testifying about the direct issue before us here today, which is whether or not Mr. Singh should have filed a Notice of Appeal on behalf of your husband?

THE WITNESS: Correct.

THE COURT: And you're willing to testify as to matters regarding that?

THE WITNESS: Yes.

THE COURT: Okay. If we get to an area, however, where you believe there's a Fifth Amendment privilege, then you just let me know you want to talk to your counsel or you want to invoke the Fifth Amendment privilege, then we'll go from there.

THE WITNESS: Okay.

THE COURT: Okay?

THE WITNESS: Thank you.

THE COURT: All right. Is everyone satisfied with that?

MR. CHRISTENSEN: Yes, Your Honor.

MR. HUGHES: Yes, Your Honor.

MS. NAMMAR: Yes, Your Honor.

THE COURT: Okay. I was assuming she was the first witness, but I don't know why I thought that.

MR. HUGHES: And she is, Your Honor.

THE COURT: She is?

MR. HUGHES: She is.

THE COURT: Okay.

MR. HUGHES: And I guess you'll discuss with Ms. Pacheco if and when I call her.

THE COURT: Yes.

MR. HUGHES: Okay.

THE COURT: That's what I was thinking we can do.

MR. HUGHES: Okay.

THE COURT: Since we have Ms. Jeter on the stand.

All right. So, Mr. Hughes, I'll turn it over to you then.

MR. HUGHES: I have one additional question, if I may, Your Honor, and I believe Ms. Nammar was trying to explain to me. If I want to display an exhibit for the witness to view while I'm questioning --

THE COURT: Is the ELMO up or can you just give a copy to the witness?

MR. HUGHES: I can give a copy to the witness.

THE COURT: Why don't we just do that.

MR. HUGHES: Okay.

THE COURT: Just easier probably.

MR. HUGHES: Much better.
THE COURT: Old fashion way.
MR. HUGHES: Yes.
THE COURT: All right. All right, Mr. Hughes. You can -- you can swear the witness.
MR. HUGHES: Yes.
THE COURT: You call Ms. Jeter, correct?
MR. HUGHES: That's correct.
THE COURT: All right. Ms. Jeter is on the stand. She can be sworn.

ANDREA JETER, DEFENDANT'S WITNESS, SWORN

THE COURTROOM MANAGER: Thank you. Please be seated. Please state your name for the record, spell your first and last name, and speak into the microphone.
THE WITNESS: Andrea Jeter, A-N-D-R-E-A, J-E-T-E-R.

DIRECT EXAMINATION

BY MR. HUGHES:
Q Good morning, Ms. Jeter.
A Good morning.
Q How are you?
A Good.
Q Good. Ms. Jeter, are you married?
A Yes.
Q Who is your husband?
A Courtney.

Q And do you see -- and it's Courtney G. Jeter?
A Yes.
Q And do you see him in the courtroom this morning?
A Yes.
Q Okay. And what is he wearing and where is he seated?
A The white jumpsuit and seated at the table there.
Q Okay. I want to direct your attention --
THE COURT: She has identified the defendant.
MR. HUGHES: Okay.
BY MR. HUGHES:
Q I want to direct your attention back to May the 13th of 2024. Do you recall where you were that day?
A Here.
Q Here at the U.S. courthouse?
A That -- that room, the other courtroom.
Q And why were you here on that day?
A For sentencing.
Q And that was for sentencing of your husband on the three counts to which he pled guilty; is that correct?
A Yes.
Q Okay. Did you have in your mind an expectation of what that sentence might be?
A 15 years.
Q Okay. So, you thought that at the conclusion of the sentencing, that your husband would receive 180 months or

15 years?
A Yeah.
Q What did you base that expectation upon?
A I asked Gary what the best and worst outcome, and he said the worst case scenario would be 15 years.
Q Okay. And when you say Gary, are you referring to Gary Singh?
A Yes.
Q And Gary Singh was your husband's sentencing counsel, correct?
A Yes.
Q Okay. He represented your husband at the sentencing that day?
A Yes.
Q All right. Were you present in the courtroom when sentence was actually pronounced?
A Yes.
Q And what was your understanding of the length of the sentence when it was pronounced?
A It was 20 years.
Q Okay. 240 months?
A Yes.
Q All right. Once you heard that that was the sentence that was pronounced, obviously that was more than the 15 years you expected, correct?

A Yes.
Q Okay. What, if any, action did you take upon hearing that the sentence was more than what you had expected?
A Actually in the courtroom, we were told not to have an outburst.
Q Yeah, was kind of an awkward question and I apologize.
What did you do afterwards?
A After we went outside, all my children were there, they gathered around me, they were all crying.
Q Okay.
A I stayed strong for them. And Gary said, I'll meet you outside. And so I told them, we got to go. And I came out the -- out into the -- before the steps in front of the courthouse.
Q So outside of the building here of the courthouse?
A Yes.
Q And you said you had your children with you. Who -- who were the children who were with you?
A There was Shawntel Pacheco, John Pacheco, Shane Morris, Tasha Morris, Kiana Pacheco. I think that was all.
Q And did you meet with Mr. Singh outside of the courthouse that day right after the sentencing?
A Yes.
Q And I just want to make sure I understood. Had you told Mr. Singh you wanted to meet with him or were you waiting for

him to come out?
A No, he was kind of waiting for the kids to get off me and he motioned that he would meet me downstairs. So I told the kids right then, stop, let's go. And we went down the elevator right after him. So he had just come out and we came out right behind him.
Q And did you have a conversation with Mr. Singh?
A Yes.
Q And what was that conversation about?
A So, we were, like, so what now? Is that it? And he said, I -- no, he said I can appeal. And he said the judge said he was going below the recommendation of the prosecution and he went above it. So we have an appeal. And I was like, really? And he said, yes, but I only have 14 days to do it and I need to get the transcript from the court first. So I said, how do I do that? He said, I'll get it and I'll let you know later how much it is, you can pay me.
Q Okay. Now, let me just ask you some questions. You mentioned something about the recommendation of the government as to the sentence, you just referred to that.
A Mm-hmm.
Q Do you recall when Judge Seabright asked Ms. Nammar what the government's request was, what their recommendation was for the sentence towards the end of the proceeding?
A I don't. I really don't.

Q Okay.

THE COURT: To be clear, I'm sorry, you're talking about in court during the sentencing itself?

MR. HUGHES: That's correct, Your Honor.

THE COURT: If she recalls what Ms. Nammar's recommendation was?

MR. HUGHES: That's correct.

THE COURT: That was your question.

MR. HUGHES: Yeah.

THE COURT: You don't have a recollection of that?

THE WITNESS: Um --

THE COURT: It's fine if you don't.

THE WITNESS: No, I don't.

THE COURT: I just want to make sure I understood the question.

THE WITNESS: Yeah. I don't.

THE COURT: Okay. Thank you.

MR. HUGHES: And I'm sure I asked it very awkwardly, so.

BY MR. HUGHES:

Q So you don't remember the recommendation, but just so we understand and the record is clear, Mr. Singh told you that because the sentence exceeded the government's recommendation, that's why Courtney had a right to appeal; is that correct?

A That's what he told me.

Q Okay. Did Mr. Singh tell you that he was going to appeal your husband's sentence?
A Yes.
Q Now, at that point did you know what was involved in perfecting an appeal? In other words, what is the first step that an attorney has to take in order to preserve the client's appellate rights?
A I have -- I have no idea -- I don't know anything about the law, but he told me he needed the transcript. So I assumed that was the first step.
Q So he told you that he needed the transcript of the sentencing proceedings; is that correct?
A Of the sentencing, yeah.
Q And so just so we're clear, at this point he's told you that in response to your question, what can we do, that we can appeal; is that right?
A Right.
Q And that he needed the transcript?
A Yes.
Q Did he mention anything about payment for the transcript?
A He said I would have to pay for the transcript. And I said, that's fine. How do I get it? And he said, I'll get it, and my office will send you an invoice.
Q Okay. And were any of your children --
THE COURT: Can I interrupt, just ask a question?

MR. HUGHES: Absolutely.

THE COURT: Because I don't remember. Was Mr. Singh retained or appointed in this case?

MR. HUGHES: He was retained, Your Honor. He was the third counsel.

THE COURT: Okay. I remembered that. I just wanted to make sure it was a retained -- he was retained counsel.

MR. HUGHES: He was. He was.

THE COURT: And, Ms. Nammar, I assume you stipulate to that as a fact?

MS. NAMMAR: Yes, Your Honor.

THE COURT: Okay. Thank you.

BY MR. HUGHES:

Q So you have a discussion with Mr. Singh that he was going to appeal --

A Yes.

Q -- and that he was going to get the transcript?

A Mm-hmm.

Q And that you were going to have to pay for the transcript?

A Yes.

Q While this conversation is taking place, are any of your children within earshot to --

A Yes. My daughter, my oldest daughter Shawntel was -- had her arms wrapped around me. She didn't let me go.

Q Okay. And how long did this conversation take place?

A Five minutes maybe.

Q Okay. So, when you left the courthouse that day was it your belief and expectation that Mr. Singh was going to file a Notice of Appeal on your husband's behalf?

A Absolutely.

Q Okay. Did you have any reason to think that that wasn't going to happen?

A No.

Q Okay. When was the next time you heard from Mr. Singh regarding the transcript?

A A while later. I'm not sure if it's -- if it was before Courtney left or after --

THE COURT: Sorry, before Courtney left?

THE WITNESS: Oh, FDC.

THE COURT: FDC. Thank you.

THE WITNESS: Mm-hmm. He -- his office sent me the invoice.

MR. HUGHES: Okay. May I approach the witness, Your Honor?

THE COURT: You may.

BY MR. HUGHES:

Q Okay. Ms. Jeter, I'm going to hand you what's been admitted as Exhibit 1. And I'm going to step back and just ask you some questions.

A Okay.

Q Okay. Do you recognize that document?
A Yes.
Q Okay. And what is that?
A The -- the e-mail that asked for the check to pay for the transcript.
Q Okay. And so this is an e-mail from -- it's dated June 18th of 2024, correct?
A Yes.
Q And it's from Mr. Singh to you asking that you mail him a check in the amount of $201.05; is that correct?
A Yes.
Q And was that to pay for the transcript?
A Yes.
Q Okay. I want to turn to the second page of that exhibit. You'll see at the top, it appears there's an e-mail from the law office of Gary Singh to Ann, I believe it's Matsumoto. And could you just read that sentence after "*aloha*, Ann"?
A "Mr. Singh would like to follow up on his transcript request that we submitted on May 21st in regards to the above-referenced matter."
Q Okay. Now, at that time or around May the 21st, did Mr. Singh ever tell you that he had requested the transcript?
A He told me, yes --
Q Okay.
A -- that his office had requested it. I think it might

have been before then. But it could have been on that day, I'm not sure.

Q Okay.

MR. HUGHES: May I approach the witness again, Your Honor?

THE COURT: You may.

BY MR. HUGHES:

Q Okay. Ms. Jeter, I'm going to hand you what's been admitted as Exhibit 2 and ask you, do you recognize that document?

A Yes. The check I wrote to Gary for the transcript.

Q Okay. So that's the check for $201.05, correct?

A Yes.

Q Okay. Now, at that point when you wrote the check, did you think that the appeal had been filed?

A Yes.

Q Okay. Did you have any reason to think that it hadn't been filed?

A No.

Q Okay. Had you and Mr. Singh had any conversations about the status of the appeal or whether or not it had been filed?

A No.

Q Okay. When was the next time you made inquiry of Mr. Singh to find out the status of the appeal?

A The next time I asked him about it was after Courtney got

to Lompoc.
Q Okay.
A And then it took a while later before he received his personal belongings. And he told me, you know what I don't have, I don't have a copy of the appeal. And I said, oh, I don't have it either. So I asked Gary for it.
Q And do you recall when you asked Gary for that?
A November.
MR. HUGHES: May I approach the witness again, Your Honor?
THE COURT: Yes.
BY MR. HUGHES:
Q Okay. Ms. Jeter, I'm going to hand you what's been marked as Exhibit 3 and ask you take a look at that and if you recognize it?
A Yes.
Q Okay. And what is that?
A This was the text I sent to Gary. It was November. November 2nd asking for a copy of the appeal.
Q Okay. And what was his response?
A An appeal was never filed. We only ordered a copy of the transcript of the sentencing.
Q Okay. Now, with respect to communication in general with Mr. Singh, from the time -- particularly focusing from the time of the sentencing until November the 2nd of 2024, was it

primarily through text, would you call him, how would you -- how would you normally communicate with him?
A Primarily through text.
Q Okay. And what was your reaction when you found out on November the 2nd of 2024 that the Notice of Appeal had never been filed?
A I was devastated. I started looking for help.
Q Okay. Sort of looking for legal help; is that right?
A Yeah, mm-hmm.
Q Okay. Did you notify Mr. Jeter, Courtney, that Mr. Singh had informed you the Notice of Appeal had never been filed?
A Yes.
Q Okay. So let's talk a little bit about what happened with Mr. Jeter from the time he was sentenced until you sent this text to Mr. Singh on November the 2nd.
He went back to FDC Honolulu, obviously, after he was sentenced?
A Yes.
Q Do you know where he went next?
A He went to Victorville, California.
Q Right. And do you know how long he was there?
A Oh, kind of long. Till September. So June to September.
Q Do you remember -- okay. So he arrived there sometime in June?
A Yes.

Q Do you remember the exact date by any chance?
A I think he left here June 13th.
Q Okay. In terms of being able to communicate with your husband when he was in Victorville, was that more difficult than doing it here at the FDC --
A Yes.
Q -- was it easier?
A It was much more difficult.
Q Do you know why?
A I think they were, like, locked down for 23 hours. So they had one hour to shower, exercise, make phone calls and stuff. So, I'm not sure what the time limit was, but, you know, there was a short period of time.
Q Okay. So it had become more difficult for you to communicate with him?
A Yes.
Q Okay. Let me ask you, if I can grab -- now, you understand that your husband has filed a petition pursuant to 28 U.S.C. 2255 seeking habeas relief from his conviction and sentence, correct?
A Yes.
Q Okay. I know that was a lot of legalese.
A Lot of words.
Q You know that I'm trying to get his appeal rights back?
A Yes.

Q Okay. So in support of our petition, do you recall filing a sworn declaration?
A Yes.
Q Okay. And you've had an opportunity to review that declaration recently?
A Yes.
MR. HUGHES: And, Your Honor, just for the record that's filed as ECF Document 177-1.
THE COURT: All right.
BY MR. HUGHES:
Q Ms. Jeter, I want to ask you, do you need a copy to review or do you -- would it help you?
THE COURT: Do you have a copy for me? I didn't bring that with me.
MR. HUGHES: Okay. May I approach, Your Honor?
THE COURT: Yeah, you can -- thank you. And you can approach the witness if you wish.
MR. HUGHES: Yeah.
BY MR. HUGHES:
Q Okay.
A Okay.
Q And, Ms. Jeter, if I can just direct your attention to the second paragraph towards the end where you state that he left Honolulu FDC immediately after his sentencing. So he did not have any contact with Gary Singh after that.

Having had a chance to -- and just so we're clear, this affidavit was signed approximately 15 to 16 months after your husband was sentenced, correct?
A Mm-hmm. Yes.
Q Having had a chance to reflect upon that, do you think "immediately" was the best choice of words or inaccurate?
A No, it wasn't, but what I meant was, most of the people that got sentenced would leave six months, nine months, one year later. Nobody left, like, right after it. And he left in June. He was sentenced the middle of May and left the middle of June. So it was, like, less than a month or right around a month.
Q Okay.
A That's what I meant by immediately. Well, I should have said shortly.
Q Okay. And further along in that sentence after his sentencing, so he did not have any contact with Gary Singh after that. What time period did you mean to reference?
A After he left FDC.
Q Okay. So just so we're clear for the record, it's not your testimony there was no contact after the sentencing, there was just no contact --
A No, no.
Q -- after he left FDC?
A Yes, yes.

Q So no contact with Mr. Singh when he was in Victorville?
A No.
Q And no contact with Mr. Singh when he was in Lompoc?
A No.
Q So as far as you're aware, the last contact he had with Mr. Singh would have been here at FDC?
A Yes, right before he left.
Q Okay. I think I've already asked you if you had -- once you found out the appeal had not been filed, you let your husband know; is that correct?
A Yes.
Q Okay. So, I'm almost finished, I just want to ask, at any time prior to November the 2nd of 2024, did you have reason to believe that a Notice of Appeal had not been filed?
A No, I was pretty sure it was filed.
Q Okay. And Mr. Singh --
A I thought.
Q Okay. And Mr. Singh told you that -- did he tell you he was going to file it or that he had filed it?
A He was going to file it, is the -- is what he told me.
Q Okay.
A And he told me he had 14 days to do it.
MR. HUGHES: Okay. I'll pass the witness, Your Honor.
THE COURT: All right. Cross.
MS. NAMMAR: Mr. Hughes, do you have a copy of, I

think you said 177, the document?

MR. HUGHES: Yes.

MS. NAMMAR: Sorry, I don't have that.

CROSS-EXAMINATION

BY MS. NAMMAR:

Q Good morning.

A Good morning.

Q One moment, please.

All right, Ms. Jeter, are you familiar with the sentencing guidelines?

A No.

Q Are you familiar with Mr. Jeter's plea agreement?

A No.

Q Did you ever review Mr. Jeter's plea agreement?

A I'm not sure -- I'm not sure what exactly the plea agreement is.

Q Okay. And are you familiar with a presentence investigation report?

A I know they did one. I didn't get it. I asked for it, but I didn't get it.

Q Okay. So you never reviewed the presentence investigation report, did you?

A No.

Q And are you familiar with the government's, what's called a 5K motion that was filed in Mr. Jeter's case?

A No.
Q So you never reviewed a 5K motion filed by the government, did you?
A No.
Q Okay. So you weren't aware of what Mr. Jeter was facing whenever he appeared for sentencing on May 13, 2024, were you?
A Gary told me that the -- no, I just knew what Gary told me.
Q Okay. And you -- your testimony was that Gary told you he was getting 15 years, correct?
A Yes.
Q Okay. And so you're not aware that in Mr. Jeter's plea agreement or when he pled guilty he told the Court that he understood that he didn't know what his sentence was going to be and that no one had promised him what his sentence was going to be. Were you aware of that?
A I just know what Gary told me when I asked him directly what was the sentence going to be, I said, what's the worst case scenario? He told me 15 years.
Q Okay. And so you don't understand Gary is not the one sentencing Mr. Jeter, correct?
A Oh, I understand that.
Q Okay. And it's the judge?
A Yes.
Q And Mr. Jeter's sentence was completely up to the judge;

did you understand that?
A Yes.
Q Okay. So your testimony is that you met with Gary outside of the courtroom on May 13th?
A Yes.
Q And at that time he told you he was going to file a Notice of Appeal?
A Yes.
Q Do you understand that it's not Mr. Singh's -- it's not his choice whether to file a Notice of Appeal?
A Whose choice would it be? I mean if it's -- what defendant wouldn't want an appeal?
Q Okay. Do you understand that Mr. Jeter waived his rights to appeal?
A Well, I asked Gary about that, and Gary said no, this is different. He can appeal this.
Q Okay.
A And that's why he explained, because of the -- the length of the sentence.
Q And so your testimony was that the judge sentenced Mr. Jeter above the recommendation of the prosecutor, is that what you said?
A That's what Gary told me on the courthouse steps.
Q And you sat here in this courtroom for Mr. Jeter's sentencing, correct?

A Yes.
Q And you're aware that the judge did not sentence Mr. Jeter above the guideline range, correct?
A I'm not -- I'm not -- I was not aware of it.
Q All right. So you have no idea, correct?
A No.
Q Okay. You just went over your declaration with Mr. Hughes?
A Yes.
Q And in fact, you filed two different declarations in this case, didn't you?
A I don't think so.
Q Okay.
A I --
Q Do you recall signing a declaration on August 19th of 2025?
A Was it the same day?
Q August 19th of 2025, do you recall signing a declaration?
A I don't know.
Q Okay.
A It might have been the same thing without this -- this part on the bottom. I did do one like that, without it and then I put it in.
THE COURT: When you say, for the record, this thing on the bottom, where it says "I declare under penalty of

perjury."

THE WITNESS: Yes, yes. Sorry, I keep moving the mic.

BY MS. NAMMAR:

Q So you are referring to document -- what's filed in the court document as 177-1 up at the top of the page; is that correct?

A Yes.

Q Okay. And are you aware that on August 22nd of 2025, Mr. Hughes filed a document, which is document ECF 175-1, with your signature, a declaration very similar to this one, and you dated it August 19th of 2025, are you aware of?

A I'm not aware of it, but I know I did send one without it and then he asked me to put it in there.

Q Okay. And so then you sent another declaration to Mr. Hughes with the "I declare under penalty of perjury"; is that correct?

A Yes, yes.

Q Okay. And that, I believe, was filed by Mr. Hughes as Document 176. And that was dated August 22nd --

A You're really totally confusing me because this is 177 and it has that in there. So I'm not sure. I would need to see because I don't know what you're talking about.

MS. NAMMAR: Your Honor, I only have one copy of each of these.

THE COURT: All right. We can print them out. Why

don't we give the numbers again and we can print out copies for everybody.

MS. NAMMAR: Document 175-1, it's Page I.D. 1508.

Document 176, Page I.D. 1509.

And Document 177-1, Page I.D. 1512.

THE COURT: All right. Well, we have that already. So just the other two needs to be printed.

So if we can go to 175-1. Maybe print, like, four copies of that.

And then 176.

Why don't you give the witness one of each and give me one of each and each of counsel one of each.

THE WITNESS: Thank you.

THE COURTROOM MANAGER: (Complying.)

THE COURT: And 176.

All right, Ms. Nammar.

MS. NAMMAR: Okay.

THE WITNESS: Okay.

BY MS. NAMMAR:

Q Okay. Ms. Jeter, if you'll look up for a moment.

Your testimony previously was that you told Gary in November -- you asked Gary in November whether an appeal had been filed; is that correct?

A No. I asked Gary for -- to e-mail me a copy of the appeal because Courtney didn't have his copy.

Q Okay. And when was that?
A That was in November.
Q Okay. If you'll please look at Document 175-1.
A Okay.
Q And if you'll read the last sentence, please?
A "Courtney found out after he got to Lompoc in September that nothing was ever filed."
Q Okay. And then if you'll look at Document Number 176, and if you'll read that last sentence before the --
A -- "asked me to get a copy of the appeal Gary filed after he got to Lompoc and we found out in November that nothing was ever filed."
Q Okay. So which was it, Ms. Jeter, September --
A November.
Q -- or November?

THE COURT: Hold on, hold on. Wait until she's done with her question.

THE WITNESS: Oh, sorry.

THE COURT: We have a court reporter who cannot take two people --

THE WITNESS: Oh, I'm sorry.

THE COURT: No, you're interrupting me. Can't take two people speaking at the same time.

THE WITNESS: Okay.

THE COURT: Just wait. Okay?

All right. Ask your question.
BY MS. NAMMAR:
Q So, Ms. Jeter, which was it that he -- when was it that he realized an appeal had not been filed?
A November.
Q Okay. And that's what you believe, correct?
A I know that because that's when -- I have the -- here's the proof right here that there was -- it was November, it's dated.
Q Okay. And so you misspoke when you said September in your previous declaration?
A Yes, that's why there was another one done.
Q All right. Throughout Mr. Singh's representation of Mr. Jeter, you testified that you communicated with him mostly via text message; is that correct?
A Yes.
Q Did you ever speak with him on the phone?
A Yes.
Q And did you ever go to his office?
A Yes.
Q And you personally asked Mr. Singh for assistance on several occasions, didn't you?
A For me? What do you --
Q You personally asked Mr. Singh for assistance with legal issues on several occasions, didn't you?

MR. HUGHES: Objection. Relevance, Your Honor.

THE WITNESS: I don't --

THE COURT: No, I'll permit it. Just go slowly, okay, at this point.

THE WITNESS: Okay. Okay. Well --

THE COURT: Just say yes or no at this point. If you're able to.

THE WITNESS: Yes.

THE COURT: Okay.

THE WITNESS: I'll say yes.

BY MS. NAMMAR:

Q All right. And in fact, the day after Mr. Jeter's sentencing on May 14th, 2024, you sent Mr. Singh a text message telling him that Mr. Jeter needed to see him, didn't you?

A Probably.

Q Okay. Let's look at, if you can turn, there's a binder up there in front of you, to Exhibit 25. It'll be the last exhibit and it's 14 pages.

And if you can take a moment to familiarize yourself with this exhibit, please?

A Okay. Hold on, I didn't get there yet.

Oh, they're marked. Sorry.

Okay.

Q Do you recognize this?

A Yeah.

Q And what is it?
A Text messages between me and Gary.
Q Okay. And on Page 1 of Exhibit 25, those messages start on April 28, 2024; is that correct?
A Yes.
Q And if you'll go to the last page, 14, the last text message was November 4th of 2024; is that correct?
A Yes.
Q Okay. And so, if we can go to Page -- sorry, at Page 1, the bottom, the first message that starts "Courtney wants to see," do you see that?
A Yes.
Q And if you could read that, please?
A "Courtney wants to see you as soon as possible" --

THE COURT: Hold on. Wait, wait, hold on.

MR. CHRISTENSEN: Your Honor, I need to get to the restroom.

THE COURT: Okay.

MR. CHRISTENSEN: Sorry.

THE COURT: All right. Why don't we do this: Why don't we just go ahead and take a five-minute break, we'll take a very short break. Anyone can use the restroom who needs to, stretch your legs and we'll pick up. Okay.

THE WITNESS: Okay.

THE COURT: All right.

(A recess was taken from 9:48 a.m. to 9:56 a.m.)

THE COURT: All right. Please be seated.

We're back with counsel, Mr. Jeter.

Ms. Jeter, I remind you you're still under oath.

THE WITNESS: Yes.

THE COURT: Ms. Nammar, you may continue with your cross-examination.

MS. NAMMAR: Yes, Your Honor. Thank you.

BY MS. NAMMAR:

Q Ms. Jeter, when we left off we were on Page 1 of Exhibit 25. And I had asked if you would please read the bubble that starts, "Courtney wants to see."

A "Courtney wants to see you as soon as possible. He also said to ask you to bring the paperwork that shows the actual meth versus pure meth. He said you would know what he's talking about. He looked up case law already and needs to show it to you."

Q And what date was that that you sent that text message?

A May 14th.

Q And 2024, correct?

A Yes.

Q And what was Mr. Singh's response?

A "Okay."

Q And if we could turn -- sorry, are you aware that on May 15th, 2024, the following day, Mr. Singh went and visited

Mr. Jeter?
A I don't know the actual days he went to visit.
Q Okay. And on May 23rd you sent Mr. Singh another text message, didn't you?
A Yes.
Q And if you can look on Page 2 of Exhibit 25, the text message on May 23rd, 2024, that starts, "Good morning, Gary." Can you read that, please?
A "Good morning, Gary. Courtney needs to see you when you can. He said there is another testimony on the case he wanted to testify for. He said that you -- that should be the corroborating evidence Maggie needed."
Q Okay. And are you aware that Mr. Singh went and met with Mr. Jeter a few days later on May 26th of 2024?
A I -- I don't know when. He didn't tell me every time he went to see him. I know when I told him that Courtney wanted to see him, but I don't know when he went to see him.
Q Okay. And so when you told Mr. Singh that Courtney needed to see him, you weren't aware of whether he went or not?
A No.
Q All right. If we can turn to page -- on that same page, the last bubble that starts, "Courtney said," if you could read that, please?
A "Courtney said he needs to see you and it's very, very important."

Q And that was on May 28th of 2024, correct?
A Yes.
Q And you sent that message to Mr. Singh?
A Yes.
Q And since you said you weren't aware of the times that Mr. Singh met, would it surprise you to learn that Mr. Singh met with Mr. Jeter on May 29th, 2024, the following day?
A No.
Q Okay. And then on -- if we could turn to Page 3 of that same Exhibit 25?
A Okay.
Q And if you can please read the last bubble starting with, "Courtney will be leaving."
A "Courtney will be leaving this month. Can we just do a general power of attorney that specifically mentions Lexi's medical, education, passport renewals and his Social Security benefits? Let me know how much it will" -- probably cost, let's see --
Q That message --
A Cuts off after that.
Q Okay. And then if we turn over to Page 4, I think that message carries over, it starts on the top of that page as well.
A Oh, "how much it will be."
Q Okay. On June 26, 2024, you asked Mr. Singh to draft a

power of attorney so that you could care for Mr. Jeter's minor child, didn't you?
A June 6.
Q June 6, I'm sorry. Correct?
A Yes.
Q Okay. And Mr. Singh prepared a power of attorney for you, didn't he?
A Yes.
Q And Mr. Singh took that power of attorney along with a notary out to the Federal Detention Center in Honolulu?
A Yes.
THE COURT: Let her finish the question.
BY MS. NAMMAR:
Q And had Mr. Jeter sign that power of attorney, didn't he?
A Yes.
Q On June 10th of 2024, you sent Mr. Singh another message, didn't you? If you could turn to Page 6 of Exhibit 25?
A Okay.
Q And in the middle of the page on Page 6 where it starts, "I just sent you an e-mail," do you see that?
A "I just sent you an e-mail. The title company needs Courtney to sign and notarize a document."
Q And what was Mr. Singh's response?
A "Okay. I am home and will check on it tomorrow."
Q Okay. And on June -- Mr. Singh took a notary out to FDC

for Mr. Jeter to sign and get that document notarized, didn't he?

A Yes.

Q And you received that document, correct?

A Yes.

Q Okay. Throughout your communications with Mr. Singh you asked him questions about Jeter's placement; is that correct?

A You mean where he was going when he left here?

Q Let's see.

A Wait a minute.

Q If you'll turn to Page 2 of Exhibit 25. And if you'll read the first bubble at the top starting with, "Did Courtney."

A "Did Courtney tell you to change his locations to Stafford first" -- I spelled it wrong -- "and Terminal Island second?"

Q Okay. And so you had conversations with Mr. Singh, you sent him text messages regarding Mr. Jeter's placement, meaning what facility --

A Yes.

Q -- he may be going to? Correct?

A Yes.

Q Okay. And you also asked him various questions about other things, correct?

A (No response.)

Q If you could, for example, turn to Page 3 of Exhibit 25 and read to yourself the top bubble on June 3rd, 2024.

MR. HUGHES: Your Honor, I'll just object to the relevance.

THE COURT: Overruled.

MR. HUGHES: Okay.

THE WITNESS: Does --

BY MS. NAMMAR:

Q Did you read that?

A Yes.

Q Okay. And so my question to you was that you asked Mr. Singh various questions, other questions, correct?

A I just sent messages that Courtney wanted to ask him.

Q And did Mr. Singh respond to those messages?

A Not sure, let me check.

Q Okay. Below that, if you'll look on June 5th, 2024, do you see the message you sent to Mr. Singh asking about RDAP?

A Yes.

Q And Mr. Singh responded, "he is eligible for it," correct?

A Yes.

Q Okay. So Mr. Singh answered your questions, correct?

A Yes.

Q In all of those conversations, if you look at Exhibit 25, starting at Page 1, April 28th, 2024, which was prior to Mr. Jeter's sentencing, all the way up until November -- I'm sorry, October 11th of 2024, which is on Page 14, you never once mentioned anything about an appeal, did you?

A The appeal had to be filed in 14 days; why would I ask? It was done.
Q So from May 13th until May 28th, in these text messages you never asked Mr. Singh about an appeal, did you?
A No.
Q All right.
A My -- my assumption it was done.
Q Ma'am, thank you.
It wasn't until November 4th of 2020 -- I'm sorry, November 2nd of 2024, almost six months after Mr. Jeter had been sentenced, that you sent the text message asking that Courtney said he doesn't have a copy of the appeal you filed, correct?
A Correct.
THE COURT: What page are you on?
MS. NAMMAR: That's on Page 14 of Exhibit 25.
THE COURT: Thank you.
BY MS. NAMMAR:
Q And Mr. Singh's response, if you could please read that after your text message to Mr. Singh? Actually, let's just -- if you'll read on November 2nd, 2024, the text message you sent to Mr. Singh, please?
A "Good afternoon -- good afternoon, Gary. Courtney said he doesn't have a copy of the appeal you filed regarding the judge saying he was going to give him less than what the prosecutor

asked for. Can you send it to him or e-mail it to me and I'll get it to him. Thank you."

And his answer was: "An appeal was never filed. We only ordered a copy of the transcript of the sentencing."

And I said: "Okay. I'll let him know."

Q And then on November 4th, 2024, you sent another message, correct?

A "Can you e-mail me a keep of Courtney's presentencing report. Thank you."

Q Okay. And your testimony was that when you found out -- when Mr. Singh responded that an appeal was never filed, you were devastated; is that what you testified to on direct?

A Yeah. I assumed we were waiting for an answer.

Q Okay. And so your: "Okay. I'll let him know," that's your devastation; is that correct? Your response and devastation?

A That's my response to him because I'm, like -- it doesn't tell you what time I answered that. It wasn't, like, oh, okay.

Q And so is your testimony that if you answered it, what would your testimony be regarding the time?

A My testimony would probably be the same words because that's how I talk.

Q Okay. Understood. Thank you.

Are you aware that to file a Notice of Appeal you don't need a transcript?

A No.
Q And do you know what it takes to file a Notice of Appeal?
A No.
Q Would you be surprised to learn that it's just one simple piece of paper?
A I'm very surprised.
Q All right. And because -- were you here on May 13th of 2024 at Mr. Jeter's sentencing?
A Yes.
Q And do you recall Mr. Jeter having an outburst?
A Yes.
Q And are you aware that Mr. Jeter wrote letters of apology to Judge Seabright and myself?
A Yes.
Q And that's why the transcript was ordered in this case --
A No, it isn't.
THE COURT: Let her finish the question.
BY MS. NAMMAR:
Q Ms. Jeter, that's why the transcript was ordered in this case, correct?
A No.
Q Is so that Mr. Jeter could see what he said at the sentencing?
A Absolutely not.
Q All right.

A Can I say something?
Q Ms. Jeter --
THE COURT: Your attorney can ask you questions.
THE WITNESS: Okay.
THE COURT: Okay.
BY MS. NAMMAR:
Q You were not present at the Federal Detention Center on May 15 of 2024 when Mr. Singh met with Mr. Jeter, were you?
A No.
Q And you were not present at the Federal Detention Center in Honolulu on May 26, 2024, when Mr. Singh met with Mr. Jeter, were you?
A No.
Q In fact, you were not present during any of the meetings --
A No.
Q -- between Mr. Singh and Mr. Jeter, correct?
A Correct.
Q And so you have no firsthand knowledge of the discussions that Mr. Singh and Mr. Jeter may have had throughout the representation, do you?
A No.
Q Ms. Jeter, do you know one of the reasons that Mr. Jeter did not want to go to trial and was pleading guilty and taking responsibility in this case is because he was trying to avoid

his family members being involved, correct?
A Probably. Because he's like that.
Q All right. Because he didn't want his children to get involved in this, correct, any further?
A I don't know what he did. But as far as the plea, because I think it took a long time and it was a process, but I know he was trying to save his family and his house.
Q All right. And he didn't want you to have charges brought against you, correct?
A I guess not.
MR. HUGHES: Calls for speculation, Your Honor.
THE WITNESS: I don't know what --
THE COURT: Okay.
THE WITNESS: None could be brought against me.
BY MS. NAMMAR:
Q No charges can be brought against you?
A I'm not involved in that.
Q You weren't involved in the drug conspiracy?
MR. HUGHES: I'm going to object to the relevance, Your Honor.
THE COURT: Well, she's opened the door to this now, is the problem.
Now, I'm not saying that overrides the Fifth Amendment privilege though, I'm just saying she opened the door to the relevance part of this.

MR. CHRISTENSEN: Your Honor, I would like to speak with my client, please.

THE COURT: All right, you may. So can you just step down and go to that corner and speak with Mr. Christensen?

THE WITNESS: (Complying.)

(Pause in the proceedings.)

THE COURT: All right. Why don't you start with a new questioning, Ms. Nammar.

MS. NAMMAR: Okay.

BY MS. NAMMAR:

Q Ms. Jeter, you knew that your husband had been dealing drugs for sometime, correct?

MR. HUGHES: Your Honor, just for the record, we renew our relevance objection.

THE COURT: Overruled.

THE WITNESS: I'll do my Fifth Amendment.

THE COURT: All right.

BY MS. NAMMAR:

Q Okay. You knew that Mr. Jeter's adult children were involved in dealing drugs with him, correct?

A Fifth Amendment.

MR. HUGHES: Your Honor, may we have a running relevance objection to this entire line of questioning?

THE COURT: I'm not a fan of --

MR. HUGHES: Okay.

THE COURT: -- running objections because you never know exactly when they end --

MR. HUGHES: Understood.

THE COURT: -- is the problem. So just object as we go. I don't think I'm going to let this go much further in any event.

MR. HUGHES: I'll try to make them as unobtrusive as possible.

THE COURT: I understand. Thank you.

MR. HUGHES: Thank you.

BY MS. NAMMAR:

Q Ms. Jeter, you relied on your husband financially, didn't you?

A No.

Q You didn't rely on him financially?

A No.

Q You supported yourself financially?

MR. HUGHES: Relevance, Your Honor. Objection.

THE COURT: Overruled.

You can answer.

THE WITNESS: I had -- I had a job. Yes, I supported myself.

BY MS. NAMMAR:

Q And so no money, Mr. Jeter gave you no money?

A Fifth Amendment.

Q Your family and your children, Mr. Jeter provided for them financially at times, didn't he?
A Fifth Amendment.
Q If there were any possible way that you could get Mr. Jeter's sentence reduced, you are willing to do whatever you can to assist him; isn't that correct?
A Fifth Amendment.
MS. NAMMAR: No further questions, Your Honor. Thank you.
THE COURT: All right. Mr. Hughes?
MR. HUGHES: Yes, Your Honor, brief redirect.

REDIRECT EXAMINATION

BY MR. HUGHES:
Q Ms. Jeter, I believe the binder you have up there, I want to ask you some questions about a couple of exhibits.
A Okay.
Q Could you turn to Exhibit Number 22.
A Okay.
Q Okay. And the first page of that exhibit indicates that it was filed with the court under ECF Document Number 160 on May the 15th of 2024, correct?
A Yes.
Q And within that exhibit there's another exhibit within an exhibit, and if you could turn to Page 4. Do you see that there is a, for want of a better term, a letter that's

addressed to Judge Seabright?
A Yes.
Q And what's the address -- I mean, I'm sorry, what's the date of that message?
A May 14th.
Q Okay. You see it has a "from" and a "to" line at the top. Do you see any indication there that this was a message that was sent to anyone?
A It was from Courtney because that's his federal number, 12508122, and it was to Judge Seabright.
Q Okay. But on the "to" line, under "from," nothing is --
A Oh, nothing is there.
Q Okay. And then on Page 6, you'll see also there's a similar type apology letter addressed to Ms. Nammar, correct?
A Yes.
Q And that date, the date of that letter is also May --
A May 14th.
Q Okay. So, you were asked some questions about this outburst that Mr. Jeter had following the pronouncement of his sentence; you recall that, correct?
A Yes.
Q And you'd agree with me that in these messages dated May the 14th, that Mr. Jeter is --
MS. NAMMAR: Objection, Your Honor. Leading.
THE COURT: Sustained.

BY MR. HUGHES:
Q Is Mr. Jeter, in your opinion, acknowledging his outburst within those messages?
A Yes.
Q Okay. And again, those are the following day, the next day, May the 14th of 2024, correct?
A Correct.
Q So, had Mr. Jeter already apologized and acknowledged this prior to Mr. Singh coming out to visit him for the first time on May the 15th?
A Yes.
Q Okay. I think you were asked some questions about Mr. Singh's assertion that the reason a copy of the transcript was needed was so that Mr. Jeter could see what he said during the outburst, correct?
A Yeah.
Q Okay. But we also discussed during your direct examination the fact that that transcript was not ordered by his office until May the 21st of 2024, correct?
A Correct.
Q So the transcript wasn't ordered until a week after Mr. Jeter had already acknowledged the outburst and apologized?
A Correct.
Q Okay.
MR. HUGHES: Pass the witness, Your Honor.

THE COURT: All right.

MS. NAMMAR: No further questions.

THE COURT: All right, you may step down, ma'am.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: All right. Next witness?

MR. HUGHES: At this time, Your Honor, we would call Courtney Jeter.

COURTNEY JETER, DEFENDANT'S WITNESS, SWORN

THE COURTROOM MANAGER: Thank you. Please be seated.

Please state your name for the record, spell your first and last name, and speak into the microphone.

THE WITNESS: Courtney Gene Jeter, C-O-U-R-T-N-E-Y, J-E-T-E-R.

THE COURT: Okay. You speak really fast, Mr. Jeter.

THE WITNESS: Okay.

THE COURT: That was a record of sorts.

THE WITNESS: I'll slow it down.

THE COURT: Slow it down for the court reporter. Okay. Thank you.

DIRECT EXAMINATION

BY MR. HUGHES:

Q Good morning, Mr. Jeter.

A Good morning, sir.

Q How are you today?

A I'm okay.
Q Good. Listen, I want to get right to it and direct your attention back to your sentencing on May the 13th of 2024. Obviously you recall that day, correct?
A Yes, sir.
Q Okay. Did you understand and expect that on that day you were going to be sentenced to a term of imprisonment in a federal correctional institution?
A Yes, sir.
Q What amount of time were you anticipating or expecting that you were going to receive at sentencing?
A There were two expectations. One a little more expected than the other. I -- I thought it might be 15 and below, and I was expecting a little more on the second one. I was expecting between ten and 13 years.
Q Okay. And why did you expect that?
A Because after the PSR, I didn't really understand it totally. I'm -- I can read, so I understood it, but I didn't -- Gary didn't explain things to me. But he and I had a conversation and I said, what -- what am I looking at? Can you get me below 15? He said, I think we can get you there. And I said, okay. I said, you know, I'm a older guy, it would be much better if I could get between ten and 13. And I said, if you can get me between ten and 13, those Rolexes that I brought in that you looked at, I'll give you one. Give you the one you

liked. And he said, you got a deal. I'll get you between ten and 13.

I had Andrea take the Rolex to his office, with expectation of getting between ten and 13 years. When I didn't get it, I had the outburst in court because I was surprised that I didn't get it.

Q And again, you're referring to Mr. Singh who told you about the ten to 13 years?

A Right, we had a deal.

Q Okay. And the reason I wanted to clear that up, you -- basically Mr. Singh was your third lawyer?

A He was my third attorney.

Q You started off with Mr. Harrison?

A Mr. Harrison and then I -- he had to recuse himself, conflict of interest, and I went to Mr. Breiner. And down the road he had to recuse himself for conflict of interest and he referred Mr. Singh.

Q Okay.

A Now, I could go a little further, but I'm not here to disparage any attorney, but I'll just skip that part and I'll say he referred Mr. Singh and he said that he would guide Mr. Singh through this process.

Q Okay.

A And so I -- I accepted Mr. Singh.

THE COURT: You said we had a deal. Can you explain

what that deal was so I understand what you mean by that?

THE WITNESS: Well, when Gary and I -- Mr. Singh and I were talking, he came to see me, I had taken pictures before -- I was a pawn broker. So I had maybe 15 Rolexes in my collection. And Gary -- I took 'em down -- and he -- he was viewing them because I had them in my -- in my little carrying bag I got there right now, the little brief thing. And we were talking and he had on a runner's watch. And he said he really liked one I had. And I -- I asked him that day when he came to see me, I said what -- where am I at on my sentencing? Because I wasn't sure. He didn't explain things to me too -- too much at all.

And he said -- I said, can you get me below 15? He says, I think I can get you below 15. And I said okay, I said I would really -- if you can get me between ten and 13, considering my age, that would be -- I would -- that would be preferable. I said, I'll give you one of those Rolexes, the one you liked. And he said, you got a deal.

THE COURT: All right. So the deal was if the sentence was 13 years or below, you would give him the Rolex.

THE WITNESS: Give him the watch.

THE COURT: All right. Okay.

THE WITNESS: And he said, you have a deal. And I said, okay, I'll have my wife take it to your office -- or take it to you, and she did that. I called her, I said, look

under --

THE COURT: All right. You've answered my questions.

THE WITNESS: Okay.

THE COURT: Mr. Hughes, next question.

BY MR. HUGHES:

Q So it's your testimony she delivered the Rolex prior to you receiving your sentence?

A Yes.

Q Okay. All right. So, this conversation you had with Mr. Singh about the ten to 13 years, at what point in time did that take place? I believe it was after you received the PSR?

A It was -- it was in that timeframe. The -- the -- I can't remember all those dates, but Gary came to see me pretty regular, and when he came, there was always four or five people that went down, it never was just me of course. He's got other clients, even though I was a paying client. And our time together would be 15 to 30 minutes, in that range.

Q Okay. And approximately how much time before your sentencing did that conversation take place?

A Well, I hadn't been to -- I don't think I'd been to -- I hadn't been to my plea and I hadn't been to my sentencing. I don't really remember exactly when the PSR was, but it was in that timeframe. Somewhere around -- in -- in between the plea -- the PSR, the plea and the sentencing.

Q So the sentence that you expected on May the 13th of 2024,

was that based entirely upon this representation made by Mr. Singh?

A It was. I -- I -- there was also a 5K1 thrown in there somewhere. I didn't really know -- I don't think I'd been given anything in -- specifically then. So, it was -- that was still somewhere on the table and I -- I just took it from what Mr. Singh was indicating that that -- he was thinking of that and -- and what I was looking at as far as a zero criminal history and my age, and that's what I based it on. I really -- I -- with the calculations, we never really talked about -- he never got specific with me on the calculations or anything like that.

Mr. Singh, with me, when he came on to my case, he said, Myles had briefed him. I had signed the MOPA. There was really nothing he could do. He couldn't do it because I was -- I was stuck on things. I was stuck on entrapment and prosecutorial misconduct and those things. And he said he couldn't do any investigations, he couldn't go and talk to Maggie or Craig about anything. At the time Craig was --

MS. NAMMAR: Your Honor, I'm going to object as to relevance. This is going into other claims that have already been handled.

THE COURT: Yeah, sustained.

THE WITNESS: Okay. I --

THE COURT: No, no, just wait for another question.

THE WITNESS: Okay.

BY MR. HUGHES:

Q Okay. So at the sentencing, do you recall when Judge Seabright asked Ms. Nammar what the government -- what their requested sentence was, do you remember that?

A 19-and-a-half years.

Q Okay. Otherwise 235 months?

A Yes, sir.

Q Okay. And you ended up receiving 240 months; is that correct?

A Yes, sir.

Q All right. So let me ask you, when you heard that your sentence was 240 months, or 20 years, what was your reaction?

A I -- I was shocked because that's basically a death sentence. I was 63 years old, and 20 years is a death sentence for drugs. So, I had an outburst in court that day because I was shocked. But that's not -- I wasn't raised that way. Even though I was shocked, I still want to show respect to the judge and to the prosecutor in their -- in their forum. And I did have an outburst and I felt bad about that.

Q Okay. And do you recall also that day towards the end of the sentencing proceeding Judge Seabright telling you about how you could file a Notice of Appeal --

A Yes.

Q -- if that's something you wanted to do?

A Yes, sir.
Q And what was your understanding of the amount of time that you had to do that?
A 14 days.
Q Okay. Upon learning that you could file a Notice of Appeal, is that something you wanted to do?
A It's -- it's -- that question is -- I mean of course.
Q Okay.
A I got 20 years. But that's not the only reason now, Mr. Hughes. I'll tell you what really got me on track on this appeal thing. And I'll try to skip over things that's already been decided on.
But when I had Myles, there was things that came up that I asked him to do for me and he said he could not get the answers from the prosecution. And I said, well, how can I defend myself? And he said, you can appeal it.
Q Just so we're clear, Mr. Breiner is the person who told you this?
A Mr. Breiner.
Q And this was prior to sentencing?
A This is way before sentencing. This is somewhere in the beginning, like January 20 -- January 2022.
Q Before Mr. Singh represented you?
A Before Mr. Singh ever came on because I was -- I was stuck on, I need these things for -- to allow me to have my due

process. And he says he can't -- they won't give him any information, he can't do anything, I could appeal it. So I'm stuck on this appeal now because -- and then as we go along, you can appeal that.

Q Okay. And so we're clear, this was in January of 2022?

A January, February, March 2022.

Q Did you tell Mr. Breiner at that point that you wanted to appeal those things that he was discussing?

A I said, I said, I'm going to appeal it. I said, because I have a right. I said, I don't know the law. I'm not versed in legalese. I said, but I have a right to defend myself.

MS. NAMMAR: Your Honor, I'm going to object again. This is a discussion with Mr. Breiner. That's not the subject of the hearing today.

THE COURT: Well, he's testifying as to his motivation for wanting to file a Notice of Appeal -- an appeal, so I will permit it. But I think we're starting to go a bit afield.

MR. HUGHES: I understand.

THE COURT: So maybe you can ask another question.

BY MR. HUGHES:

Q Okay. So let me ask you this, Mr. Jeter, let's go back to May the 13th of 2024.

A Okay.

Q Did you -- on that date did you inform Mr. Singh that you wanted to appeal?

A Yes.
Q Did you ask him to file a Notice of Appeal on your behalf?
A He informed me. We was -- we -- Mr. Singh and I were sitting there, and Your Honor, Mr. Seabright, gave me my sentence and I had the outburst. And Gary said, there you go, there's your appeal. I didn't know what he was talking about, and he said, the judge just went over the prosecution's recommendation; you're in. And I said, I'm in for the appeal? He says, you're in.
Now, I didn't understand the parameters of the appeal process or the boundaries, that some appeals are different than others and some just -- you can appeal for certain things with some and not with others. I didn't understand that, but I knew I was getting an appeal.
Q Okay. So how did you know you were getting an appeal?
A He told me. He said, you're in.
Q Okay. Did you -- did you also tell him that you wanted him to file an appeal on your behalf?
A Yes.
Q I'm referring to May the 13th of 2024.
THE COURT: Can I just ask to make sure, are you talking about -- so, I left the bench after the sentencing, right?
THE WITNESS: Yes, sir.
THE COURT: And you were still here?

THE WITNESS: Yes, sir.

THE COURT: So is that when the discussion was or was it when I was still on the bench?

THE WITNESS: No, when you was on the bench and you announced the sentencing, when I had the outburst, when I had the outburst -- when you announced my sentencing, I had the outburst. I said, 20 years? And Gary said, you're in.

THE COURT: So that's while I was still on the bench?

THE WITNESS: It might have been, sir.

THE COURT: All right. All right.

THE WITNESS: He said, you're in. I said, I'm in where? And -- and he said, don't -- he said, relax, you're in. He said, the judge went over, over on the sentencing recommendation by the prosecutor, you're in on the appeal.

I think, I'm not sure, but I think I asked Judge Seabright to repeat what he said about the appeal because I was kind of dizzy at that time because 20 years will make you dizzy. And I was kind of dizzy and I think I -- I said, can you repeat it, because I wanted to make sure that I was hearing because I wanted to make sure that I had the appeal lane open for me. And it ended, Gary said, I'm going to go talk -- I had to go back through the doors with the gentlemen, back to jail, and Gary said, I'm going to go talk to your wife and let her know about the appeal. And I said, okay.

Now, from there I was feeling bad because I had the

outburst. So, from there I went back to my --

THE COURT: Okay, hold on a second. I want you to just answer the questions that are asked, okay. You tend to go off and --

THE WITNESS: Yeah, I have that tendency. I'm sorry.

THE COURT: That's okay, but I think Mr. Hughes would prefer that you answer his questions.

THE WITNESS: Okay.

BY MR. HUGHES:

Q Okay. So we established that on May the 13th, 2024, Mr. Singh told you he was going to appeal?

A Yes, sir.

Q Did you concur in that decision, did you agree with that decision?

A Absolutely.

Q Did you tell him you wanted him to appeal for you?

A Absolutely.

Q Okay. Was that the first time, that -- the day of the sentencing, May the 13th of 2024, is that the first time you told Mr. Singh that you wanted to appeal?

A No.

Q So what were other occasions where you told Mr. Singh that you wanted to appeal?

A When Mr. Breiner turned me over to Mr. Singh, my introduction to him was, I -- he -- he said that I had spoken

with Myles and he brought me up to speed on the case; I don't know a lot. And I went into the entrapment and the prosecutorial misconduct, and I said, Myles said that I can appeal these issues, but I want you to investigate 'em. He says, I cannot investigate anything. You signed a MOPA. There's nothing I can do.

He says, but you can appeal it. Like Myles said, you can appeal it. I said, okay. I said, so what are you going to do for me for $25,000? He said, I'm going to see you through the PSR; he did that. He didn't -- he didn't give me any information on what was available. I didn't know he could object at the PSR. I didn't know I could not -- I -- I didn't have to answer the questions. Moving on.

He took me to the plea.

Q Change of plea hearing?

A Change of plea.

Q Okay. Just so we're --

MS. NAMMAR: Objection, Your Honor. This is a narrative.

THE COURT: Sustained.

BY MR. HUGHES:

Q So your change of plea hearing occurred in front of Judge Porter; is that correct?

A Yes, sir.

Q All right. And at the change of plea hearing you entered

pleas of guilty to three of the counts, correct?
A Yes, sir.
Q Now, with respect to the gun count, the 924(c) count?
A Yes, sir.
Q Did you enter a plea of guilty to that count?
A I -- Judge Porter read the --
MS. NAMMAR: Objection, Your Honor. Relevance.
MR. HUGHES: Let me -- if I could ask another question?
THE COURT: You may. You may.
BY MR. HUGHES:
Q Did you and Mr. Singh prior to you entering a plea, and I'm specifically referring to the gun count, did you and Mr. Singh have a discussion about whether or not you could appeal your guilty plea to that particular count?
A Yes, sir.
Q Okay.
A Mr. Singh -- I didn't agree with the gun count because that's not why I had those guns. And I told Judge Porter, he read it and I said, it wasn't in furtherance of drugs. I said, it could be perceived that way. And he says, it either has to be that way or it's not that way. And so, I'm standing there because I don't know really what to do, and Judge Porter said, do you need some time with your attorney? I think the prosecutor was Mr. Nolan at that time, says, I don't think

Mr. Jeter is confused -- is denying the charge, he's just confused with the wording. But that wasn't it. And I -- and he says, well, take a few minutes with your attorney, because Mr. Singh said nothing at all.

So we sit down and I said, Mr. Singh, what do I do? And he looked at me, never said a word. And we just looked at each other, never said a word. So I get back up, I'm not happy with this charge because I know -- I took responsibility --

MS. NAMMAR: Objection, Your Honor, to the narrative.

THE COURT: Stop, stop, stop. Sustained.

BY MR. HUGHES:

Q Okay. Were you advised that you could appeal your guilty plea to that gun count that you gave during the change of plea hearing in front of Judge Porter?

A When I -- when I sat back down, I was unhappy, and Mr. Singh said, don't worry, you can appeal that.

Q And what did you say in response?

A I said, and -- and I am, I'm going to appeal that because that's not the reason I had those guns.

Q Did you instruct Mr. Singh to appeal your guilty plea to the gun charge that was given at the arraignment hearing, change of plea hearing?

A I don't know if I instructed him because I don't know if I understood the law to that degree.

Q Okay.

A But I knew there would be a time when I could appeal because I had heard that from Myles and Gary up to that point.
Q Okay. Was there any other time besides at sentencing, at the end of the sentencing on May the 13th of 2024, any other time you told Mr. Singh that you wanted to appeal any aspect of your case?
A There's a number of times.
Q Okay.
A We spoke about it a number of times because that was the only way I -- I didn't see another way to get anything done. I didn't know -- I -- if I can say -- if I can speak, if I can speak a little moment, Your Honor.
THE COURT: No. You have to answer the questions, that's --
THE WITNESS: I didn't -- I didn't -- I only had Myles and Gary to go through. When I gave them directions on what I needed to get done and it didn't get done, I didn't have another way to get anything done. Their answer to me was, don't worry, you can appeal it. You can appeal it.
BY MR. HUGHES:
Q What are some examples of some of those things? We talked about the gun.
A The gun. I wasn't the leader because I said when is it --
MS. NAMMAR: At this point I'm going to object. The only relevance here is the appellate period from May 13th to

May 28th.

THE COURT: All right. Overruled. Go ahead.

THE WITNESS: Okay. The leadership charge, because I -- I told Myles and Gary, I said, guys, I'm not the leader of this. I said, I didn't -- they -- I was given the drugs from Lynch. And I said, I should be able to find out who he is so I can have some kind of leverage to help myself. I said, I'm not the leader. They're making me the leader. And I said, how can I be the leader when they gave it to me and they know that they gave it to me. I said, since when is it that the federal government doesn't want the top guy? And -- and they said, well, appeal it.

BY MR. HUGHES:

Q And what did you say in response when they said, appeal it?

A I said a number of different answers. One answer, I said, why can't you go and get the information from the prosecutors because they know who the top guys are because I told them when we sat down and talked at the FBI office and I told them on my patio. They know about it.

THE COURT: Okay. I want you to lower your voice a little bit.

THE WITNESS: Yes, sir.

THE COURT: Okay?

THE WITNESS: I just -- I get -- I get excited because

I've been going through this for five years and this is probably the first time I've ever gotten to express it and get it out about what really happened, and I apologize.

THE COURT: All right.

THE WITNESS: I said --

THE COURT: No, no, no, I want another question.

MR. HUGHES: Yes, Your Honor.

BY MR. HUGHES:

Q So, after May the 13th of 2024, I believe Mr. Singh came to see you two days later on May the 15th of 2024 at the FDC?

A Yes.

Q Was an appeal discussed?

A We -- we discussed the appeal. He said he had talked to my wife and -- and he was filing the appeal. And I said, okay. He says, I'll get with her on some things that I need to get done. I didn't really know what -- exactly what that was, but I knew he had 14 days because I heard it in court.

Q Okay.

A And I handed him the letter to Ms. Nammar and to Judge Seabright that day. And he said -- I said, I want you to give this to them because I wasn't raised like that.

Q Okay.

A I wasn't raised to show any kind of disrespect, especially when they're doing their jobs. And I gave him the letters and we talked and that's -- he left.

Q Okay. And when he discussed that with you on May the 15th and told you that he was filing the appeal, did you request that he do so or did you tell him that you agreed with that? Just tell us a little bit about what your response was.
A When Mr. Singh said he was filing the appeal, I said, okay, now I get to get in the leadership role, the entrapment, the -- the guns, the prosecutorial misconduct. And Mr. Singh said, you can get all of that in. He's, like, and I didn't -- I didn't know the difference between this appeal was only for the sentencing, but I know it now.
Q And were all -- were those all things you had told him previously that you wanted to appeal?
A He knew. I had told him that.
Q And had you instructed him to appeal those issues on your behalf?
A Yes.
Q Okay. All right. So, I want to talk to you a little bit about, briefly, the messages that you -- to Judge Seabright and Ms. Nammar that you prepared on May the 14th. Do you have a copy of the notebook there?
A I do.
Q Okay. Could you turn to Exhibit 22.
A Exhibit -- okay.
Q And then could you turn to Page 4 of that exhibit.
A Page 4?

Q Yes.
A Okay. Let me -- Exhibit 22, Page 4. Okay.
THE COURT: It's your TRULINCS to me, is what it is.
THE WITNESS: I have it, sir. Okay. Yes.
BY MR. HUGHES:
Q Okay. Do you -- I didn't mean to cut you off. I'm sorry.
Do you recognize that document?
A Yes, sir.
Q What is that?
A It's my letter to Judge Seabright.
Q Did you prepare that letter?
A I did.
Q When did you prepare it?
A I prepared it on the day I was sentenced, or the day after.
Q Okay. You'd agree with me the date is May the 14th of 2024?
A Yes, sir.
Q And then turning to Page 6?
A Yes, sir.
Q Okay. What is that?
A That's my letter to Mrs. Nammar.
Q Okay. And what date was that prepared?
A 5/14.
Q And where did you prepare those?

A At the FDC on the computer.
Q Okay. And did you print them off?
A Yes, sir.
Q All right. What did you do with them after you printed them off?
A I met with -- I printed them, got copies, met with Gary and gave them to him.
Q And when did you meet with Gary?
A On the 14th.
Q Was it the 14th or -- could you turn --
A No, it was -- it was the next day, it was the 15th.
Q Okay.
A I'm sorry.
Q All right. So, you met with him two days later, after the sentencing, with Mr. Singh, you handed him the letters of apology?
A Yes, sir.
Q And what did you ask him to do with those?
A To give one to each of them.
Q Why did you want to do that?
A Like I said, I wasn't raised that way and I -- I felt --
THE COURT: I think you've answered the question.
THE WITNESS: Yeah, I wasn't raised that way.
BY MR. HUGHES:
Q And, Mr. Jeter, you reviewed Mr. Singh's declaration

concerning the reason why the sentencing transcript was ordered, correct?
A I think I have. I think I did. Was it the one where he said that he needed to remind me of what was said in court?
Q Right. Right. You've read that in the declaration, right?
A I did.
Q Did you need a reminder two days later about what you had said in court?
A No. No, sir.
Q Okay. You had already prepared the apology letters?
A The letters were already prepared.
Q Okay. Did you ask Mr. Singh to get a copy of the sentencing transcript for you so that you could remind yourself of what you said in court?
A I haven't gotten the sentencing transcript to this day.
Q Okay. But my question is did you ask him to do it for that reason?
A No, sir.
Q Okay. So at this point, by May the 15th of 2024, two days after your sentencing, did you think that the Notice of Appeal had been filed?
A I did.
Q Okay. Why did you think that?
A Because he told me he was filing it.

Q Okay. Did you have any other discussions during the 14-day period from when you were sentenced, I guess that would be May the 13th to May the 27th of 2024, did you have any discussions let's say after May the 15th about the appeal?
A I'm sure Gary and I -- I probably said, how's it going with the appeal, or is it done, or something like that. But as far as in-depth, I was thinking that's his job to get that part done and he'll explain it to me once it's done.
Q Okay.
A Pretty much that's how I relied on -- during my entire case that's what I did. I -- I relied on the words because I paid them.
Q Okay.
A I paid them to represent me. And I paid them handsomely. They got $100,000 to split.
Q Okay.
A And -- and I said, I mean --
THE COURT: All right, I think you've answered the question. Next question.
BY MR. HUGHES:
Q Why did you want to appeal, Mr. Jeter?
A Why did I?
Q Why did you want to appeal?
A Because my -- my concerns weren't getting answered. My concerns during the process were not getting answered. I

wasn't getting the help that I paid for. I felt like if I asked you -- and I even offered to pay for a private investigator myself to -- to get my concerns answered. I felt like if I asked you to go and talk to the prosecutor about entrapment, the leadership role, the gun charge, these things should be addressed. I -- I did not have the representation I thought I -- I thought that I should have gotten more for what I paid.

Q And do you recall when you left FDC Honolulu?

A I left on -- sometime early June.

Q Where did you go?

A I went to Victorville.

Q How did you get there?

A We flew over.

Q Okay. So when you arrived at Victorville, could you just briefly describe what the communication was like, were you able to communicate, for instance, with your wife?

A Victorville is a tough place.

Q Okay.

A You get there and you're on holdover status. So, you're locked down 23 hours a day, most days 24. You shower about twice a week. You get out, you can get on the phone, computer, shower, exercise in about one hour. No more. And it's still that way till this very day. And -- and so I would -- and you've got a lot of guys, they're running -- they're running to

the phones because everybody is trying to get their messages in or their -- or their shower in. So it's -- you know, it's a race. That's Victorville.

Q So being locked down 23 hours a day at Victorville, did that have an impact on your ability to communicate with your wife, Andrea?

A It did.

Q Okay.

A Some days I couldn't, I couldn't communicate with her, but sometimes I could. I never could get on a pattern because it's not set up for that.

Q How long were you at Victorville?

A I was there three-and-a-half months.

Q Okay. And then you went to Lompoc; is that right?

A Yes, sir.

Q Okay. And when did you find out that a Notice of Appeal had not been filed on your behalf?

A Well, I did not have access to Gary's e-mail or phone number. So the only way I could communicate was through my wife to my attorney.

I got -- I left Victorville September 5th. I got to Lompoc. Got checked in, settled in. Shortly after I -- I was e-mailing my wife, I said, 'eh, check with Gary, see how the appeal is going. Because I know if he gets it in within the 14 days, then it takes months for it to -- you know, people

have things to do, it takes months to get -- get it to where I can get an answer.

And when she e-mailed me back, Gary didn't file the appeal, he only filed for the sentencing transcripts, I didn't understand that. I mean what the heck do I need with a sentencing transcript?

Q Why didn't you understand that?

A Because he -- he said he would appeal. And we had been going through this appeal thing since Myles Breiner. And, you can appeal. You can appeal. You can appeal this. You can appeal that. I get to the appeal process and he doesn't file the appeal. I don't -- I don't get that at all.

Q Just so we're clear, on these occasions when you were told you could appeal, what was your response?

A I said, I'm definitely appealing. There's no doubt that I'm going to appeal.

Q And did you instruct them to file an appeal on your behalf?

A I absolutely did.

Q On how many occasions?

A Countless.

Q Okay. And did you do so within 14 days of judgment being entered against you in this case?

A Absolutely.

Q Okay.

MR. HUGHES: I'll pass the witness, Your Honor.

THE COURT: All right. Cross. Ms. Nammar?

MS. NAMMAR: Yes, Your Honor, I forgot to mention, Mr. Singh has to be at Family Court in Kapolei at 1 o'clock. So he needs to leave here by noon. I think we're going to be okay, but --

THE COURT: Well, I mean do you want to wait on the cross? I mean there's no jury here.

MR. HUGHES: Right.

THE COURT: Do you want to have Mr. Singh get on the stand now?

MR. HUGHES: I'm fine with that, Your Honor, if that's -- I have no problem with that. I'm not opposed.

THE COURT: How long will your cross be?

MS. NAMMAR: I don't think my direct of Mr. Singh will be that long. So I think we'll try to --

THE COURT: How about your cross though?

MS. NAMMAR: Hopefully not too long, but --

THE COURT: All right, go ahead.

MS. NAMMAR: Okay.

CROSS-EXAMINATION

BY MS. NAMMAR:

Q Good morning, Mr. Jeter.

A Good morning, Ms. Nammar.

Q You're talking about discussing your rights to appeal with

your attorneys, correct?
A Yes, ma'am.
Q And you were first represented by Mr. Harrison, correct?
A Yes, ma'am.
Q And then by Mr. Breiner, right?
A Yes, ma'am.
Q And when you were represented by Mr. Harrison and Mr. Breiner, you had not entered a guilty plea yet, had you?
A No, ma'am.
Q At that time you reserved all of your rights to appeal, correct?
A Yes, ma'am.
Q You had not waived any rights, had you?
A No, ma'am.
Q To appeal at least?
A Right.
Q And when you first met Mr. Singh you had not entered a guilty plea yet, had you?
A No, ma'am.
Q And so you still reserved your rights to appeal, correct?
A Yes, ma'am.
Q And the conversations that these three attorneys had with you on a consistent basis about you could reserve your right to appeal, that was all in the context that if you went to trial, you would be preserving your right to appeal, correct?

A That's not correct. When we had --
Q Okay. You said that's not correct. Thank you. That answers my question.
So you didn't under --
A But that's not --
THE COURT: Let --
THE WITNESS: That's not --
THE COURT: No, no, listen to me. Stop. Let her ask the next question.
BY MS. NAMMAR:
Q Mr. Jeter, you entered into a plea agreement with the government, correct?
A Yes, ma'am.
Q And you -- in entering into that plea agreement there was an appellate waiver provision, correct?
A Appellate waiver provision?
Q Yes. That by pleading guilty you were waiving your right to appeal your sentence and conviction, correct?
A Yes, ma'am.
Q And so you understood that when you pled guilty, when you raised your hand and you were sworn in before Judge Porter, that you were waiving your rights to appeal your conviction and your sentence as long as it was within the guideline range determined by the Court at the time of sentencing, correct?
A That is not correct.

Q So you're telling me, Mr. Jeter, under oath here today that when you were under oath before Judge Porter, you lied to the Court; is that correct?
A I did not lie. I'm not saying that. What I'm saying is that my attorneys told me I could appeal and that was not the only way to appeal.
Now, I -- I understand that they read me my waiver of appeal, but my attorneys assured me that was not the only way to appeal.
Q I'm not asking what your attorneys assured you, I'm asking what the Court assured you.
At your change of plea, the Court assured you that you were waiving your right to appeal, correct?
A That's what the Court said.
Q And you told the Court that you understood you were waiving your right to appeal, correct?
A That's -- that's correct.
Q Okay. And so after you entered your guilty plea in, I think it was approximately March of -- can't recall the exact year -- 2023 maybe, you waived your right to appeal except under a limited circumstance, correct?
A I -- I waived my right to appeal with the understanding that that wasn't the last opportunity I would have to appeal based upon the information my attorneys told me.
Q All right, Mr. Jeter. At your sentencing hearing, when

Judge Seabright advised you that you had a right to appeal, he advised you that you had a limited right to appeal, correct?
A Yes, ma'am.
Q Because Judge Seabright advised you that you had waived most of your rights to appeal by entering into your guilty plea with the government, correct?
A Yes, ma'am.
Q And his advisement to you was that if you believed there's some other way that you can appeal, then that's why he needed to advise you that you had 14 days in which to do so, correct?
A Yes, ma'am.
Q Okay. But you understood that you had waived your right to appeal by pleading guilty?
A I understood that there -- based upon my attorney's advice that there was a way that I could appeal.
Q And so are you saying that you lied to the Court whenever you said you understood you were giving up your rights to appeal; yes or no, Mr. Jeter?
A I'm not -- I never lied to the Court.
Q All right. I want to talk about your sentence -- your guideline range, I'm sorry.
A Mm-hmm.
Q Do you understand that your guideline range at the time of sentencing was determined to be 324 to 405 months imprisonment?
A Yes, ma'am.

Q So you knew prior to being sentenced on May 13th of 2024 that you were facing a guideline imprisonment range of 324 months to 405 months, correct?
A No, ma'am.
Q You didn't understand -- I just asked you, Mr. Jeter, if you understood your guideline range was 324 to 405 months, and you said yes; is that correct?
A I -- I read that, but I didn't know that on sentencing day because there was a 5K1 that -- that you had presented to me and on -- on the Kawika Monalim thing.
Q Had you seen the 5K1 motion that the government had filed?
A I don't remember if I seen it then or if it was later, but I know that we met, you and I.
Q Mr. Singh went over the Government's 5K motion with you prior to sentencing, correct?
A No. Mr. Singh didn't go over --
Q You understood that the government had requested a three-level departure for your cooperation, correct?
A I -- I found that out eventually.
Q Okay. And you knew that the government was -- then determined your new guideline range to be 235 to 293 months, correct?
A I knew that that was the possibility there. I didn't really know what my sentence would be, otherwise I wouldn't have asked Mr. Singh what he could get me.

Q Right. And you didn't know what your sentence would be because you knew that it was entirely up to Judge Seabright as to what your sentence was, correct?
A You know, sometimes --
Q Mr. Jeter, did you know or did you not know that your sentence was entirely up to Judge Seabright?
A I -- this is --
Q Yes or no?
A This is when I don't feel very comfortable because I don't know the law like that. But I'll answer your question as well as I can.
I was basing what I was being sentenced to on what my attorney was telling me. That's what I believed.
Q Mr. Jeter, do you recall when you met with government agents in the U.S. Attorney's Office?
A In the beginning?
Q On numerous occasions.
A Yes.
Q And do you recall being told that no one can make promises to you, not the prosecutor, not your attorney, not the agents, because the only person who determines your sentence is Judge Seabright; do you recall that?
A I don't recall anybody specific -- we never talked about Judge Seabright.
Q Mr. Jeter, do you recall at your change of plea when Judge

Porter told you that the only person that determines the sentence is the district judge?

A I'm sure if that was said, then I -- I remember that, but --

Q All right. So you knew going into your sentencing on May 13th of 2024, while you may have hoped that Judge Seabright gave you five years or less, or ten years or 13 years, you had no idea what he was going to give you, correct?

A I didn't know. No, ma'am.

Q All right. And Mr. Singh was asking for a sentence of between 120 and 180 months, correct?

A Is that what he asked for?

Q Yes, that's what he asked for.

A Okay. Okay, I agree that's what it was.

Q All right. And so on May 13 you had no idea what your sentence was, and that's why you were shocked because you didn't know what it was going to be, you were hoping for the best, correct?

A That's not true.

Q You weren't hoping for the best?

A That's not true. I was going on what my attorney told me. My attorney told me he could get me between ten and 13. That's what I expected.

Now, now I have to say this, I should have been more astute and taken more time to -- to ask more questions, but I

relied on what he told me as far as what my sentence was going to be.
Q All right, Mr. Jeter, I want to turn to talk about this Rolex that you're talking about. You described that Mr. Singh met with you at FDC Honolulu; is that correct?
A Yes.
Q And you had a folder much like the one you have here in court today, a brown accordion-style folder?
A Same one.
Q Okay. And you had Rolexes in that folder?
A No, ma'am. I had pictures.
Q Pictures?
A Pictures -- pictures of my Rolex collection, of my home, of things that -- that my wife had sent in to me.
Q And what do these pictures look like of the Rolexes, are they just a single picture of the Rolex or are they --
A No, it's a group of -- it's in a box, a Rolex box. It's got four, eight, 12, 12 slots and each slot had a Rolex in it and then there were other Rolexes lying in there. It's a Rolex box for a number of watches.
Q All right. And you showed those pictures to Mr. Singh?
A Yes, ma'am.
Q And is it your testimony today that you made a deal with Mr. Singh that if he got you ten to 13 years you would give him a Rolex?

A That's absolutely my testimony.
Q All right. So if I ask Mr. Singh in here today, is he going to tell me that he has a Rolex from you? Did you provide him a Rolex?
A He's going to tell you he's got the Rolex. And if he -- if he -- if he's honest, then he'll tell you he's got the Rolex. If he's dishonest, like he was on this -- telling me he was going to file the appeal and didn't do it, then he won't tell you.
Q And the only reason he has the Rolex is because of this deal, not some other -- not some other reason?
A There's no other reason.
Q You didn't give him the Rolex as payment instead of payment for his services?
A Ms. Nammar, I paid him $25,000 for nothing.
Q Mr. Jeter, did you pay him by way of a Rolex?
A I made a deal with him on the Rolex that if he got me between ten and 13 years, I would give him the Rolex. He said, you got a deal. I said, I'll have my wife to deliver it to you.
Q So you made that deal with him understanding that he can't make a deal like that because he's not the one sentencing you; is that correct?
A Ms. Nammar, you see me up here. I do not understand the law that well.

Q Mr. Jeter --
A I deal with him because I'm trying -- I'm 60-something years old at the time. I'm trying to get my sentence down as low as I can. So I have a daughter that I want to see off to college. I want to try to have a life, a little life left. I made the deal for that reason.
Q I understand, and that's why you're here today, right, because you're trying to get your sentence down as much as you can, correct?
A It would be nice.
Q All right. Mr. Jeter, going back to these issues of prosecutorial misconduct, leadership/organizer role, you've been hung up on those issues for quite sometime, haven't you?
A Yes, ma'am.
Q Despite the fact that you know you were guilty of serious drug trafficking, correct?
A I am absolutely 100 percent guilty for what I did.
Q Yes. You had kilos of controlled substances that you were storing and distributing in this community, correct?
A I did.
MR. HUGHES: Your Honor, object to the relevance.
BY MS. NAMMAR:
Q And --
THE COURT: Wait, hold on. Ms. Nammar?
MS. NAMMAR: Yes. Your Honor, I think it goes to his

credibility, his testimony here today.

THE WITNESS: If I can -- if I can say something? I take responsibility for what I did. From the very beginning, you know that, you've seen me. But you also know, Ms. Nammar, from the very beginning that I told you that I was getting the drugs from Jeff Lynch out of Mexico and he was sending it to me and he was getting the bulk of the proceeds and he had entrapped me. I felt I was being entrapped. I told you all this from the very beginning.

BY MS. NAMMAR:

Q Mr. Jeter, do you know what the legal definition of entrapment is?

MR. HUGHES: Relevance, Your Honor. Objection.

THE COURT: Yeah, let's move on.

MS. NAMMAR: All right.

BY MS. NAMMAR:

Q I want to turn back to your sentencing day.

You testified that once Judge Seabright handed your sentence down?

A Yes, ma'am.

Q That you were shocked, correct?

A I was -- I was -- well, from my outburst, you know I was surprised.

Q All right. And you were dizzy after that, you testified to, correct?

A I think it's on record that I said that.
Q And you might not really remember what was going on or couldn't focus because you were so shocked; is that fair?
A No. No, I remember what was going on. I was just -- I was a little surprised, shocked, or whatever you want to call it, because I'd been promised a lot less.
Q But you had to ask the judge to repeat himself with regards to your limited appellate rights, correct?
A No, I --
Q Yes or no, Mr. Jeter?
A I asked him to repeat himself on something in that -- in that realm of time because I said I -- I -- could you repeat that? I don't know if it was exactly that, but it was in that realm of time because I wanted to make sure that I was staying with the process.
Q All right. And you were emotional on that day, weren't you Mr. Jeter?
A Yes, ma'am.
Q And you actually even didn't want the judge to keep reading the conditions of supervised release, do you recall that?
A Like I said --
Q Mr. Jeter, do you recall that? Judge Seabright was trying to read you the conditions of your supervised release and you told --

A And I think -- I think -- I think I said, Judge, I -- I'm -- I'm -- the sentence -- the sentence is throwing me off, or something to that degree. And that probably was the reason for this letter right here because, you know what, I have to say this: --
Q Mr. Jeter, that's not the question. I didn't ask you. All right. You've answered the question.
One moment, please.
Mr. Jeter, you understood that when you pled guilty to a charge, you do not get -- with a plea agreement that waives your appellate rights you don't get to appeal the charge that you just pled guilty to immediately, do you?
MR. HUGHES: Objection, Your Honor. I apologize, Ms. Nammar.
Calls for a legal opinion from a lay witness.
THE COURT: Well, you can ask him his understanding.
THE WITNESS: Repeat that, please?
BY MS. NAMMAR:
Q You understood, prior to your change of plea when you first came in on your arraignment and plea following your arrest, do you remember that?
A Yes, ma'am.
THE COURT: You're asking about his first appearance in court?
BY MS. NAMMAR:

Q Yes, your very first appearance in court.
A My first appearance in court? That was -- that was with Judge Porter on -- on the arraignment.
Q Yes. Right following your arrest back in September, I think, I believe you were arrested on --
A 30th.
Q -- September 30th?
A Yes, ma'am.
Q Of 2021, correct?
A Yes, ma'am.
Q And you were then arraigned in court in the magistrate court on the indictment, do you recall that?
A Yes, ma'am.
Q And at that time you pled not guilty to all of the charges, correct?
A Yes, ma'am.
Q And then when you changed your plea, you pled guilty to three counts, correct? Moving forward several years when you were before Judge Porter?
A Oh, okay, several years later?
Q Yes, yes.
A I pled guilty.
Q And that's called changing your plea, correct?
A Yes, ma'am.
Q And you pled guilty to three counts pursuant to a plea

agreement?
A Yes, ma'am.
Q All right. And you understood at that time that you were entering a guilty plea to those counts, correct?
A Yes, ma'am.
Q You had that appellate waiver which we just discussed, correct?
A The appellate waiver, I heard it, I heard it stated a couple of times when I came to court.
Q So did you choose to ignore that appellate waiver; is that what you're saying, Mr. Jeter?
A I'm not saying I chose to ignore it, I'm saying my that attorneys, Myles Breiner and Gary Singh, told me that I could appeal.
Now, Ms. Nammar, I listened to them to the -- to the detriment of my life. I'm -- I'm here for 20 years because I didn't go and do enough studying to figure out what my real options were.
Q Okay. I want to talk about when you asked -- you claim that you asked Mr. Singh to file a Notice of Appeal. What day was that on?
A On my sentencing date.
Q May 13th, 2024?
A May 13.
Q Okay. And you said you asked him where, where were you?

A We were sitting in court.
Q Okay. Right at this counsel table?
A If it was this room, it was -- I mean it was at the table.
Q Okay. And do you recall having a discussion with Mr. Singh about your response and your outburst with the Court at that time?
A Yes.
Q And that Mr. Singh didn't believe that you acted appropriately?
A No, Mr. Singh, Mr. Singh knew. He knew why I felt like I felt.
Q I'm not asking you what Mr. Singh knows. I'm asking you --
A He didn't -- he didn't --
Q -- if Mr. Singh told you --
THE COURT: Stop, stop, stop.
Answer the question that's asked.
THE WITNESS: Answer --
THE COURT: No, no, stop. I'm going to have her ask again.
THE WITNESS: Yeah.
THE COURT: Just listen to the question and answer the question.
THE WITNESS: Okay.
THE COURT: Not what you want to say but the question.

THE WITNESS: Okay. All right.
THE COURT: All right.
BY MS. NAMMAR:
Q Mr. Singh told you that he felt your behavior was inappropriate, correct?
A No, ma'am.
Q Okay. Did he -- did you discuss your outburst with Mr. Singh at that time?
A Yes, ma'am.
Q And on May 14th, the next day, you wrote the apology letters, which we've previously gone over, which are Exhibits 22, I believe. Yes, you wrote those two apology letters to Judge Seabright and to me, correct?
A Yes, ma'am. If I may back up a second?
Q No.
A And explain something?
Q No thank you.
After writing those apology letters, you met with Mr. Singh on May 15th at the Federal Detention Center, correct? Mr. Singh came to visit you?
A Yes.
Q And that's May 15th of 2024. And you provided those letters to Mr. Singh and asked that he give them to Judge Seabright and myself, correct?
A Yes, ma'am.

Q And you understand that Mr. Singh filed those letters in your case on the docket, correct?
A I know that he got them to you guys. I don't know if he filed them or not. I really don't know that process.
Q All right. So you don't understand that Mr. Singh isn't allowed to have ex parte communications with the Court, correct?
A I didn't -- I didn't know that. I thought that if I -- I wrote the -- I typed the letters out and I said, could you give one to Mrs. Nammar and to Judge Seabright because I wanted to apologize for my outburst.
Q Okay. So if you learned that Mr. Singh cannot communicate with the judge outside my presence, then by filing those letters all parties can see those letters, correct?
A I know it now since you told me.
Q Okay. But -- and that's what you wanted is those letters to reach Judge Seabright and myself, correct?
A Yes, ma'am.
Q And Mr. Singh did that for you, correct?
A Yes, ma'am.
Q And at that meeting on May 15th you discussed what had occurred at sentencing, the fact that you got upset; is that correct?
A Yes, ma'am.
Q And you talked about getting the transcript from the

sentencing hearing, correct?
A What -- what we talked about?
Q You talked about getting the transcript from the sentencing hearing on May 15th with Mr. Singh, correct?
A You're asking me -- you're asking me what I talked about and I want to tell you.
Q No, I'm asking you if you talked about getting the transcript from your sentencing hearing, yes or no?
A Mr. Singh -- Mr. Singh said he was going to file the appeal. I had no idea what a sentencing transcript was.
Q Are you aware that you don't need a transcript in order to file an appeal, a Notice of Appeal?
A I -- I didn't even know what a sentencing transcript was. I haven't received one to this very day.
Q All right.
A I -- I did know --
Q Mr. Jeter --
A -- that we talked about him filing the appeal.
Q Mr. Jeter, in that binder in front of you, if you can turn to Exhibit 22, please.
A 22.
THE COURT: 22.
BY MS. NAMMAR:
Q And if you'll turn to Page 4. This is your letter that you drafted and signed to Judge Seabright; is that correct?

A Yes, ma'am.
Q Okay. And if you could read -- if you could just read that entirety of the letter, please?
A Okay. "Dear Judge Seabright, I was in your courtroom on May 13th, 2024, and I had a small outburst after my sentence was announced. I would like to apologize to you and your staff for my reaction. The sentence simply caught me off guard and my reaction was a reflection of that fact. I respect your decision and will do my best to fulfill it without any problems. Thank you. Sincerely, Courtney Jeter."
Q Okay. So you told Judge Seabright that you respect his decision, correct?
A Yes, ma'am.
Q And that's his decision, 240 months, correct?
A Yes, ma'am.
Q All right. Your wife, you told your wife, Andrea, that you needed to see Mr. Singh on several occasions, correct?
A Yes, ma'am.
Q And you had her communicate that to Mr. Singh?
A Yes.
Q And every time she did that, Mr. Singh came and visited you at FDC Honolulu, didn't he?
A No, not -- not every time. He came -- he -- Mr. Singh would come and see a group of us. So when he had a group scheduled, that's when he would come. He wouldn't

necessarily -- he never, not one time have I seen Mr. Singh by myself. It's always four or five of us when I go down.
Q Sir, are you saying you sat in a circle with four or five other defendants and had a conversation with Mr. Singh?
A Mr. Singh comes, they call us wherever we're housed at, we all get together. We all go down the elevator together to the room. Mr. Singh will come out and say, I'll see you, and the other four will sit out in the room.
Q Yeah, so your discussions with Mr. Singh are private, correct?
A Are in private.
Q Yes, they're not with the other defendants?
A No, but --
Q Okay.
A -- he didn't come to see me specifically for me. He just came for a group of us.
Q But you testified previously that you saw Mr. Singh quite a bit, you had regular visits with him, correct?
A Mr. Singh came regularly.
Q All right. And you met with Mr. Singh on May 15, 2024, we just discussed, right?
A Yes, ma'am.
Q And on May 26 of 2024 Mr. Singh came and saw you, didn't he?
A I am not sure, ma'am. I just know that --

Q Okay. If you could -- if you could -- in the binder in front of you, Mr. Jeter, if you could turn to Exhibit 24, please.
A Exhibit 24. Okay. Okay.
Q And you're not -- probably not familiar with this, but this is a legal sign-in sheet for attorneys at the FDC?
A Yes, ma'am.
Q Okay. And if you'll look on Page 1, Exhibit 24, go down about halfway you'll see some redactions, a black redaction box.
A Okay.
Q All right. And on -- I'm sorry, let's start at the top. On 4/27, it's about the second entry. Do you see that?
A 4/27, yes, ma'am.
Q And it's G. Singh under printed name?
A I see that.
Q And then Jeter?
A Yes, ma'am.
Q Right? So it looks like on April -- I mean, I'm sorry, April 27th Mr. Singh came to see just you; is that correct?
A Mr. Singh never -- no, ma'am. I mean my name is there, but Mr. Singh -- I never seen Mr. Singh by myself.
Q Okay. Well, you did -- you just testified that you did see Mr. Singh by yourself. He's seeing other people, correct?
THE COURT: He's talking about a bunch of people

coming down the elevator and everyone has their turn with Mr. Singh.

THE WITNESS: Yes, sir.

THE COURT: All right.

BY MS. NAMMAR:

Q Okay. So if in this exhibit, the legal sign-in sheet from FDC, if Mr. Singh's name is on there, do you dispute that he didn't -- didn't appear at FDC that day, do you have any reason to dispute that?

A No, ma'am.

Q Okay.

A If his name is there, I'm sure he came.

Q And so if I told you that Mr. Singh saw you on May 26, 2024, you would agree he probably did?

A If it -- if it's there.

Q And on May 29th of 2024, if he signed in --

A If it's -- if it's there.

Q And on May 31st of 2024?

A If it's there.

Q And on June 8th, 2024?

A If it's there.

Q And on June 10th, 2024?

A If it's there.

Q And do you recall on June 8th, 2024, Mr. Singh came and brought a notary public?

A I remember that day.
Q Right. And you signed a power of attorney --
A Yes, ma'am.
Q -- that Mr. Singh had drafted for you?
A Yes, ma'am.
MR. HUGHES: Object to the relevance, Your Honor.
BY MS. NAMMAR:
Q And --
THE COURT: Wait, wait, wait, hold on. I didn't hear your objection.
MR. HUGHES: I would object to the relevance, Your Honor, as to bringing out a power of attorney for Mr. Jeter.
THE COURT: Well, it's been testified to on -- previously, I think. So I'll overrule the objection.
MR. HUGHES: Thank you, Your Honor.
BY MS. NAMMAR:
Q And on June 10th you also signed what was titled an "Uninsured Deed" that Andrea needed you to sign so she could sell the house; do you recall that?
A I -- I recall I had to sign something for the house. I don't know exactly when, but I -- I believe you.
Q And the notary was there as well?
A I -- I take your word for that.
Q Okay. And Mr. Singh would have brought her in there; is that correct?

A If you say so, I agree with you.
Q Okay. And so between May 13th, the day of your sentencing, and your departure from FDC Honolulu which was sometime in June of 2024; is that correct?
A May 13th to June 2024, okay. When did I leave?
Q I'm not sure exactly.
A So what's your question?
Q So between that time period, who was your bunk mate? Do you recall?
A Bunk mate.
THE COURT: You're saying between sentencing and when he left FDC, that period?
MS. NAMMAR: Yeah.
THE COURT: Okay. Whatever that period is.
THE WITNESS: Between sentencing and when I left FDC?
THE COURT: -- Victorville, who was your bunk mate?
THE WITNESS: Wow, that was 14, 15, 16 months ago.
BY MS. NAMMAR:
Q Do you remember Rajesh -- an individual by the name of Rajesh Bhatti?
A Who?
Q Rajesh Bhatti. Bhatti, B-H-A-T-T-I.
A No, ma'am.
Q You don't recall bunking with him at FDC Honolulu?
A I had a -- they switched me from -- I went from one place

to the other and I had a number of different bunkies. What did he look like?
Q Okay, that's fine. I'm not sure.

THE COURT: Let me just stop. Should we -- I'm getting concerned about the time. I think we need to take a five-minute break for everybody. Do we want to come back with Mr. Singh?

MS. NAMMAR: Probably so if that's okay.

MR. HUGHES: I'm fine with that, Judge.

THE COURT: Okay. All right. So why don't we take a quick restroom break and then we'll come back. We're going to have Mr. Singh come on and then have you come back.

THE WITNESS: Okay.

THE COURT: Okay?

THE WITNESS: All right, Your Honor.

THE COURT: All right. Thank you.

(A recess was taken from 11:18 a.m. to 11:30 a.m.)

THE COURT: All right. We're back with counsel, Mr. Jeter.

And, Ms. Nammar, you're going to call out of order your first witness.

MS. NAMMAR: Yes, Your Honor, we call Gary Singh.

THE COURT: All right. Swear in Mr. Singh.

GARY SINGH, GOVERNMENT'S WITNESS, SWORN

THE COURTROOM MANAGER: Please be seated. State your

name for the record, spell your first and last name, speak into the microphone.

THE WITNESS: Sure. Gary Singh, G-A-R-Y, S-I-N-G-H.

DIRECT EXAMINATION

BY MS. NAMMAR:

Q Good morning, Mr. Singh.

A Good morning.

Q Are you a member of the Hawaii State Bar licensed to practice in the State of Hawaii?

A I am.

Q And how long have you been practicing law in Hawaii?

A I was licensed in 1995.

Q And so is that about 30 years?

A That's correct.

Q How much of that time have you been representing criminal defendants?

A Probably 20 years.

Q Okay. So at least 20 years?

A Correct.

Q Are you currently a member of the Criminal Justice Act panel, or CJA panel, here in Federal District Court in the District of Hawaii?

A I am.

Q And approximately how long have you been a member of the CJA panel?

A About 20 years.
Q So you represent indigent clients; is that correct?
A That's correct.
Q And do you also have privately paid clients?
A Yes, I do.
Q Have you ever filed a Notice of Appeal on behalf of a defendant?
A Mr. Jeter?
Q No, have you ever filed just in general a Notice of Appeal on behalf of any defendant?
A Yes, I have.
Q And approximately how many times in your at least 20 years of practicing criminal defense have you filed Notice of Appeals in criminal cases?
A Well, I can tell you this year, the last 60 days I filed three.
Q Okay. So in the last 60 days in different cases you filed three Notices of Appeal?
A That is correct.
Q Okay. And what do you have to do to file a Notice of Appeal on behalf of a defendant?
A Well, it's a two-page document. You file that with the court, there's a Notice of Appeal, basically you put the case name on it and the date the judgment was entered, and you submit it.

Q And do you need a transcript in order to do that?
A No, you don't.
Q You don't need any kind of transcript; is that correct?
A That is correct.
Q And so in order to file that Notice of Appeal do you even have to request a transcript?
A Once you file it and then you will get dates from the Ninth Circuit giving you deadlines for certain things and then you do it.
And I always make it clear to all my clients on the CJA cases that I will not represent them on the appeal. I will file the notice and then I will file a notice to withdraw.
Q Okay. And is that because you don't do appeals?
A That is correct.
Q You're not what's called an appellate attorney; is that correct?
A Correct. But I have done a lot of immigration appeals, but not dealing with criminal cases before the Ninth Circuit.
Q Okay. And so as you just stated, you'll file that notice and then you will motive to withdraw from the case; is that correct?
A That is correct, yes.
Q And in that event would you advise the defendant that he would need to file -- to obtain a new attorney to proceed with the appeal?

A Well, I never had a private client who asked me to file an appeal. Usually the Ninth Circuit CJA monitor, whoever it is, they usually find someone to replace me.
Q Okay. And with a private client, when you file a Notice of Appeal, are there filing fees?
A Yes, there is.
Q And those are required in order to file that notice, correct?
A That is correct.
Q You began representing Mr. Jeter, Courtney Jeter in approximately January of 2023; is that correct?
A That's about right, yeah.
Q And do you see Mr. Jeter in the courtroom here today?
A Oh, yes, I do.
Q And if you could just identify him for the record?
A That's the gentleman sitting far on the right, uniform.
Q And what is he wearing?
A White jumpsuit.
Q And this is the same Mr. Jeter that you represented in the criminal matter; is that correct?
A That is correct, yes.
MS. NAMMAR: And, Your Honor, just identification for the record.
THE COURT: Yes.
BY MS. NAMMAR:

Q Were you privately retained by Mr. Jeter?
A Yes, I was.
Q And so just to be clear, you were not appointed by CJA to represent Mr. Jeter?
A That is correct.
Q Did Mr. Jeter plead guilty pursuant to a plea agreement with the government?
A That is correct.
Q And in his plea agreement did Mr. Jeter waive his right to appeal his conviction and any sentence within the guideline range as determined by the court at the time of sentencing?
A That is correct.
Q And did you understand this at the time Mr. Jeter was pleading guilty that he was waiving his rights to appeal?
A Yes.
Q And you understood this at the time of his sentencing as well; is that correct?
A That is correct.
Q Did Mr. Jeter retain the ability only to attack -- to collaterally attack his sentence that was greater than the specified guideline range as determined by the Court?
A Yes.
Q And did he also retain the right to make a collateral attack of ineffective assistance of counsel?
A Right, only those two counts, yes.

Q Okay. Mr. Jeter was sentenced on May 13th of 2024, correct?
A Yes.
Q And do you recall what his sentence was?
A I believe it was 12.5 years.
Q 12.5 years?
A That's what I -- I may be wrong, but that's my --
Q If you could -- would it refresh your recollection if you were to take a look at the judgment in this case?
A Yes, please.
Q If you could turn in the binder --
A Yes.
Q -- to Exhibit 21.
A Yes.
Q And do you recognize this as the judgment for Mr. Jeter's --
A Yes, I do.
Q And if you can look at Page 3, please.
A Yes.
Q And read that to yourself and let me know if that refreshes your recollection.
A Yes, it does. It was 180 months.
Q If you could just read the entirety of that paragraph, please.
A A total of 240 months.

Q Okay. So Mr. Jeter received a sentence of 240 months; is that correct?
A That is correct.
Q And do you recall whether he was sentenced within the guideline range?
A That's my understanding, yes.
Q Okay. And do you remember what his guideline range was?
A I do not recall right now.
Q All right. Following Mr. Jeter's sentencing on May 13th of 2024, did you believe that there were any grounds for him to appeal his sentence?
A No.
Q And why was that?
A Because to my understanding it was within the guidelines and he had waived most of his appellate rights.
Q And did you ever tell Mr. Jeter that he was eligible for an appeal because the judge said he was going to go below the recommendation and went six months over it?
A Nope.
Q Did you ever tell Andrea Jeter that same thing, that you believed that Mr. Jeter was eligible for appeal because the judge said he was going to go below the recommendation and went six months over?
A No. The discussion -- the discussion usually is the judge can do anything he wants. You know, a possibility of things

can happen, but sentencing, end of the day, is the judge's decision. And if he goes over the guidelines, then you have a reason to file an appeal. But it's within the guidelines, then you do not.

Q And so in this case you understood that Mr. Jeter's sentence was within the guideline range, correct?

A Correct.

Q And so he did not have a basis to appeal?

A That is correct.

Q And did you ever promise Mr. Jeter what type of sentence he would get?

A Never.

Q Did you ever promise Mr. Jeter that he would get between ten and 13 years?

A We had discussions about it, you know. He was hoping for it. He was saying he will do whatever it takes, he would like to keep it under ten if that was possible. And I keep telling him, it's up to the judge. You know, I'll do whatever I can, but I cannot promise you that.

Q And did you ever promise Mr. Jeter that you would in fact get him a sentence of between ten and 13 years?

A Never.

Q Did you ever promise him that you would get him any type of sentence?

THE COURT: You mean specific months?

BY MS. NAMMAR:

Q Specific month, yes, sir.

A Never. I have never done that with any of my clients because end of the day, the judge makes the final decision.

Q Did Mr. Jeter ever give you a Rolex watch?

A Yes, he did.

Q And if you could tell us about that.

A Well, Mr. Myles Breiner was his second attorney. And Mr. Myles Breiner and myself were having a meeting with him. And we were talking about watches. And I wear Casio, a running watch, because I run. I don't wear anything else. And Mr. Jeter said, hey, I will give you a watch. And I said, no, he had already paid me the retainer. At a later time his wife did come to the office with, I believe, four or five different watches. And he did give me one, yes.

Q And do you recall when that discussion with Mr. Breiner and Mr. Jeter was, what time of -- timeframe?

A I met Mr. Jeter many, many times at the Federal Detention Center.

Q Was this prior to your representation of him?

A No, after.

Q Okay.

A Yeah, after. And at times I will run into Mr. Breiner while he's there seeing other clients. And then he will just come into the attorney room and he will just chat with us.

So, as to the discussion on the watch, it must be prior to the sentencing.

Q And Mr. Breiner withdrew as counsel for Mr. Jeter when you took over; is that correct?
A That is correct.
Q But was Mr. Breiner at Mr. Jeter's sentencing?
A Yes, he was.
Q And had they remained friends?
A I do not know the answer to that. I mean --
Q Okay. That's fine.
A Yeah, can't answer that. Yeah.
Q And so this discussion that you had with Mr. Breiner and Mr. Jeter at the FDC regarding the watches, do you recall any kind of a timeframe, was it prior to him pleading guilty or prior to his sentencing?
A No, it must be after he pled out and prior to sentencing.
Q Okay. And was there ever any condition of him giving you that watch?
A No.
Q Was it for payment of your services?
A No, he already paid me.
Q Was it -- did you promise him to give him a sentence of ten to -- get him a sentence of ten to 13 years and that's why he gave you that watch?
A No, I would not -- if that was the condition, I would have

never taken the watch.
Q Okay.
A I don't even wear it.
Q And so the only -- you understood that you were receiving that watch as what?
A As a gift.
Q I'd asked you if you ever told Mr. Jeter or Andrea Jeter whether the -- that Mr. Jeter was eligible for appeal because the judge said he was going to go below the recommendation and went six months over. Does that make sense to you?
A No.
Q And why not?
A Because I've never told a client in all my years of practice what the sentence going to be unless we have an agreement with the Court. Sometimes you have the 12(c)(1)(C) agreement where the Court is binding with the defense and the prosecutor, then we have a range. In this case we did not.
Q And did you recall that Mr. Jeter's guideline range in his PSR was actually 324 to 405 months, does that sound accurate?
A It was pretty high, yes.
Q And the government filed a 5K in this case; is that correct?
A Yes, and he was hoping for something much more lower, which was not.
Q And do you recall what day final judgment entered?

A It was the following day of the sentence. I believe it was May 14th.

Q Okay. And so I want to take you back to May 13th, 2024, the day of the sentencing.

After the sentence was handed down, Mr. Jeter had an outburst; is that correct?

A That is correct.

Q And did you have a discussion with him about that immediately following the sentencing?

A Yes, we did.

Q And if you could just tell us about your discussions with Mr. Jeter immediately following the sentencing at counsel table?

THE COURT: So this is, to be clear, are you saying after I left the bench and you were still here in the courtroom with Mr. Jeter?

THE WITNESS: That is correct, Judge.

THE COURT: Okay. All right, go ahead.

THE WITNESS: So myself and Mr. Breiner were kind of puzzled by his demeanor. And it was uncalled for. I did not like it. And so did Mr. Breiner. And Mr. Jeter was kind of upset because he got the sentence that he did not expect.

And so I went to see him two days later and he gave me a letter to file with the court. And at the time he goes, I do not recall what transpired, because Mr. Jeter was talking for a

long time at sentencing. I believe it was almost like more than 30 minutes. And that's what triggered him to ask me to get a copy of his transcript of the sentencing, and that's what I did.

BY MS. NAMMAR:

Q And so was that request to get a copy of the transcript done on the day of sentencing on May 13th or after?

A After.

Q Okay. So on May 13, the day of his sentencing, did you ever have a discussion with Mr. Jeter about ordering a transcript that day?

A I don't believe so.

Q Can you recall?

A No, I don't think so.

Q Did you have a discussion with Andrea Jeter either in the courthouse or on the courthouse steps regarding ordering a transcript?

A I do not recall.

Q Did you ever tell Andrea Jeter immediately following the sentencing while still on the grounds of the courthouse at least that you were going to file an appeal?

A No.

Q Did you ever tell Andrea Jeter at that time that you believed there were grounds to file an appeal?

A We never discussed appeal.

Q Okay. Did you -- do you recall whether you discussed ordering a transcript with Andrea Jeter on May 13th immediately following the sentencing?
A No.
Q If Mr. Jeter wanted to file a Notice of Appeal, he would have to have had paid a filing fee; is that correct?
A That is correct, yes.
Q Did you ever have any discussions with Andrea Jeter or Courtney Jeter about a filing fee for a Notice of Appeal?
A There were never discussion of an appeal. You know, so there was no reason to talk about a filing fee.
Q And when you met and visited Mr. Jeter -- if we could turn to Government's Exhibit 22 in the binder? And if you could flip through this, it's several pages.
Do you recognize this exhibit?
A Yes, I do.
Q And how do you recognize it?
A Because Mr. Jeter gave it to me and my office filed it with the court.
Q Okay. And do you recall when he gave you these?
A You know, I believe it must be the following day, on the 15th. And that's when my office filed it.
Q And did you have discussions with Mr. Jeter about these letters when he gave them to you?
A Yes, we did.

Q And did you have discussions with Mr. Jeter about filing -- about the possibility of filing an appeal or him having waived his rights or anything about an appeal?

A We -- the judge did explain to Mr. Jeter he had 14 days. And on the 14th we got the judgment. So when I went to see him, I gave him a copy of the judgment and I did tell him, you have 14 days from May 14, starting from May 15. And we also discussed about what transpired in court. And I understand that he was not happy. I was not happy. You know, I was hoping that he would get what he wanted.

You know, I have no issues with Mr. Jeter. I always got along with him great. He was always -- he's always respectful and a gentleman. And I spent a lot of time with him during the course of my representation with him. And he gave me this letter because he felt it was wrong for him the way he behaved in court, and I agreed with him. Because Mr. Jeter is a gentleman. I've never seen him acting out or what have you. So that's why I was kind of surprised and that's when he goes, hey, I would like to know what happened because I do not remember. And that's the reason why we got a copy of the transcript.

Q And if we could look at Page 4 of this exhibit, it's the letter to Judge Seabright. If you could read the last sentence?

A "The sentence simply caught me off guard and my reaction

was a reflection of the fact. I respect your decision and I will do my best to fulfill it without any problems. Thank you."

Q And what did you understand this to mean, "I respect your decision"?

A He's just going to move on and, you know, accept the sentence that Judge Seabright imposed on him.

Q And so at that time when you met with Mr. Jeter and got these letters from him, did he express any desire to file an appeal?

A No. If he had done that, I would have done it. You know, it's a two-page piece of paper and my office would have fronted the money. And like the time he ordered the transcript, you know, we fronted the funds and later his wife, Mrs. Jeter, wrote us a check because we did not know how much it was. So the filing of the appeal and paying for it is not a problem. But he never asked. That's the problem.

Q And you understood that he didn't have any grounds to appeal, correct?

A That is correct. But even if there's no grounds, if he wanted me to file it, it's my job to file it. I would have done it.

Q And you would have done so?

A Yes.

Q If we could look at Exhibit 23, please, there in the

binder. This is a two-page exhibit. Do you recognize this?
A Yeah, it's my calendar, which is -- looks kind of sloppy, sorry.
Q That's okay. So this is your personal calendar from May 2024; is that correct?
A Yes.
Q And I have redacted some information on there that's not relevant to the case, but other than that, is this a true and accurate copy of your May 2024 calendar?
A Yes, it is.
Q There are some notations on there, for example, on Saturday, May 4th, it looks like FDC?
A Yes.
Q And several throughout. Could you explain what that means?
A Well, this is for me to keep track of my mileage for my tax returns, end of the year. So, end of the year I will know how many miles I drove to FDC from my office, I'll just go through my calendar and give it to my CPA.
Q And so on the dates on your calendar where it says FDC, those are the dates that you would have gone to FDC?
A That is correct.
Q Could it be possible that you've made a mistake and you may be one day off, for example, if you said you were there on the 19th, you might have been there on the 20th?

A That's possible.
Q Okay. And if you'll look at May 13th of 2024 on the calendar?
A Yes.
Q Is that -- it looks like "Jeter sentencing"?
A Yes.
Q Is that correct?
A At 1:30, yes.
Q Okay. And if we can turn to Exhibit 24. This is a seven-page exhibit. Do you recognize this?
A Yes. This is the logbook at FDC that you have to complete when you sign in.
Q And so when an attorney goes to visit his clients at FDC, you sign in on this book; is that correct?
A That is correct.
Q And if you could just walk us through this sign-in?
A So, the logbook has a section for date, the key number. The key number is for the locker, you keep your phone and your personal stuff outside that you cannot take into the FDC. And the time you got there. And you put your name, you sign your name, the inmate's name, the inmate's registered number -- registration number, the date.
Q And so are you required to put all of the inmates that you are visiting that day?
A That is correct.

Q And if you don't put that inmate down, then do they not go and call that inmate down to visiting; is that correct?
A That is correct.
Q Okay. And so if -- we'll look at the top of this, it looks like 4/27?
A Yes.
Q Is that your name and signature?
A Yes, that's my handwriting, yes.
Q And who did you list as the inmate?
A Mr. Jeter.
Q And so would you have seen anyone else that day?
A No.
Q Probably just Mr. Jeter?
A That is correct.
Q And if we can go down the page to about April 30th, it looks like?
A Yes.
Q Do you recognize your name and signature?
A Yes.
Q And how many clients were you visiting that day?
A On that given day I saw four.
Q And was Mr. Jeter one of them?
A That is correct.
Q And if we can turn to -- I'm going to skip to Page 2, down almost three-fourths of the way on May 4 of 2024?

A Yes.
Q Is that your signature as well?
A Yes.
Q And who were you visiting that day?
A I saw Mr. Jeter and Mr. Bhatti, who was his bunky, who was also my client.
Q Mr. Bhatti was Mr. Jeter's bunky?
A Correct.
Q And if you'll look at the next page, Page 3. May 11th, is that your signature?
A Yes.
Q And did you visit Jeter that day according to this?
A Yes.
Q And that would have been just two days prior to sentencing, correct?
A That is correct.
Q Okay. And if we go to the bottom of that, Page 3, May 15th, is that your signature?
A Yes, it is.
Q And did you visit Jeter that day?
A I did.
Q And so that would have been the day that you received the letters from Jeter; is that correct?
A That is correct.
Q If we turn to Page 4, on 5/18, is that your signature?

A Yes.
Q And what inmate were you visiting that day?
A I saw Mr. Taylor that day.
Q Okay. And as we look down the page, it looks like you saw Mr. Taylor a couple more times, on the 30th -- I'm sorry, on the 20th and the 21st; is that correct?
A Yes.
Q And so you wouldn't have seen Mr. Jeter on those occasions?
A That is correct.
Q And if we could turn to Page 5. Going down to the bottom of the page, it looks like on May 26th?
A Yes.
Q Is that your signature?
A Yes.
Q And did you see Mr. Jeter that day?
A Yes, I did.
Q And if we could turn to Page 6 on May 29th?
A Yes.
Q Did you see Mr. Jeter that day?
A Yes, I saw Mr. Jeter and Mr. Bhatti on that day.
Q Okay. And then down at the bottom of the page, on May 31st did you again see Mr. Jeter?
A Yes, I saw Mr. Jeter and Mr. Bhatti and one other inmate.
Q And if we turn to Page 7, on June 1st, is that your

signature?
A Yes, it is.
Q And who did you see that day?
A I saw Mr. Bhatti, Mr. Taylor, and another person, I'm unable to read the handwriting. Mr. Brady I think, not Mr. Jeter.
Q Okay. And on June 4th did you visit the FDC again on that date?
A I saw Mr. Khan and Mr. Bhatti, not Jeter.
Q Okay. And so you represented Mr. Bhatti as well?
A Yes, and Mr. Bhatti was a CJA client. And once Mr. Jeter was sentenced and we talked about what we were going to do, Mr. Jeter did not feel comfortable coming down every time, because every time he comes down he's searched, strip searched. So, moving forward I was told by Mr. Jeter that if I see Mr. Bhatti and if he wants me to see Mr. Jeter, he will pass on the message. That's the reason I did not see him. I'm there already. If he wanted to see me, I could have seen him.
Q This log ends on June 6th, but you've been to the FDC many times thereafter; is that correct?
A I was there yesterday.
Q Okay. And so Mr. Jeter was sentenced on May 13th, correct?
A Correct.
Q And judgment issued the following day, May 14th?

A Correct.
Q And so he had how many days in which to file a Notice of Appeal?
A 14.
Q And would May 28th, 2024, have been that deadline?
A That's correct.
Q And so during that time period, May 13th, 2024, and May 28th, 2024, how many times did you visit Mr. Jeter at FDC?
A I believe two times.
Q And that was on May 15th and May 26, as we just established; is that correct?
A That is correct.
Q On that visit on May 15th, 2024, did Mr. Jeter ever ask you to file a Notice of Appeal?
A No. If he had asked, I would have done it.
Q Okay. And he never did so on the 26th either, did he?
A No, he did not.
MS. NAMMAR: One moment, please.
BY MS. NAMMAR:
Q So we previously established that you met with Mr. Jeter on at least two occasions during that 14-day appellate period. You also met with him several days thereafter. If he would have asked you, for example, on June 4th or June 8th to file a Notice of Appeal, what would you have done?
A Well, even if I had passed the deadline, if he had asked,

I would have done it.
Q You would have still filed the Notice of Appeal?
A I would have done it, yes.
Q And would you have sought permission to be able to file that out of the time?
A Yes. I would tell him the process because we already passed the deadline, we have to show a reason why, you know.
Q And in your experience, does the court often grant extensions for various things?
A I have never done one before, so I can't really answer to that.
Q On a Notice of Appeal you've never done one?
A Correct. I mean missing the deadline.
Q Understand. But if at any time Mr. Jeter would have asked you to file a Notice of Appeal, you would have done so?
A I would have, yes.
Q In your 30 years of practicing law and your 20-plus representing criminal defendants, have you ever refused to file or failed to file a Notice of Appeal when a client has requested that you do so?
A Never.
Q I want to turn to Exhibit 25, please. This is a 14-page exhibit. Do you recognize this?
A Yes. This is the text message between myself and Mrs. Jeter.

Q And are these text messages that you provided to the government?
A Yes.
Q And are these all of the text messages from your phone between yourself and Mrs. Jeter from April 28th, 2024, to November 4th, 2024?
A Yes.
Q Did you have any other communications with Andrea Jeter after November 4th, 2024?
A Do not recall.
Q And did your phone have any further text message communications between you and Andrea Jeter?
A No.
Q Andrea Jeter asked you to do numerous things for her, correct?
A Yes.
Q And are those reflected in these text messages?
A Correct.
Q For example, she asked you to file a power of attorney; is that correct?
A She asked me to draft one and seek assistance of a notary, and then we went to see Mr. Jeter to have that notarized, correct.
Q So you did that?
A Yes.

Q Did she ask you to get notaries on other things?
A Yes, she did.
Q And did you do that?
A Yes, I did.
Q And when she asked you questions about Mr. Jeter's, maybe his location or his PSR, did you answer her questions?
A Yes, I did.
Q During this time period, did you ever have any discussions with Andrea Jeter about filing a Notice of Appeal?
A Never.
Q And if you'll turn to Page 14 of this exhibit. On November 2nd, 2024, if you'll read that bubble, please, where it starts, "Good afternoon, Gary"?
A You want me to read it out loud or just to myself?
THE COURT: We can read it for ourselves.
BY MS. NAMMAR:
Q Okay. In this bubble Ms. Jeter has asked you to obtain a copy of the appeal that you filed. Do you see that?
A Correct. I see it, yeah.
Q And what was your response to her?
A Well, when I saw the text message, I was surprised. Puzzled. That's the reason my response is, an appeal was never filed, because it was never asked. We only ordered a copy of the transcript of the sentencing and that was the end of that.
Q Okay. And her response was just, okay, I'll let him know,

correct?

A Correct.

Q Did you ever hear anything else from Andrea Jeter or Courtney Jeter regarding an appeal?

A Never.

MS. NAMMAR: No further questions.

THE COURT: Can I ask one question? On May 15th when you met with Mr. Jeter, the judgment had been entered the day before.

THE WITNESS: Correct, yes.

THE COURT: And so you told him about the 14 days runs from the date of the judgment, you explained?

THE WITNESS: Correct. Yes.

THE COURT: What was his response to that when you explained that to him?

THE WITNESS: He basically, Judge, was going to take full responsibility and move on. There were a couple of things in this case that he was very concerned about. He was very concerned about not having Mrs. Jeter getting involved. He didn't want his son to get involved. Did not want his daughter to get involved. He didn't want to lose their house. He was very disappointed in the length of the sentence, but he basically said, hey, I'm just going to accept it and I'm going to move on and please file these two documents for the court. And I was very disappointed also, to be honest with you, you

know, but that is the sentence.

Now, if he had asked me to file an appeal, I would have.

THE COURT: So I think you said earlier he expressed no desire to appeal.

THE WITNESS: That's correct, Judge.

THE COURT: So you told him about the deadline?

THE WITNESS: Yes.

THE COURT: And his response was?

THE WITNESS: I'm just going to move on.

THE COURT: Going to move on. Okay. All right.

MS. NAMMAR: Sorry, Your Honor, I have one other question, if I may.

THE COURT: Yes.

BY MS. NAMMAR:

Q You were with Mr. Jeter after his change of plea with Judge Porter, correct?

A Yes.

Q He pled guilty to three counts, correct?

A Correct. Yes.

Q One of the counts he pled guilty to was a 924(c) firearm charge?

A Yes.

Q Did you ever tell Mr. Jeter after he pled guilty that day in court at the table that he could appeal that?

A No.

Q Did you continuously tell Jeter that he could appeal?

A We never really discussed appeal. We spent a lot of time on -- focusing on the length of the sentence that he may get. We did discuss that and I keep on telling him, there's a range. It's up to the judge. I don't make the decision.

MS. NAMMAR: Thank you. No further questions.

THE COURT: All right. Cross?

MR. HUGHES: Thank you, Your Honor.

THE COURT: Are you due in Family Court at a certain time?

THE WITNESS: 1:30, Your Honor.

THE COURT: 1:30?

THE WITNESS: Yeah, in Kapolei.

THE COURT: Okay. And how long will that take you to get there?

THE WITNESS: 45 minutes.

THE COURT: Okay. All right.

MR. HUGHES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HUGHES:

Q Good morning, Mr. Singh. I believe it's still morning. How are you?

A Good morning.

Q I think there are a lot of things we can agree about in

this case, correct? For instance, you were sentencing counsel on May the 13th, 2024, correct?
A Yes.
Q And you never withdrew? You never withdrew as Mr. Jeter's attorney?
A That is correct.
Q Okay.
A I've never done one before, but okay.
Q And I know that you dispute that Mr. Jeter instructed you to file a Notice of Appeal, but had he done so it would have been your professional responsibility to do that because you were still his counsel, correct?
A Well, if Mr. Jeter had asked me to file the appeal --
Q Right.
A -- I would have told him, I will file the notice, he has to look for someone else to do the appeal because I do not do appeals with the Ninth Circuit. And I will give him time to seek new counsel and then a withdrawal and substitution.
Q Would you agree with me that because you had not withdrawn, it would be your obligation to perfect the appeal by filing a Notice of Appeal?
A If he had asked me to do so, correct, yes.
Q Okay. All right. And I want to ask you some questions about a declaration that you submitted in response to the 2255 petition filed by Mr. Jeter. Do you remember preparing that

declaration?
A Yes.
Q Have you reviewed it prior to your testimony today?
A A couple of days ago, yes.
Q Okay. Do you have a copy there with you?
A No, I do not.
MR. HUGHES: Your Honor, may I approach?
THE COURT: You may.
MR. HUGHES: Would you like a copy as well?
THE COURT: This is an exhibit; is that right?
MR. HUGHES: It's -- it was going to be Exhibit 4. I don't have to admit it, but you should have a copy of it.
THE COURT: Well, I think for the record we should probably should just go ahead and admit it then. Are you okay with that?
MR. HUGHES: That's fine.
THE COURT: All right. So I'll admit Exhibit 4 then.
(Defendant's Exhibit 4 was received in evidence.)
THE COURT: And you may approach.
BY MR. HUGHES:
Q And if I could ask you to turn to Page 7 towards the end of Paragraph 21.
A Yes.
Q You state that: Following the pronouncement of his sentence, Judge Seabright advised Jeter that he had waived most

of his rights to appeal, but if Jeter believed the waiver was unenforceable -- was not enforceable or that there were grounds he could appeal, he could do it within 14 days.

You'd agree with me that that's not an instruction to Mr. Jeter that he cannot file a Notice of Appeal, correct?
A I do not understand the question.
Q Okay. So Mr. Jeter was instructed that if he wanted to file a Notice of Appeal that he had to do so within 14 days, correct?
A Yes.
Q He was not told that he could not file a Notice of Appeal?
A That is correct.
Q And another fact I think we can agree on, Mr. Jeter never told you not to file a Notice of Appeal?
A That is correct.
Q All right. So, he was instructed he could file within 14 days. You state in Paragraph 22 on Page 8: That after the sentencing hearing, the following day, following entry of his final judgment, I met with Jeter at the Federal Detention Center.

I believe the sentencing was on May the 13th, correct?
A Correct.
Q And the judgment was actually entered the next day, on May the 14th, correct?
A Correct.

Q So then you went to visit Mr. Jeter on May the 15th, correct?
A Yes, I think I'm off by one day on this, yes.
Q Okay. So if you could look at the binder of the government's exhibits. If I could have you turn to that.
A Sure.
Q And specifically to Exhibit Number 22.
Okay. So we talked about these apology letters, correct?
A Yes.
Q And you didn't instruct or advise Mr. Jeter to write these, did you?
A I did not.
Q Okay. He did this on his own?
A That is correct.
Q In fact, when you met with him on the 15th he showed up with them, you had no idea that he was going to bring them to you, correct?
A That is correct.
Q And you'd agree with me that in these letters he acknowledges his outburst, correct?
A Correct.
Q And he's apologizing for what happened?
A Yes.
Q And in order to avoid any type of ex parte communication,

you then filed these letters with the court on May the 15th, I'm assuming after your visit on that day?
A Correct.
Q Okay. So going back to your declaration, looking at Paragraph Number 22?
A Yes.
Q You state that, on the 15th, that you and Mr. Jeter discussed the 14-day period --
MS. NAMMAR: Objection, Your Honor. It doesn't say on the 15th.
MR. HUGHES: Okay.
BY MR. HUGHES:
Q You state that when you met with Mr. Jeter, that you discussed the 14-day period to file, correct?
A Can you show me which number you're referring to, which page number?
Q Page Number 8 in Paragraph 22.
A Got it. Okay.
Q Okay. And the sentence I want to ask you about: Jeter requested that I obtain the transcript from the sentencing hearing because he wanted to know what he said to the Court, correct?
A That is correct. Yeah.
Q Now, at this point he's already prepared these apology letters, correct?

A Yes.
Q And would you agree with me that in these apology letters he is acknowledging that he had had this outburst?
A Yes.
Q Okay. So is it your testimony that two days later he indicated to you that he did not remember what he said during the outburst?
A Correct.
Q Would you agree with that?
A Yes.
Q So, I'm trying to understand, if he's already apologized, if he's already prepared these apology letters, why would he need the transcript to figure out what it was he said during his outburst?
A Because during our discussion he indicated that he does not recall what he said to the Court.
Q Okay.
A Because the sentencing was pretty lengthy. Mr. Jeter was talking for, I believe, 30 to 45 minutes.
Q Okay.
A And he does not recall what he was saying. So he asked me to get the transcript so he can review it.
Q So it was your understanding that he indicated to you that a mere two days later he could not recall what he had said to the Court?

A Correct.

Q Well, he's already -- and we've already established he had already filed the apology letters. I'm just trying to figure out, what would be the purpose of him determining what he had said to the Court?

MS. NAMMAR: Objection, Your Honor. That's a question for Mr. Jeter. He doesn't have knowledge --

THE COURT: Yeah. Sustained. You can ask if there's a conversation regarding that, but not his reading Mr. Jeter's mind.

MR. HUGHES: Absolutely. Thank you, Your Honor.

BY MR. HUGHES:

Q In the conversation with Mr. Jeter, did he indicate to you why it was important to him to know what he had said during this outburst?

A What I recall is he did not remember what he said to the Court at sentencing. And the only way he can go back is by reading what he said. And that's the reason he wanted a copy of the transcript.

Q Okay. But what I'm asking is, did he indicate to you why he wanted to remember what he had said during the outburst?

A You may want to ask him that.

Q Okay.

A Yeah.

Q So is your answer that he did not tell you why he wanted

to remember?

A I don't think so.

Q Okay. During the course of your representation of him, did he ever exhibit any memory problems?

A No.

Q Did he ever --

A Not that I can think of.

Q And I apologize for talking over. I'll slow down.

A No, no, no, that's fine.

Q Did he ever exhibit any signs of dementia or anything else that would cause you to question his memory?

A Well, other than him claiming that he's getting old, you know, he joked about that, no, he's pretty smart.

Q Okay. And I believe that at the time of this sentencing he was 63, maybe 64, somewhere in that range?

A Yeah.

Q Okay. So it's your testimony that the reason you ordered the sentencing transcript was because Mr. Jeter wanted to try to remember, recall what he had said?

A That's my understanding, correct, yeah.

Q And did you -- did you and Mr. Jeter at that point discuss cost, how much it would cost to get the transcript?

A I told him I do not know how much and I told him that my office will front it, and then once we get the invoice from the court reporter, I will pass that on to his wife.

Q And when you say that your office would front it, you mean your office would pay for the transcript and then ask his wife for reimbursement?
A That is correct.
Q And you told him that you did not know what the cost would be, correct?
A That is correct.
Q And do you know when your office actually requested the transcript?
A I do not.
Q Okay. I'm not sure if there's a copy up there for you, but let me see if -- if there's an Exhibit 1?
A It's not here, no.
THE COURT: Exhibit 1?
MR. HUGHES: That's correct, Your Honor. That was entered earlier that we offered.
THE COURT: All right. You have that in front of you?
THE WITNESS: Exhibit 1? No, Judge.
THE COURT: One.
THE WITNESS: No. Only got Exhibit 1 through 25.
MR. HUGHES: I've got an extra one, Judge.
THE COURT: All right. You may approach.
BY MR. HUGHES:
Q I'm going to hand you Exhibit 1.
A Yes.

Q Okay. And do you recognize that document?
A Yes, I do.
Q Okay. And what is that?
A It is an invoice from my office going to Andrea.
Q Okay. And what was -- that's an e-mail from -- was it from you personally or from -- part of your office staff?
A My staff.
Q All right. What is the date on that?
A June 18, 2024.
Q Okay. And you're requesting payment in the amount of $201.05 for the transcript, correct?
A Correct, yes.
Q Okay. And it's not a dispute that Ms. Jeter did in fact send you a check in that amount to reimburse you for the cost of the sentencing transcript?
A That is correct, yes. He paid for it, yeah.
Q Okay. And I'll ask you to turn to Page 2 of Exhibit 1, or the second page, I don't think it's numbered. You have a legal assistant named Dana Devers; is that correct?
A That is correct.
Q And would you agree with me that Ms. Devers is, that second page, sending an e-mail to Ms. Matsumoto stating that, we requested the transcript on May the 21st?
A Correct.
Q All right. So do you have any reason to believe that

that's not the date that your office requested the transcript?
A No, that was the date we requested it, yes.
Q Okay. So is there any reason if Mr. Jeter wanted to have his memory refreshed or wanted to know what he said, why you waited almost a week to request the transcript?
A Maybe I got busy with other matters. This was not urgent, you know.
Q All right. And I believe you testified that you went out to the FDC on two occasions during the 14-day period between May the 14th of 2024 and May the 28th of 2024?
A Correct.
Q And I believe you testified that when you went on May the 15th, you did inform Mr. Jeter that he had 14 days to file?
A Correct.
Q So his appellate rights were discussed?
A Correct.
Q And I want to make sure on the other occasion, I think it was either May the 25th or 26th, were his appellate rights discussed at that time as well?
A I don't believe so because on my first visit it was pretty clear that he was just going to move forward.
Q Okay. And I believe when you testified that he told you he wanted to move forward, I believe that you testified that the reason he wanted to do that was that he didn't want to get his family further involved; is that right?

A That was part of the reason, yes.
Q Okay. Would you -- would you agree with me that filing a Notice of Appeal -- I mean -- well, I'll ask you. Let me strike that question. Let me ask you this:
How would it get his family involved in his criminal prosecution if he filed a Notice of Appeal?
A You have to ask him that.
Q Okay. But that's the reason he gave to you, he wanted to move on because he was afraid that if he appealed, that he would get his family somehow involved?
A No, I think Mr. Jeter was getting tired of this case by now. You know, he'd been going through all this and he -- when he was in prison he even wrote a book. You know, I got to know him really well, I got to know.
Q And you testified that he was very upset with his sentence, correct?
A Correct. Yes.
Q And isn't it true that one of the reasons he was upset is because based on his age he realized that he would be serving that sentence well into his late 70s?
A Well, his goal was to see his daughter graduate.
Q Okay.
A And based on the length of the sentence, he was pretty upset. And he was pretty close to his youngest daughter.
Q So if his goal was to see his younger daughter graduate,

would you agree with me that he would basically want to do just about anything to get some relief from the sentence?
A At the time of sentencing, correct.
Q Okay. And so someone who is in his position who would like to get out and spend this time with the family, as you mentioned, would you agree with me that basically an individual in that position would want to avail themselves of any potential opportunity to get relief?
A He -- he even tried asking me to go to the prosecutor to give them more information on some other cases. He was hoping for a better 5K downward departure. That did not happen and that's what frustrated him.
Q Okay.
A We tried many things. He asked me to even contact court reporter -- not court reporter, reporters with the news talking about other cases.
Q Okay.
A You know, so.
Q So when Ms. Nammar originally asked you what your recollection was of the sentence that Mr. Jeter received, I believe you stated it was 12-and-a-half years, correct?
A I did say that, yes.
Q Which I think is 150 months?
A Correct.
Q But you had your memory refreshed that the sentence he

received was actually 20 years, correct?
A That is correct, yeah.
Q Okay. Ms. Nammar asked you if you believed that there were any meritorious grounds for Mr. Jeter to pursue an appeal, correct?
A Correct.
Q And I believe you stated that in your opinion that there were not?
A Well, the plea agreement speaks for itself.
Q Okay.
A And Mr. Jeter knows that.
Q Okay. You're talking about with respect to the appeal waiver and the plea agreement?
A Yes.
Q But you'd also agree with me, and I believe you testified to this earlier, that your belief as to whether or not he has any meritorious grounds for appeal, that belief is immaterial, correct?
A If Mr. Jeter had said, Gary, file a Notice of Appeal, I would have done that, regardless of what.
Q Right.
A It's a one-page document and then I will ask him to go get another attorney to represent him, which never happened.
Q Regardless of whether or not the plea agreement has an appeal waiver?

A Correct.
Q And regardless of whether or not you think that the grounds are not meritorious?
A I just did that last month for another client.
Q Okay. Just want to ask you a couple questions about the Rolex. You stated that you did receive a Rolex from Andrea Jeter, correct?
A Correct.
Q And it was not part of the payment of your fee?
A Correct.
Q And that it was basically a gift that Mr. Jeter was giving to you; is that correct?
A That is correct.
Q Okay. And as far as ordering the transcript is concerned, and maybe my notes are off, but I thought you testified that you didn't recall the discussion concerning ordering the transcript. Did I get that wrong? And I'm talking about when you went out there on the 15th.
MS. NAMMAR: That misstates the testimony.
MR. HUGHES: I may have misstated it, Your Honor.
THE COURT: I think you might be thinking about Mrs. Jeter.
MR. HUGHES: Possibly.
THE COURT: Potentially. Potentially.
MR. HUGHES: I'll move on.

THE COURT: I mean you can ask the question, Mr. Hughes. I'm not going to stop you from asking the question.

BY MR. HUGHES:

Q I'll ask you. Do you remember having this discussion about the transcript on May the 15th?

A We --

THE COURT: With Mr. Jeter.

BY MR. HUGHES:

Q With Mr. Jeter.

A Mr. Jeter, yes. And that's the reason I ordered the transcript for the sentencing.

Q Got you. But with Ms. Jeter, you don't recall whether or not you had that conversation?

A I told her after talking to Mr. Jeter that he would like me to order the transcript.

THE COURT: No, on the steps, the front of the courthouse after the sentencing.

THE WITNESS: No, no.

THE COURT: Okay.

THE WITNESS: No. This is after I met him.

THE COURT: Okay.

BY MR. HUGHES:

Q Did you have a conversation with Ms. Jeter on the steps of the courthouse after the sentencing?

A We did have discussion, yes.
Q What did you talk about?
A We were disappointed with the sentencing.
Q And she asked you if there was anything that could be done about it, correct?
A I do not recall that.
Q Okay. You don't recall whether she wanted to find out if there was anything that could be done to perhaps get some relief?
A I think all of us were kind of surprised and shocked.
Q Okay.
A And that was what was discussed.
Q And do you not recall whether you discussed his appellate rights with her or did you not discuss his appellate rights?
A I never discussed that with her, no.
Q Okay. And you never told him that he could not appeal, correct?
A No.
Q Okay. Just brief, you've been asked a number of questions about a Mr. Bhatti, I think, B-H-A-T-T-I?
A Bhatti.
Q Could you just give me a brief physical description of what he looked like?
A He is half East Indian, half Filipino.
Q Okay. All right. Now, one other thing you told

Ms. Nammar was that even if the deadline had passed, if Mr. Jeter or any other client asked you to file a Notice of Appeal, you would do it anyway, correct?

A Well, I got to go check the rules and see what are the requirements because I've never done one.

Q Okay.

A And if the rules, you know, permits me to do it, I will.

Q Okay. Because I understood you to say that even if Mr. Jeter had asked you after the 14 days had run, even if he had asked you to file a Notice of Appeal at that point, that you would have done it?

A I would have done it and I would discuss it with him, hey, we need to have a valid, legal reason.

Q Okay. So you'd agree with me that on November the 2nd of 2024, Ms. Jeter reached out to you and asked whether a Notice of Appeal had been filed, correct?

A That's --

MS. NAMMAR: Objection. That misstates the testimony.

BY MR. HUGHES:

Q Okay. Through the text, a text message was sent to you, I believe it's on Government's Exhibit 25, Page 14. Do you have that in front of you?

A I have it.

Q Okay. Do you see that: Good afternoon, Gary. Courtney said he doesn't have a copy of the appeal you filed regarding

the judge saying he was going to give him less than what the prosecutor asked for.

Would you agree with me that that message indicates that Mr. Jeter wanted you to file a Notice of Appeal?

A That's the reason I testified earlier when I saw that message I was puzzled and surprised.

Q Okay. So, and November 2nd, clearly is way past the 14-day deadline, correct?

A Correct.

Q But you did not file a Notice of Appeal when this message was sent to you past that deadline?

A There was never a follow-up after that.

Q Okay. Did you try to follow up with Mr. Jeter to ask, what's this all about, why -- why is your wife asking me about an appeal, did you ever try to communicate with him about that?

A No. Usually, from past experience, Mrs. Jeter was pretty good. She will always contact me if she wanted me to do something.

Q And once Mr. Jeter left FDC Honolulu, did you have any further communication with him?

A I don't believe so. You know, like, let me give you one simple example. When Mr. Jeter had a matter pending before the Family Court at Kapolei, he contacted his wife and he asked me to go make the appearance. I did. So, you know, whenever there's something pressing, he does contact her. And like I

indicated earlier, I have nothing against Mr. Jeter.
Q Understood.
A You know, I mean if he had asked me to do it, I would have done it. Simple as that.
Q Okay. But you did not -- once he left FDC Honolulu, there was no more direct contact between you and him?
A My job was completed in my mind that he was sentenced, the 14 days had passed, and he had not given me any instructions what to do.
Q Do you recall when you finally got the sentencing transcript?
A I believe it must be sometime in June when we made the payment.
Q Okay. Would it have been before you asked Ms. Jeter to write the check to you to reimburse the cost?
A Usually around the same time. You know, usually the court reporters with e-mail you the amount and we usually send them a check.
Q Okay. And do you know where Mr. Jeter was on June the 18th of 2024 when you made that request to Ms. Jeter?
A Do not know.
Q All right. Did you send a copy of the sentencing transcript to Mr. Jeter?
A I believe I gave it to Mrs. Jeter.
Q Okay. And how did you transmit it to her?

A She probably came by the office.
Q All right.
A Or I mailed it to her. I'm not sure. Either one of that.
Q So you sent it to Ms. Jeter, but not to Mr. Jeter; is that correct?
A My understanding is Mr. Jeter was in transit. So he was going from one location to the other, and this was told to me by Mrs. Jeter. And that's the reason Mrs. Jeter had asked me to send her a copy of his PSR because he had lost all his material during the transfer.
Q Okay.

MR. HUGHES: Your Honor, may I have just one minute?

THE COURT: Yes.

(Pause in the proceedings.)

MR. HUGHES: I'll pass the witness, Your Honor.

THE COURT: All right. Ms. Nammar, anything further?

MS. NAMMAR: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. NAMMAR:
Q Mr. Hughes was asking you, essentially he said that you -- Mr. Jeter said he did not remember what was said, and then that he went and wrote those letters on the 14th, you got them on the 15th. Do you recall those questions?
A Yes.
Q Okay. And Mr. Jeter knew that his behavior was

inappropriate on the day of sentencing; is that correct?
A That was discussed once the judge sentenced him, the judge left the bench, we had a few moments between myself, Mr. Jeter and Myles Breiner. And we looked at him, we went, what was all that about?
Q And so Mr. Jeter wasn't questioning, he knew it was out of character for him, you felt it was out of character as well; is that correct?
A Correct.
Q And he's just wanting the transcript to go back and review what exactly happened; is that accurate?
A That's my understanding, yes.
Q Okay. You also talked about that Jeter was focused on cooperation after his sentencing and that he was contacting you numerous times about?
A While he was here, we were in contact. But once he was gone, we lost contact.
Q And while he was here, after his sentencing on May 13th, he actually wrote several letters similar to the letters -- sorry, he wrote several letters to individuals about his cooperation; is that correct?
A That is correct.
Q He wrote a letter to Mr. Breiner?
A Yes.
Q And this was after his sentencing in May of 2024; is that

correct?
A Correct.
Q And he wrote a letter to you as well?
A Yes.
Q And he wrote a letter to myself as well; is that correct?
A That is correct.
Q Those letters were not delivered, were they?
A No.
Q You never provided me with that letter?
A No.
Q Prior to this -- this matter arising; is that correct?
A Correct.
Q And so you continued to have discussions with him of how he could reduce his sentence with regards to his cooperation, correct?
A Correct.
Q And he was trying to cooperate in a state matter as well; is that correct?
A That is correct.
Q And I believe Andrea Jeter had asked you some questions regarding that. There's a text message in the Exhibit 25 where she asks about the Soapy [ph. sp.] case; is that right?
A That is correct.
Q And were those discussions related to his cooperation?
A Correct.

Q Okay. There's also some messages in Exhibit 25 between you and Andrea Jeter about letters to Peter Boylan; do you recall those?
A Yeah. He's the reporter with the newspaper, yes.
Q Okay. And that's where Mr. Jeter was trying to get you to provide letters to Mr. Boylan; is that correct?
A That is correct.
Q Okay. Mr. Hughes asked you if -- he said you never told Jeter that he couldn't appeal. Do you recall that question?
A Yes.
Q And -- but you did discuss with Mr. Jeter that he had waived most of his appellate rights, correct?
A That is correct.
MS. NAMMAR: Okay. No further questions, Your Honor.
THE COURT: Anything?
MR. HUGHES: Nothing further, Your Honor.
THE COURT: You may step down.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: All right. So we're going to take a -- is a half hour enough for everybody?
MR. HUGHES: Sure.
THE COURT: Does that do it for everyone?
MR. HUGHES: Sounds good.
THE COURT: Why don't we say 40 minutes, okay. Let's

do that.

MR. HUGHES: Okay.

THE COURT: And we'll pick up then. Okay. Thank you all.

MR. HUGHES: Thank you, Judge.

(A recess was taken from 12:30 p.m. to 1:18 p.m.)

THE COURT: All right. Please be seated.

We're back with counsel, Mr. Jeter.

Mr. Jeter, I think we need you back on the stand now, right? We're going to finish up with you.

You don't need to -- yeah. I just remind you you're still under oath.

THE WITNESS: Yes, sir.

THE COURT: All right. Ms. Nammar.

MS. NAMMAR: Yes.

COURTNEY GENE JETER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

RESUMED CROSS-EXAMINATION

BY MS. NAMMAR:

Q Mr. Jeter, I just have a couple more questions for you.

You were talking about your time at Victorville and how it was difficult for you to communicate with people while you were there; is that correct?

A Yes, ma'am.

Q And -- but you still were able to e-mail with your wife, Andrea Jeter, correct?

A Yes, ma'am.
Q And you were able to make telephone calls to her as well?
A Yes, ma'am.
Q And I believe your testimony was that you just didn't have a consistent, like, maybe previously you could have called her every single day at a certain time, and you couldn't get in a rhythm?
A I just got in when I could get in.
Q Okay. And you wrote a book since you've been in prison as well; is that correct?
A Yes, ma'am.
Q And you had your wife contact Gary on numerous occasions for you, correct?
A Yes, ma'am. Every occasion that I needed something because I didn't have his e-mail or phone number.
Q While you were at FDC Honolulu, though, you did have his personal cellphone, correct?
A I -- I didn't have his -- I never -- if I had it, I never called him. I don't think I had it. I know I had Myles', but I don't think I had Gary's. And my -- you know, I got in the habit of just sending it through my wife --
Q Okay.
A -- because -- because that way I knew it would get a response.
Q And you've seen the Exhibit 25, the text messages between

your wife and Gary, correct?
A Yes, ma'am.
Q And so you know your wife had Gary's personal cellphone?
A Yes, ma'am.
Q And you never -- either at FDC Honolulu after your sentencing or at Victorville, you never sent Gary an e-mail about an appeal or anything requesting an appeal or the status of an appeal, correct?
A I never had his -- I never sent him one. I didn't have his e-mail.
Q And you never sent your wife an e-mail regarding a status of an appeal or anything, and you never said anything to her until she sent the text message to Gary that we've seen in November 20 --
THE COURT: That -- that was two questions in one.
MS. NAMMAR: Sorry.
BY MS. NAMMAR:
Q You never said anything to your wife until she sent the text message in November 2024 to Gary, correct?
A I said it -- I said -- I'm the one that initiated it.
Q Okay.
A And -- and -- because I -- Victorville is just a different kind of place. I mean, it's different.
Q That's okay. I don't --
A And once I got to where I was at and got settled in, my

mind went to my case.
Q Okay.
A And then I sent it and then she sent it to him.
Q And so that was the first time you had a discussion with her about the appeal?
A It may not have been the first time. I may have spoken to her about it, but it wasn't -- it wasn't something that I thought about because I figured it was being done.
Q And you heard your wife's testimony here today, you sat in this courtroom when she testified, correct?
A Yes, ma'am.
Q And she testified she didn't discuss the appeal with you, did she?
A She didn't discuss very much with me, ma'am.
Q Okay. Thank you.
A Like -- like that. I mean she's my wife and we have conversations, but when it comes to my case, she just relays messages. Because --
Q Understood.
MS. NAMMAR: No further questions. Thank you.
THE WITNESS: Okay.
THE COURT: Okay. Anything further?
MR. HUGHES: Yes, Your Honor, briefly.
THE COURT: All right.

REDIRECT EXAMINATION

BY MR. HUGHES:
Q Mr. Jeter, if I could ask you just one more time, this will be the last time.
A Yes, sir.
Q If you could turn to Exhibit 22 in the book with the government's exhibits. And specifically to Page 4.
A Exhibit 22, Page 4. Yes, sir.
Q Okay. And you see that you were asked some questions about that last sentence, I respect -- this is the letter to Judge Seabright: I respect your decision and will do my best to fulfill it without any problems.
A Yes, sir.
Q What did you mean by that?
A I mean, I'm torn being here because I did wrong. And I have to come here for -- and -- and try to defend myself for things that were done wrong to me, but you guys try to do the right thing for America, and I respect it. If I had you as a brother, sister, children, I'd be proud of the work you do. And that's what I meant. I -- I respect what you do. And I'm not -- even if you sentence me to 100 years, if that's your decision, I respect it.
I just wasn't ready for that kind of sentence. Last time I been sentenced to any time in jail was in 1998. I got six months. And that was nearly a quarter century ago. But I didn't mean it where I'm just going to lay down. I have a

daughter. At that time I got sentenced she was seven, now she's 12. I'm -- I was 63. The sentence was basically a death --

THE COURT: That can't be right. You said at the time you were sentenced she was seven, now she's 12 --

THE WITNESS: Backwards. Backwards. At the time I was sentenced she was seven. Now she's 12. Eight, nine, ten -- I been in -- I been in for going on five years.

THE COURT: You were sentenced just over a year-and-a-half ago.

THE WITNESS: Well, the time I came in.

THE COURT: The time you were arrested.

THE WITNESS: Yeah, I was arrested. Now she's 12. I want to spend time with her. I -- I meant it in a way where you folks would know that I respect what you do. I didn't mean it in a way where you folks would take it like I'm not going to try to fight to get out and be with my family. Because I'm definitely going to do that. I have nothing to lose.

BY MR. HUGHES:

Q And that was my next question. You were not trying in any way to convey the idea that you were not going to appeal, is that right, with that language?

A I'm going to continue to appeal until I can get heard. And if I don't get heard, that's God's will.

Q And if I could just have you briefly turn to Page 6

briefly. This is the letter to Ms. Nammar?
A Yes. Yes, sir.
Q And you see the language very similar to what you wrote to Judge Seabright: I respect the job you perform, will do my best to fulfill my sentence without incident.
Did you mean the same with respect to Ms. Nammar as you did to Judge Seabright?
A I respect you, Ms. Nammar.
Q Okay. And again, follow-up question is, does this in any way indicate your -- that you're communicating that you did not want to appeal?
A I'm going to appeal. I'm going to fight.
Q Okay.
A I mean I'm fighting now. I come and found you to continue to fight. So, what have I -- have I ever been shown any indication of not fighting?
Q Okay. And you were obviously present when Mr. Singh testified, correct?
A Yes.
Q You heard his testimony that the reason --
MS. NAMMAR: Objection, Your Honor. This is beyond the scope.
THE COURT: Well, let me hear the question and then take up the objection.
MR. HUGHES: Okay.

BY MR. HUGHES:
Q You heard his testimony that the reason that you wanted him to get the transcript of the sentencing was because you wanted to find out what it is that you had said.
A Yes, sir.
Q Is that true?
A No, sir. I -- I -- I wrote it. I wrote it the next -- I wrote it that night and gave it to him the next couple of days. I know -- I know what I said.
Q Do you have -- go ahead.
A With no disrespect to Mr. Singh, Mr. Singh, he -- I'm not going to say that. Go ahead.
Q Do you have any -- any type of memory problems or any type of dementia that would prevent you from remembering what you said at your federal sentencing two days later?
A No, sir.
Q Okay. And as far as the transcript is concerned, what was your understanding of why the transcript was being ordered?
A I -- I thought the transcript was being ordered to prep for the appeal. I didn't really know the process. But when my wife told me that she gave -- that he said he --
MS. NAMMAR: Objection. Hearsay.
THE WITNESS: Okay, I'll leave my wife out.
THE COURT: Just tell us your understanding. I think that --

THE WITNESS: My understanding was, you -- you need to -- he needed the money, he ordered the transcript, and when I met him he said he had 14 days to appeal. He -- and he was getting things straight with my wife with the transcripts. I just figured it was all part of the process.

BY MR. HUGHES:

Q Okay. Did it have anything to do with jogging your memory as to what you had said two days earlier at your sentencing?

A It doesn't even line up like that. I mean I -- I had already written it out. I mean it's -- it doesn't even -- something -- that's not even -- it doesn't flow like that.

Q And you heard his testimony that the -- he did testify that he received the Rolex from your wife?

A Yes. Yes, sir.

Q You heard his testimony that that was a gift?

A Yes.

MS. NAMMAR: Objection, Your Honor. This is beyond the scope. Mr. Singh testified --

THE COURT: I think you can ask the question without going into what Mr. Singh said.

MR. HUGHES: Okay.

BY MR. HUGHES:

Q Is it true that that was a gift?

A No, sir. Mr. Singh knows the truth on the -- on the Rolex. He knows that we made a deal.

Q Okay.
A I think that's why he got stuck in the beginning on 12-and-a-half when you asked how much time because the subconscious usually overrides the conscience when it's something that's on your mind.
Q Okay. Do you have any personal animosity towards Mr. Singh?
A I think Mr. Singh is a fine man. I think he's a good guy. I don't understand why he said we didn't speak about the appeal, but it's another -- that's another --
Q Do you know why he didn't file a Notice of Appeal?
A I have -- I have my -- an idea.
Q And what's that?
A He said it sitting up here, he said he never -- he has never done one. So I just assume -- he said he passes it off to somebody else. So I just assumed that that's what happened because I'm sure he didn't just drop the ball on the -- I think it's just because he didn't have that knowledge.
Q Okay.

MR. HUGHES: I'll pass the witness, Your Honor.

THE COURT: Anything else?

MS. NAMMAR: Just briefly.

RECROSS-EXAMINATION

BY MS. NAMMAR:
Q Mr. Jeter, you apparently misheard Mr. Singh. He never

said he's never filed a Notice of Appeal. Mr. Singh testified that he does not do appeals in criminal cases, meaning he doesn't write the appeal and argue the appeal. Do you understand that?
A I understand that.
Q But he did testify that he had filed many notices of appeal. Do you recall that testimony?
A I recall that.
Q And do you recall that he testified that he had just recently filed three separate notices of appeal most recently?
A I would be interested in --
Q Mr. Jeter, I'm asking if you recall his testimony.
A I recall that.
Q All right. And you say you remember -- you remember everything, as you sit here today, that you said at your sentencing on May 13th, 2024?
A I can't say verbatim, but I can pick around and get certain things that were important to me that day.
Q Exactly. And why do you think a court reporter transcribes what's said at hearings such as this?
A Because they write it verbatim, as much as they can.
Q And then attorneys request those transcripts, correct?
A If you need them.
Q And rely on those transcripts in making arguments to the Court to refresh their memories, correct?

A If you need them.
Q Okay. You just said that you didn't speak about an appeal with Mr. Singh, but Mr. Singh testified that you did in fact speak with an appeal -- about an appeal. Do you recall that?
A I didn't say I didn't speak about it.

THE COURT: I think we're going far afield at this point, covering what we've already covered.

MS. NAMMAR: Okay. No further questions.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: All right. We sort of got disrupted in our flow of evidence.

MR. HUGHES: Sure.

THE COURT: I think it's back to you at this point, Mr. Hughes.

MR. HUGHES: Yes, Your Honor. We have no other witnesses, and with that we would rest.

THE COURT: Okay. So let me turn to the government then.

MS. NAMMAR: No further witnesses, Your Honor.

THE COURT: All right. So I will hear argument then. Let Mr. Jeter get settled.

MR. HUGHES: Sure. Your Honor, as we discussed --

THE COURT: And let me just say for the record, I've

spent some time looking at the law. I assume you folks have as well. And I assume everyone agrees that the leading case really is the *Roe versus Flores-Ortega* case from the Supreme Court.

MR. HUGHES: Yes.

THE COURT: But we also of course have *Flores-Ortega*, *Garza* and *Sandoval-Lopez* in the Ninth Circuit.

MR. HUGHES: Correct.

THE COURT: Everyone is familiar with those cases?

MR. HUGHES: Yes, Your Honor.

THE COURT: Okay. All right.

MR. HUGHES: Okay. Your Honor, as we discussed at the beginning of the hearing, there's really only one issue for you to decide and that is, did Mr. Jeter instruct Mr. Singh to file a Notice of Appeal on his behalf.

I believe the burden of proof on Mr. Jeter to prove that is by preponderance of the evidence. There's two cases out of the Ninth Circuit, *Silva versus Woodford*, 279 F.3d at 825, *McKenzie versus McCormick* at 27 F.3d 1415.

So the question is, has Mr. Jeter proven by a preponderance of the evidence that he asked Mr. Singh to file the Notice of Appeal.

Now, you mentioned the three cases that you cited in your September the 30th order, *Flores-Ortega*, *Sandoval-Lopez*, and *Garza versus Idaho*, those cases clearly state that even if

there's an appeal waiver, even if the lawyer thinks they're --

THE COURT: I get all of that.

MR. HUGHES: Okay. Okay.

THE COURT: I think I'm pretty familiar with the law. I don't think Mr. Singh really even disputed that, that even with a -- if there is such a thing as a totally ironclad appeal waiver provision.

MR. HUGHES: Correct.

THE COURT: Even if you could you can appeal, you can't even appeal constitutional claims or anything of any sort whatsoever.

MR. HUGHES: Correct.

THE COURT: You can't even appeal an illegal sentence, you know, even if a plea agreement waiver was enforceable that said that.

MR. HUGHES: Right.

THE COURT: If a defendant says appeal, you have to appeal, and prejudice is presumed if you don't do so.

MR. HUGHES: That's correct. That's correct. So the question is, what -- you have Mr. Jeter testifying that he did ask, I believe he testified he asked several times for Mr. Jeter *[sic]* to file a Notice of Appeal; Mr. Jeter *[sic]* saying of course that he did not ask him to do that. What corroboration do you have?

Well, you have Ms. Jeter testifying the conversation

out on the steps in front of the courthouse after the sentencing that he did in fact tell her that he was going to file a Notice of Appeal. My recollection of her testimony is that she asked, what can we do at this point? I don't think that's an unnatural question that someone would have at that point. In fact, I think it's highly believable she would be asking his attorney what can we do. Her testimony was that he told her that an appeal could be filed and that he would be doing so.

The ordering of the sentencing transcript I think is probably the most important corroborating evidence that -- to support Mr. Jeter's position that he did ask for the filing of the Notice of Appeal. I think it's very important to point out that these apology letters were prepared the day after the sentencing on May the 14th. That Mr. Singh did not have this conversation with Mr. Jeter about the sentencing transcript until May the 15th.

I'm not sure I understand --

THE COURT: What is the relevance of the transcript really? I mean you know how it works, right?

MR. HUGHES: Sure.

THE COURT: I mean I'm sure you've done it many times, Mr. Hughes. I don't want to put you on the spot obviously, right. But, I mean I know how the process works, which is within the 14-day window you file that one or two-page Notice

of Appeal.

MR. HUGHES: Correct.

THE COURT: You then get all sort of notifications, I guess for you it's from the Fifth Circuit generally. Is that right?

MR. HUGHES: That's correct. That's correct. Yes.

THE COURT: Here, of course, the Ninth Circuit, it tells you when you have to order transcripts and get them -- you know, gives you a whole timeline, right?

MR. HUGHES: Correct.

THE COURT: So it's not a prerequisite in any way.

MR. HUGHES: I would agree with that. I just think it corroborates, it indicates that activity was being undertaken to pursue the appellate process. I think that it's a more reliable version of the events that the transcript was being ordered to perfect the appeal as opposed to remind Mr. Jeter as to what he said.

THE COURT: So you're just saying between those two options your view is --

MR. HUGHES: My view is that the more credible --

THE COURT: More credible of the two.

MR. HUGHES: -- interpretation is --

THE COURT: Neither one makes a whole lot of sense in my view, but the more credible of the two.

MR. HUGHES: That's correct.

THE COURT: Okay. All right.

MR. HUGHES: That's correct. And we would simply submit that as a result of that, given the facts, which you've heard about the transcript, Ms. Jeter's corroborating evidence, that Mr. Jeter has met his burden of proving by a preponderance of the evidence that he did request that Mr. Singh file a Notice of Appeal.

And, Your Honor, pursuant to *Sandoval-Lopez*, if you make that finding, we would ask you to vacate the original judgment, re-enter it, and so that his appellate timeline will begin to run again.

THE COURT: Okay.

MR. HUGHES: Thank you, Your Honor.

THE COURT: Thank you, Mr. Hughes.

MS. NAMMAR: Your Honor, the government would submit that Mr. Jeter has not met his burden. This Court has now held the evidentiary hearing in this case and I submit that Mr. Jeter was lying on the stand. Lied in his petition and lied again here on the stand today when he says that he asked Mr. Singh to file a Notice of Appeal. As he testified, he will do anything to get his sentence reduced.

I further submit that Mr. Singh's testimony was credible. He was telling the truth. And when he said that Jeter never asked him to file a Notice of Appeal and never expressed a desire to appeal, that that was truthful.

Mr. Singh has been practicing law in this district for 30 years. He's represented many, many criminal defendants. He's represented many difficult criminal defendants. He understands the plea agreements here in this district between the U.S. Attorney's Office and defendants. He understands the appellate waiver provision in that plea agreement. He did everything he was asked to by Andrea Jeter in the text messages, as we see in Exhibit 25. And not once did she mention anything about an appeal, anything that's transcript related to an appeal until that November 2nd text message.

Her response after Mr. Singh said there was no appeal filed I would submit is not one of devastation and shock. No follow-up came after that. Her response was simply, okay, I'll tell him.

She nor Mr. Jeter ever came back and asked Mr. Singh why he didn't file a Notice of Appeal, was there anything they could do at this point. There was no further discussion.

Mr. Singh has no skin in this game. As he testified, it's a one to two-page filing. He would have withdrawn. He would have filed that notice and withdrawn. He's not an appellate attorney. I think Your Honor knows and can take judicial notice of that, that Mr. Singh does not file appeals. He consistently withdraws. He's filed notices of appeal.

THE COURT: I can't take judicial notice of that because I don't know it, but it's what he testified to. I

don't think Mr. Hughes is necessarily challenging that.

MR. HUGHES: Right.

MS. NAMMAR: Yeah. And so this isn't a situation where someone may be feeling like, oh, I don't want to do the work, I don't want to write the appeal, I don't want to argue the appeal before the Ninth Circuit, because he doesn't do that.

Additionally, these are claims of ineffective assistance of counsel. As you know and as defense counsel knows, when those claims are raised, it's usually not that attorney that's arguing the appeal or writing the appeal. The new counsel usually steps in because that's a conflict.

THE COURT: Well, I think what he wanted to appeal was my sentence was unreasonable. I mean I think that's Mr. Jeter's view, respecting the office of the court and what we do but nonetheless disagreeing with my decision in this case. I think that's what -- that would run up against the appeal waiver, of course, but I think that's what he was looking at.

MS. NAMMAR: So I think his ineffective assistance claim is foreclosed by *Flores-Ortega*. I think Mr. -- as I said, Ms. Jeter, I think her testimony was not credible. I think she would do whatever she could to get his sentence reduced. She took the Fifth on questions that didn't even call for the Fifth. The fact that I asked whether Mr. Jeter

supported her children -- his children financially, that's a simple question, she took the Fifth on that. And I would submit it's because she's concerned that maybe the support was coming from drug trafficking money. So I think Your Honor could draw an adverse inference from that and I think she was not credible.

As I said, same thing with Mr. Jeter. The apology letters, you know, defense counsel points out that these apology letters were prepared on the 14th. Mr. Singh, I think, clearly testified that he discussed on May 13th, 2024, after Your Honor left the bench, with Mr. Jeter his behavior toward the Court immediately after sentencing. That he was shocked by it. Mr. Breiner did as well. And so Mr. Jeter was on notice about that, right? He already knew. So it doesn't seem odd that he then went back and wrote these apology letters, and then Mr. Singh and Mr. Breiner discussed those apology letters -- I'm sorry, Mr. Singh and Mr. Jeter, and Mr. Jeter agreed to file those letters. And it makes sense that he could still request a transcript. And that's when Mr. Singh testified that they discussed requesting that transcript was at that May 15th session at FDC following his sentencing.

As Your Honor knows, we all remember about what happens in these proceedings, but we order transcripts all the time to determine exactly what was said or refresh our memory on something like that. So, for Mr. Jeter to realize, as he

testified today, that that's out of character for him, he feels bad, he respects Your Honor, he respects the job that you do. And so to ask Mr. Singh, you know, I'd really just kind of like to reread that, it was an emotional day for him. He doesn't remember everything that's going on. He testified he was dizzy. If Your Honor recalls, he interrupted you a lot during his sentencing hearing. He had to request that you repeat things that he decided he wanted to hear and then asked you not to discuss other things.

So I don't think getting a transcript in that order is out of the ordinary.

There are no grounds for appeal because Mr. Jeter was sentenced well below the guideline range. As Your Honor knows, his guideline range was 324, I believe, to 405. With the government's 5K, our recommendation was that that drop, and Your Honor sentenced him within that guideline range that the government recommended.

So there were no grounds for appeal. He had obtained the benefit of his favorable plea bargain, he pled to three counts. No rational defendant in this case would want to appeal or see that there are grounds to appeal. So even if Mr. Singh and Mr. Jeter had consulted about the possibility of an appeal, which Mr. Singh testified that they had, it would not be deficient performance.

The record establishes that prior to the time Jeter

claims he told his lawyer to appeal the following occurred: Jeter and his lawyers, Mr. Breiner and Mr. Singh, had consulted about whether Jeter should waive his right to appeal in order to get a plea deal. Jeter had, with full understanding, agreed in writing to waive his right to appeal. The district judge had explained to Jeter, Your Honor, that he had waived his right to appeal, but if there were limited grounds that he could do so, he felt he had a reason to, he could within that 14-day time period. Jeter had orally reiterated his choice to waive his right in open court. And then moreover in his habeas petition -- neither in his habeas petition nor at this hearing or anywhere else has he identified any nonfrivolous grounds for which he could appeal.

Jeter does not tell us in his petition or at this hearing what he might have appealed. I think generally maybe just his sentence, I guess. And he waited an entire year to file his petition claiming that he wanted to appeal.

Those are factors that are set forth in *U.S. v. Sandoval* and *Flores-Ortega*. And I would submit, Your Honor, that Mr. Jeter never did ask Mr. Singh to file a Notice of Appeal. And if he would have, Mr. Singh would have gladly filed one.

THE COURT: All right. Thank you.

Rebuttal?

MR. HUGHES: Briefly, Your Honor.

THE COURT: It is your burden, as you say, by a preponderance. I'll give you a rebuttal.

MR. HUGHES: Yes, Your Honor. As you know, and I believe it is -- I believe it's the *Garza* case that he's not required to identify meritorious arguments that he might have been able to urge. The only question is, I know I sound like a broken record, did he ask his attorney to file a Notice of Appeal. Doesn't have to demonstrate grounds, so, I think the case law is clear on that.

THE COURT: All right. Thank you.

MR. HUGHES: Thank you.

THE COURT: All right. Well, I'm going to go ahead and rule from the bench. This is all very fresh in my mind.

So, the defendant entered into a plea agreement with the government. The plea agreement is signed and dated March 31st of 2023. And he pled guilty to three counts in return for the dismissal of others, and as part of that, he did agree to cooperate with the government. We've talked about that a bit. And there is an appeal waiver provision in the plea agreement.

The plea agreement is Document 89. And the appeal waiver provision is on Pages 16 and 17.

And by the way, I not only consider the exhibits, obviously I also take judicial notice of things like the plea agreement, the transcript from the change of plea hearing and

the sentencing and so forth that are in the record. I assume there's no objection to that by either counsel.

MR. HUGHES: No, Your Honor.

MS. NAMMAR: No, Your Honor.

THE COURT: So the PSR calculated a total offense level 41, criminal history category one, for a guideline range of 324 to 405 months.

Now, Count 8 also carried a five-year mandatory minimum, that is the 924(c) count, that had to be consecutive to the sentence imposed on Counts 1 and 10.

Just so the record is clear, Count 10 had a statutory max of 20 years, and the Court imposed a total sentence of 240 months; that is, 180 months as to the drug counts and 60 months as to the 924(c) to run consecutive.

Now, I remember this sentencing well, and let me say why. Because not only did you talk for longer than most, Mr. Jeter, which I did not hold against you nor would I do that, but I remember our discussion. And I remember the emotion and the depth of feeling you had about trying to bring justice to what had happened to you years earlier. I remember telling you you were too fixated on that. Remember that?

THE DEFENDANT: I remember it.

THE COURT: You know, that was part of the problem.

THE DEFENDANT: Wasn't fixated, you said I was obsessed.

THE COURT: Okay. Maybe I used the word "obsessed," okay. And I think I said very, very, a number of veries.

THE DEFENDANT: A couple of veries in there.

THE COURT: Right. Right. And I don't know, you know, whether you agreed with me or disagreed with me on that, but that's what sort of jogs my memory specifically as to your sentencing, and I remember you being very upset after I imposed sentence.

THE DEFENDANT: I've been working on that.

THE COURT: That you, as I recall -- excuse me -- you asked to leave the courtroom, and I said no, you can't. And I do recall that you asked me to repeat the appellate rights you had at the conclusion of the sentencing hearing.

But I also remember how articulate you are, how clearly smart you are. There's just no question in my mind, I mean, you know, you stand out for that. Oftentimes people, most times people come into court aren't necessarily as smart as you are, as able as you are, as thoughtful as you are. I'm not saying you don't have issues.

THE DEFENDANT: Got issues.

THE COURT: You know, I'm not saying that. But what I'm saying is, because obviously your issues got you here, right?

THE DEFENDANT: Yes, sir.

THE COURT: But what I'm saying is that despite that,

you know, you have an ability to articulate, to think, and that was shown, I think, during the sentencing and here today.

Now some law. Let me go over some law first and then I'll get into the facts, okay.

So the Sixth Amendment guarantees the right to effective assistance of counsel at all critical stages of a criminal proceeding, including sentencing.

Now, there are two prongs to the *Strickland* test to prevail on a claim of ineffective assistance of counsel. Mr. Jeter must show two things. First, that counsel's representation fell below an objective standard of reasonableness. And two, there's a reasonable probability that but for the unprofessional errors, the result of the proceeding would have been different.

Now, in this context prejudice is sort of presumed. It's built in. So, that part of the *Strickland* test really isn't at issue here.

MR. HUGHES: Right.

THE COURT: It's really the first prong that we look at in this case.

And it's clear under the law that we've discussed here today that the Sixth Amendment is violated if counsel fails to file a Notice of Appeal when instructed to do so by counsel. And sometimes not even directly told to do so. And I'll get into that in a minute what the law is.

So, *Flores-Ortega* says that: The court has long held that a lawyer who disregards specific instructions from a defendant to file a Notice of Appeal acts in a manner that is professionally unreasonable. That it's not a strategic decision to file it or not, right, where counsel may or may not be able to do something based on a strategy and that can't be second-guessed. It's a ministerial task, the court has said, and the failure to file reflects inattention to the defendant's wishes. And as I said, the presumption of prejudice applies even if a defendant has waived a right to appeal. And that's the *Garza* case.

Now, *Flores-Ortega* really flushed out more than other cases the standard that applies. And the court said: In those cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question whether counsel has performed efficiently by not filing is best answered by first asking a separate question, and that is whether counsel in fact consulted with the defendant about an appeal. And the court defined "consult" to convey a specific meaning about explaining the advantages and disadvantages of the appeal and making reasonable efforts to discover the wishes.

And then if counsel has consulted, the question is over essentially. That there's no deficient performance.

But if counsel has not consulted, then there's a

second subsidiary question, the court said. Whether the counsel's failure to consult with the defendant itself constitutes deficient performance. And in that case, that is the *Flores-Ortega* case, the court said that question lies at the heart of this case, under what circumstances does counsel have an obligation to consult with the defendant about an appeal.

And then the court went on to talk about that test and said: Counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either, one, that a rational defendant would want to appeal, for example, because there are nonfrivolous grounds for appeal; or two, that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.

And you look at all the information known at the time, an important factor is whether there was a conviction following trial or a guilty plea. And whether the defendant received the sentence bargained for as part of the plea or waived the rights to appeal. So you have to look at all of the relevant factors in making that determination.

And then I won't go into *Sandoval-Lopez*. You know, I've read this many times over the years on different cases I've had, and I'm not sure it's totally consistent with *Flores-Ortega*, but it is Ninth Circuit law. So it is what it is. I'm just going to leave it there. But it does seem to me

to go a step further in the Supreme Court, but I don't think I'm relying on that in where I need to get.

So, what we have before us is, I think, as both counsel recognized really, at least to start with, a credibility question in the difference in the testimony, primarily between Mr. Jeter and Mr. Singh, but also with Mrs. Jeter testifying as a corroborating witness, and then the exhibits that we have as well. So looking at the totality of all that. So there is a credibility determination that I must make.

Now, let me start with defendant's testimony and go through some of the highlights, if you will, of the testimony.

He said that there was a deal with Mr. Singh that if he received a sentence of ten to 13 years, that he would get a Rolex. That after I imposed the sentence of 240 months, Mr. Singh allegedly said, you're in, meaning you're in on able to appeal and presumably prevail on an appeal. That Mr. Jeter testified that in clear terms he told Mr. Singh that he wanted to appeal on May 15th at FDC during that meeting. Mr. Singh had said he could appeal the 924(c) count, the role in the offense adjustment, what I think has been referred to as the leadership adjustment, the prosecutorial misconduct and entrapment.

But much of this testimony makes little sense even before I evaluate Mr. Singh's testimony. For example, the plea

agreement clearly limits the defendant's right to appeal. Putting aside the right to bring an ineffective assistance of counsel claim, which is also waived, as far as his right to appeal, the plea agreement is very clear that he only can appeal if I were to impose a sentence above the guideline range as determined by me at the time of sentencing. And here, of course, that guideline range was four -- I'm sorry, 324 to 405. So even if you look at the 240, if you don't look at the 180 separately from the 240, even if you combine the two, it's still well below the guideline range.

So, you know, and again, Mr. Jeter is a smart man. I think what he was saying on the stand was, well, I heard all of that, I understood what was there, but my attorneys were telling me something different. But Mr. Jeter is smart enough to understand what the Court says is what controls. I think everyone understands that. That's not a hard concept to follow.

And this was set forth by the Assistant United States Attorney, it was Craig Nolan at the time at the change of plea hearing where he set forth the appeal waiver provision, and Mr. Jeter said he understood those terms. And the Court then, that is Judge Porter covered that as well, and Mr. Jeter understood those terms. And this under oath statement at the time of the change of plea is given significant weight.

Also, the, quote, you're in comment that Mr. Singh

allegedly made makes no sense under any scenario to me. I just can't understand a scenario in which any attorney would say "you're in" based on a claim that I imposed a sentence that is below the recommendation of the government, therefore you're in. You have heightened chance to prevail, whatever that means, on appeal. There's simply no rational reason for any attorney to say something of that sort. And I just don't find the statement today by Mr. Jeter that that was said to be credible.

Now, in a very contrary sense, Mr. Singh testified that he never promised what sentence would be imposed. That he told Mr. Jeter clearly that that was my decision, the Court's decision. That he never promised a sentence of ten to 13 years or any specific timeframe. That there was no deal regarding the watch, that instead that was a gift. And on May 15th, that the two discussed the apology letter. I believe that's Exhibit -- what exhibit number is that?

MS. NAMMAR: 22.

THE COURT: 22?

MR. HUGHES: Yup.

THE COURT: The apology letters, I should say, one to me and one to Ms. Nammar. And that he also explained that because I had entered judgment the day before on May 14th, that the defendant had 14 days from then, presumably to May 28th, to file a Notice of Appeal, and that Mr. Jeter expressed no desire

to appeal. That there was comment about his family, not wanting his family involved and that he would accept his sentence, wanting to move on.

So, Mr. Singh testified quite differently than Mr. Jeter. That defendant never told him to file a Notice of Appeal, explicitly or otherwise, and in fact strongly implied if not saying, you know, outright that he did not want to file a Notice of Appeal, and I find Mr. Singh's testimony on this matter to be credible based on his demeanor and memory. That is, I do find that the testimony Mr. Singh gave as to the May 15th discussion and the lack of any further discussion to be accurate.

Now, under the case law, it appears to me that the defendant made it clear to Mr. Singh that he was not interested in appealing and that really ends the inquiry. But even if he didn't say so, even if there's some level of uncertainty as to that conversation, meaning there was not an explicit affirmative statement I don't want to appeal, but just a statement along the lines of I want to move on, although to me that's pretty clear what that means, but even if there's some question there, I then ask if Mr. Singh consulted with the defendant. And I think the answer to that is he did so. And even if he did not consult, then the question becomes, did he have an obligation to do so. And here he would have an obligation to do so if a rational defendant would want to

appeal or the defendant reasonably demonstrated to counsel that he wanted to appeal. And again, the answer to both of those is no.

First, a rational defendant would not want to appeal. You know, a defendant who knowingly and voluntarily pleads guilty and waives his right to appeal, except for a limited circumstance that is not present, got the benefit of the bargain, had counts dismissed, the government agreed not to file an 851 information, and the defendant was cooperating, given all of that, a rational defendant would not want to appeal.

And the record demonstrates that the defendant did not reasonably demonstrate in any way that he did want to appeal. In fact, the opposite is true. Based on all the information known to Mr. Singh that the defendant had pled guilty, that there was an appeal waiver, that he got well below the guideline sentence, and that he said he wanted to get this behind him, and he did get a benefit of the plea bargain, I just don't believe that is satisfied.

Now, let me talk about the transcript, because I understand that is a piece of evidence that's been talked about a great deal here. And I certainly understand the different testimony as to why the transcript was ordered in the first instance. According to Mr. Jeter's side, it's because he was going to appeal. And Mrs. Jeter testified as to the

conversation that she allegedly had outside of the courthouse after the sentencing where she allegedly said, is that it, and Mr. Singh said that he can appeal. And that there was then a decision to get the transcript. And according to her, Mr. Singh said that he was going to appeal and he needed the sentencing transcript.

Again, that makes no sense to me because he didn't need the sentencing transcript. He needed to do a one-page or two-page Notice of Appeal. That's all it is. Later the transcript would certainly have to be ordered and Mr. Singh himself said there's no urgency. But regardless of that, it's clear that it was not necessary to order that transcript at that point in time.

And I also suspect that if there was an appeal, more than that transcript would have been ordered. There would be other transcripts that would be ordered as well. But regardless of that, I just don't find Ms. Jeter's testimony in this regard to be credible. You know, it's hard not to like Mrs. Jeter. She's a very likable person. I don't think she was, you know, trying to necessarily lie to the Court, but she clearly was distraught at the time and she clearly doesn't understand court procedure or how any of this process works. And so all I can say is I don't think the conversation she says that happened, happened the way she said it did.

Maybe they did talk about an appeal and Mr. Singh did

say, I can appeal. I don't know. But it's not her decision of course. Mr. Jeter, it was your decision as to whether to bring an appeal or not.

And the testimony by Mr. Singh that the transcript was ordered based on a request by Mr. Jeter during the May 15th meeting, I understand the argument that he had already drafted and provided the apology letters to Mr. Singh to be provided through filing to myself and Ms. Nammar. And I understand that explanation sounds strange, that Mr. Jeter, you know, wanted it to review to understand or recall better what he said. But as between the two odd explanations that are before me, that's the one that sits most comfortably with me.

So I don't find that the transcript was ordered because there was an effort to undertake an appeal and discussions about that, but instead Mr. Jeter, I think, the more credible explanation is that he was upset with himself at what was said at sentencing. He let himself down in some ways through what we've been calling an outburst. I don't want to overstate it. I mean it wasn't as if he was, you know, coming at me or anything. I mean I don't want to make it sound like it was more than it was. But he himself admitted he was sort of dizzy, not thinking clearly at that point in time, and I could see somebody saying, you know, let me get a transcript, see what was said, somebody who is as thoughtful as Mr. Jeter is.

So, you know, the other issue, I think, that may be outstanding, I just want to make sure that I understand some of the argument.

I don't think, but I want to make sure, Mr. Hughes, are you suggesting through your questioning that Mr. Singh had a duty to file a Notice of Appeal on November 2nd or after? Is that part of your argument? And if so, what supports that?

MR. HUGHES: I'm not suggesting, Your Honor, that he had a duty -- is this okay to stand?

THE COURT: Sure.

MR. HUGHES: I'm not suggesting he had a duty, but simply pointing out that in his testimony he stated that even if he had been asked after the 14 days had run he would have filed a Notice of Appeal. I felt it was important to --

THE COURT: Okay. But you're not arguing it was deficient performance because he didn't do it on November 3rd or 4th.

MR. HUGHES: I don't think that's deficient because obviously the time --

THE COURT: Right. Okay. I just wanted to make sure that was -- I was not misunderstanding your argument.

MR. HUGHES: Correct.

THE COURT: Because it's pretty clear to me he could not be deficient for failing to file a Notice of Appeal -- in other words, take a hypothetical where an attorney does blow

the deadline.

MR. HUGHES: Yup.

THE COURT: Right? And then the client says, well, file it a week later, late, and the attorney says, well, it's too late. You know, the deficient performance is the 14-day period, not the 21-day period.

MR. HUGHES: Right. I think it's more along the lines of trying to impeach his testimony that I would have done it, and under those circumstances, well, why didn't you do it in this case.

THE COURT: All right. Okay.

MR. HUGHES: Right.

THE COURT: And I'm not saying that Mr. Jeter didn't eventually come to a decision that he wished he appealed or could appeal. Obviously that's the case. But that's not the question before me. You know, the question is what happened in that period when Mr. Jeter and Mr. Singh were having conversations during this period, and in particular on May 15th where both of them really honed in on that date.

I also found it interesting, you know, Mr. Jeter sort of chuckled when he said, you know, like, there's no indication that I'd give up fighting. You know, of course I would have wanted to. But of course entering a plea agreement in a lot of ways is giving up the fight. And that's part of the problem in this case, is that you did do that and you waived your right to

appeal. That doesn't mean that if you told Mr. Singh to appeal, he had to. There's no question about that. I'm not questioning that. But it does raise concerns about some other testimony that you provided that I think is inconsistent with your understanding as to what you did waive.

And I also want to say for the record, I think I mentioned this, although I find much of what Ms. Jeter said not credible, I -- I don't think this was intentional on her part. Like I said, I find her to be a very nice person, intelligent, capable, but she clearly was distraught and doesn't understand the legal process.

And last, I'm not drawing any inferences from her taking the Fifth. I also want to say that. It is what it is and I'm just leaving it at that.

And, Ms. Nammar, you suggested I do that, and I just want to say for the record I'm not doing that.

All right. Is there anything else then that we need to take up?

MS. NAMMAR: Nothing further from the government. Thank you, Your Honor.

MR. HUGHES: I don't believe so, Your Honor.

THE COURT: I mean I do have to make a decision on the certificate of appealability. Given my credibility determination, I'm inclined not to grant one, but I'm happy to hear from you, Mr. Hughes, if you want to put something on the

record in that regard.

MR. HUGHES: Right. Your Honor, obviously we would request a certificate of appealability as to all grounds that have been denied.

THE COURT: Well, I already denied it on the --

MR. HUGHES: Well, that's true. That's correct. Obviously we would request one on this, the ground that you've now denied that you --

THE COURT: But if I find the credibility, right, once that finding is there, how can reasonable jurors disagree, I guess, is my question.

MR. HUGHES: Well, I was going to argue that I think reasonable jurors could disagree, but you obviously have to make the credibility determination.

THE COURT: All right. Okay.

MR. HUGHES: Just I'm glad you gave me an opportunity to state on the record we would like for you to --

THE COURT: I appreciate that.

Okay. Ms. Nammar, anything from you?

MS. NAMMAR: No, Your Honor.

THE COURT: Okay. All right. Thank you all very much.

(The proceedings concluded at 2:10 p.m., December 3, 2025.)

COURT REPORTER'S CERTIFICATE

I, CYNTHIA FAZIO, Official Court Reporter, United States District Court, District of Hawaii, do hereby certify that pursuant to 28 U.S.C. §753 the foregoing pages is a complete, true, and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

DATED at Honolulu, Hawaii, March 12, 2026.

*/s/ Cynthia Fazio*
CYNTHIA FAZIO, RMR, CRR, CRC